

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

RMT/DMP:SK/MTK/AFM
F. #2016R02228

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 11, 2020

By ECF

The Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re:  United States v. Aleksandr Zhukov
      Criminal Docket No. 18-633 (EK)

Dear Judge Komitee:

  The government respectfully submits this letter in response to the defendant's "emergency application . . . [to be] released on bond or returned home to Europe," filed on April 9, 2020. ECF No. 96.

  The defendant is charged in a four-count superseding indictment with wire fraud conspiracy, wire fraud, money laundering conspiracy and money laundering, for perpetrating a multimillion-dollar scheme to defraud U.S. businesses in the online digital advertising industry. See Superseding Indictment, ECF No. 81; Complaint, ECF No. 1.

  The defendant was arrested in Varna, Bulgaria, on November 6, 2018, detained pending extradition, and extradited to the United States on January 18, 2019. At his arraignment, the Honorable Roanne L. Mann entered a permanent order of detention pending trial, finding that no condition or combination of conditions of release could reasonably assure the appearance of the defendant in court. See ECF No. 24.[1]

  The defendant's motion offers no new facts to alter the finding that he presents a risk of flight, and no law to support the drastic measure of dismissing the indictment and returning him to Europe. The defendant's motion should therefore be denied.

---

[1] Immigration and Customs Enforcement has also lodged a detainer.

I.      Background

On December 20, 2016, researchers at a private cybersecurity firm based in New York, New York, published a white paper titled "The Methbot Operation," revealing the operation of an online digital advertising fraud scheme. In the white paper, the cybersecurity firm revealed the Internet Protocol ("IP") addresses of computers used to carry out the fraud (the "Malicious IPs"). The cybersecurity firm explained that, based on its monitoring of network traffic related to advertisement impressions on behalf of various advertising clients, it had observed computers associated with the Malicious IPs transmitting false data to create the impression that a real human internet user was viewing an advertisement on a real internet webpage, when in fact a computer that was not controlled by any individual human (sometimes referred to as a "bot") was loading the advertisement on a fake webpage. The cybersecurity firm further explained that the Malicious IPs were associated with false registration data in publicly available IP registration databases.

The Federal Bureau of Investigation (the "FBI") began investigating the Malicious IPs and the scheme associated with them (the "Methbot scheme"). The investigation revealed that the defendant controlled the Malicious IPs. Specifically, the defendant leased the Malicious IPs from various IP address leasing companies and assigned those IPs to thousands of datacenter computer servers that he also controlled, and that were located in commercial datacenters in the United States and elsewhere. The defendant and his co-conspirators created false registration data for the Malicious IPs, making it appear that the Malicious IPs were associated with residential computers across the United States instead of datacenter computer servers in commercial datacenters.

The defendant and his co-conspirators then programmed the datacenter computer servers to simulate the internet activity of real human internet users, directing the servers to operate an automated browser, click on online advertisements a randomly determined number of times, simulate a mouse moving around and scrolling down a webpage, control and monitor video playback, falsely appear to be signed into popular social media services like Facebook, and circumvent fraud detection software deployed by certain U.S. cybersecurity firms. In this way, the defendant and his co-conspirators created "fraudulent ad traffic"—employing the datacenter computer servers to load fabricated webpages, offer up advertising space on fabricated webpages for bidding, load advertisements on the fabricated webpages through an automated computer program, and reap the resulting revenue. The defendant and his co-conspirators monitored the activity of the datacenter computer servers using an online control panel at a specific domain (centbycent.com); an email account associated with the domain sent regular emails to the defendant and his co-conspirators reporting on the performance of the thousands of datacenter computer servers employed in the scheme and the millions of fraudulent advertising impressions they created.

The defendant funneled his fraudulent ad traffic to others in the online digital advertising industry under the cover of his ad network Media Methane. The defendant

2

represented that Media Methane delivered advertisements to real human internet users accessing real internet webpages, when in fact it merely delivered advertisements to the defendant's datacenter computer servers.  Hundreds of brands and ad agencies around the world, including many in the United States, collectively paid more than $7 million in advertising fees for fraudulent ad traffic, and the defendant made millions of dollars from the scheme.  The defendant moved the resulting proceeds through multiple corporate bank accounts located around the world and re-invested some of the proceeds to perpetuate the fraud.

On November 6, 2018, the defendant was arrested by Bulgarian law enforcement authorities in Varna, Bulgaria, pursuant to a U.S. provisional arrest warrant.  Following the defendant's arrest, the defendant waived his Miranda rights and agreed to speak with FBI agents.  During his post-arrest interview, the defendant confessed that he founded Media Methane, that he knew that he was in trouble following the release of the December 2016 white paper revealing the Methbot scheme because "everything was in [his] name," including the servers, IP addresses, and contracts with other ad networks associated with the scheme, and that the white paper had exaggerated the true amount of proceeds that he obtained from the scheme.  The defendant also admitted that he controlled and used various email addresses associated with the scheme, employed and paid various co-conspirators who participated in the scheme, purchased over 1,000 servers and over 50,000 IP addresses in connection with the scheme, registered hundreds of thousands of IP addresses in the names of specific internet service providers as part of the scheme, and sold "bot" traffic to other advertising networks in the online digital advertising industry.

II.  The Defendant Remains a Flight Risk

   A.  Legal Standard

In the pre-trial context, the government bears the burden of showing that the defendant should be detained, either by showing a preponderance of the evidence that the defendant is a flight risk or clear and convincing evidence that the defendant is a danger to the community.  United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).  In determining whether a defendant poses a risk of flight or a danger to the community, courts are required to consider four factors:  (1) "the nature and circumstances of the offense charged; (2) the "weight of the evidence against" the defendant; (3) the "history and characteristics" of the defendant; and (4) "the nature and seriousness of the danger . . . posed by the defendant's release."  18 U.S.C. § 3142(g).

   B.  Argument

The defendant's lack of any ties to the United States and his strong ties to immediate family in Eastern Europe establish that the defendant would pose a clear risk of flight if released.  The overwhelming evidence of the defendant's guilt and the likelihood that he will serve a substantial sentence give him every reason to flee.  Thus, as set forth

3

below, each factor under section 3142(g) favors detention, and the defendant's proposed conditions of release are inadequate to ensure the defendant's appearance.

1. The Nature and Circumstances of the Offense

The defendant faces serious charges and the prospect of a significant prison term. Three of the four counts in the superseding indictment carry a statutory maximum sentence of 20 years' imprisonment, and the fourth count carries a statutory maximum sentence of 10 years' imprisonment, amounting to a cumulative statutory maximum sentence of 70 years' imprisonment. See 18 U.S.C. §§ 1343, 1349, 1956(h), 1957. If convicted at trial, the defendant faces an advisory Guidelines range of 210-262 months' imprisonment.[2] The prospect of incarceration provides the defendant with a motive to flee. See United States v. Salkicevic, No. 15-CR-0060, 2015 WL 525556, at *3 (N.D. Ill. Feb. 10, 2015) (defendant posed a risk of flight because possibility of significant prison term provides "every motive to flee and far less to stay").

2. The Weight of the Evidence

The weight of the evidence against the defendant is overwhelming. It includes, without limitation: (i) data from U.S. servers leased by the defendant showing that he used those servers to create fraudulent ad traffic; (ii) business records, emails, and online chats showing that the defendant was involved in the purchase, activation, and registration of servers, IP addresses, and domains used in the scheme; (iii) invoices and bank records showing that the defendant received and laundered proceeds of the scheme; (iv) and the defendant's own confession. The defendant cannot credibly claim that he was not involved in the Methbot scheme or that the scheme was not an illegal fraud. Indeed, the defendant admitted in online chats that the ad traffic he sold was "100% bots," "we have no real users," and "we came up with an idea for how to fool" and "figured out how to cheat" various U.S. companies in the online digital advertising industry. The defendant revealed his consciousness of wrongdoing in another online chat when a co-conspirator said, "let's switch to Jabber before they lock me up :))" and the defendant responded "OK."

The defendant argues that there is no image of him committing the crimes charged and that a similar ad fraud case in this district resulted in an acquittal. See ECF No. 96 at 1. The defendant is mistaken in both respects. Photographs from the defendant's online accounts show the defendant checking his online control panel, tabulating the

---

[2] This estimate is predicated on a loss amount exceeding $7 million, the involvement of ten or more victims, the sophistication of the scheme, its use of authentication features, and the defendant's role in leading the scheme and deleting evidence after the scheme was publicly revealed. The government previously provided the defendant with this Guidelines calculation in November 2019.

4

fraudulent ad traffic and revenue resulting from his scheme, see Complaint, ECF No. 1, ¶¶ 40-41; and, the case the defendant cites resulted in a conviction, which was subsequently upheld on appeal, United States v. Gasperini, No. 16-CR-441 (E.D.N.Y. Aug. 11, 2017), aff'd No. 17-2479 (2d Cir. July 2, 2018).

        3.       The History and Characteristics of the Defendant

The defendant has strong foreign ties that would facilitate flight. The defendant was born in Russia and resided in Russia and Bulgaria until the date of his arrest. He retains strong ties to both countries, including his wife in Russia and residences in both locations. In addition, four of his indicted co-conspirators, and several unindicted co-conspirators, remain at large in Russia. The defendant's family and friends have access to his homes and personal effects and could provide him with documents to assist with his travel.

The defendant also has access to funds overseas through family and friends as well as his own bank accounts, which he has placed in multiple countries in Europe, including Russia, Bulgaria, Latvia, Cyprus, and the Czech Republic. Indeed, given the defendant's use of overseas accounts, the government has been unable to seize, freeze or even obtain a full accounting of the defendant's likely substantial wealth.

The defendant also has the sophistication to make travel arrangements for himself. He knows and understands English, and is well-traveled. Based on travel records, the defendant took multiple international trips in the years prior to his arrest, including between Russia and Bulgaria as well as to France, Israel, Dubai, Thailand, and the Seychelles.

The defendant has no known ties to the United States and had never been to the United States prior to his extradition. He has no family, friends, or work tying him here. Indeed, prior to his arrest, the defendant made money through online fraud and cybercrime, which he can commit from anywhere in the world, and which is all the more concerning under the circumstances of the current pandemic, when the opportunities for, and incidences of, cybercrime have increased.[3]

The defendant's motion does not seriously address these issues. Accordingly, the defendant's history and characteristics weigh heavily in favor of detention.

---

[3] See, e.g., "COVID-19 Exploited by Malicious Cyber Actors," Cybersecurity and Infrastructure Security Agency, Department of Homeland Security, Alert AA20-099A, Apr. 8, 2020, available at https://www.us-cert.gov/ncas/alerts/aa20-099a.

####    4.   The Defendant's Proposed Conditions of Release Are Inadequate

Given the factors discussed above, no condition or combination of conditions of release can reasonably assure the defendant's appearance in court.  In any event, the defendant's proposed conditions of release are wholly inadequate.  He offers no bond, no property, and no sureties with moral suasion.  Moreover, he does not even identify where he would live in New York City, a place in which he has never lived and has no residence and no family.

Although the defendant offers to be subject to electronic monitoring, electronic monitoring is not a feasible alternative in this case as the defendant has no residence or telephone line in New York City to facilitate such monitoring.  Moreover, even under normal circumstances, such monitoring is neither a failsafe system nor sufficient, on its own, to assure this defendant's appearance.  See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology" and "monitoring equipment can be rendered inoperative").  In current circumstances, as this Court has noted, "the pandemic has complicated, to say the least, the Pretrial Services Department's efforts to monitor defendants on release." United States v. Jackson, No. 20-CR-046, ECF No. 16 at *5 (E.D.N.Y. Apr. 6, 2020).  The Department has "reported difficulties in conducting pre-assessments and home visits, particularly during the initial quarantine period following release, as well as difficulties installing electronic monitoring systems. . . . [T]he result is that Pretrial Services is essentially managing an 'honor system' throughout important aspects of the pretrial release process." Id.  In light of the defendant's ability and incentive to flee, the government submits that electronic monitoring would provide no assurance at all.

It is worth noting that the proposed circumstances of release offer no viable plan for how the defendant would live in New York City under current conditions that limit the ability to work and to obtain food, government assistance, medical treatment, medication, and other essential items.  The defendant's proposal either would put him in precarious circumstances or demonstrates that the defendant has no serious intention of remaining in New York City and facing the charges against him.

Accordingly, the Court should deny the defendant's motion for bail, which does nothing to address the defendant's risk of flight.

### III.   Release Is Not Warranted Under the "Compelling Reason" Clause

The defendant argues that his temporary release is warranted under 18 U.S.C. § 3142(i), which provides that a "judicial officer may, by subsequent order, permit the temporary release of [a] person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." See ECF No. 96 at 4.  Certain extreme medical circumstances may present "compelling reasons" that could warrant a highly circumscribed release.  But as Judge Garaufis recently noted in

rejecting a similar recent application, "[t]his provision has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." United States v. Hamilton, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (citations omitted).

The defendant's general concern with the current COVID-19 pandemic does not meet this standard. The BOP has developed national measures to mitigate the spread of COVID-19 within prisons. See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. These measures, which have been implemented at the MDC, include the following:

- Suspension of all social and legal visits: Social visits and legal visits have been suspended for 30 days, although confidential attorney calls are being provided. Inmates will be provided additional inmate telephone minutes each month.

- Inmate movement: All inmate facility transfers have been suspended for 30 days, with exceptions permitted for forensic studies or medical or mental health treatment.

- Screening and testing of inmates: All newly arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms. Inmates with exposure risk factors are quarantined. Any inmate currently in BOP custody exhibiting symptoms consistent with COVID-19 will be assessed by the institution's health services staff and placed in medical isolation. The remainder of the inmates in his or her unit will be quarantined to ensure that additional inmates do not develop symptoms. The inmate in medical isolation will be evaluated by medical staff at least twice per day, and the inmates on a medically quarantined unit will have their temperature checked twice per day. In addition, inmates will be tested for COVID-19 on a case-by-case basis in accordance with local health authority protocols.

- Modified Operations: The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

Moreover, based on a March 18, 2020 letter from the Metropolitan Correctional Center ("MCC") and MDC to the Honorable Colleen McMahon, Chief Judge for the United States District Court in the Southern District of New York, and an April 3, 2020 letter from the MCC and MDC to the Honorable Roslynn R. Mauskopf, Chief Judge for the United States District Court in the Eastern District of New York, the government is aware of the following additional measures that the MDC has taken in light of COVID-19:

- Cleaning supplies are issued once a week. They are available on each housing unit, and staff have been instructed regarding whom to contact should additional supplies be necessary.

- Staff are screening each staff member who enters the facility, including temperature scans.

- Inmate orderlies are cleaning the common areas of the institution, and every inmate has been reminded and instructed to continue to wipe down and sanitize their cells.

- Inmates have also been provided instruction via town halls regarding hygiene, and the same guidance is available on TRULINCS.

- Showers are available on a daily basis.

- Unit team staff are available on a daily basis for inmates to raise issues concerning food, shoes, and medical care.

Effective on April 1, 2020, the BOP implemented additional procedures to ensure the safety and wellbeing of inmates, including:

- For a 14-day period, inmates in every BOP institution will be secured in their assigned cells/quarters to decrease the spread of the virus.

- To the extent practicable, inmates will still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- The BOP, in conjunction with the United States Marshals Service, is working to significantly decrease incoming movement to all BOP facilities.

As these new measures demonstrate, the BOP is closely monitoring the status of the COVID-19 virus and is taking emergency steps to ensure the safety of its staff, inmates and the public. As a result, the virus's spread at MDC appears to have remained relatively limited. As of April 9, 2020, the MDC reported three confirmed cases among inmates based on eleven tests.

The defendant is 40 years old and is not listed by the BOP as being at high risk if infected with COVID-19 under CDC guidelines. Because the defendant is not uniquely situated with respect to the risk of infection of COVID-19, his circumstances do not overcome the significant flight risk he would pose if released. Indeed, this is the conclusion reached by a growing body of decisions in this district and the Southern District of New York rejecting applications for bail and continuing the detention of defendants housed in the MDC and MCC. See, e.g., United States v. Marte, No. 19-CR-795 (SHS), 2020 WL 1505565, at *1 (S.D.N.Y. Mar. 30, 2020) (denying bond for a "long time smoker" defendant who was an "alleged leader of [an] oxycodone conspiracy," noting that "the community in its entirety" is facing the pandemic); United States v. Scorcia, No. 19-CR-442 (ILG), ECF No. 254 (E.D.N.Y. Mar. 27, 2020) (ruling that court had already determined defendant was a

danger to the community and declining to release defendant based on COVID-19 pandemic for 54-year-old who cited poor health and claimed restrictions at MDC interfered with ability to prepare a defense); United States v. Bradley, No. 19-CR-632 (GBD), ECF No. 25 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC on controlled substances and firearm charges who had recently experienced a stroke and had high blood pressure); United States v. Rivera, No. 20-CR-6 (JSR) (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC on controlled substance charge who had a childhood history of asthma); United States v. Acosta, No. 19-CR-848 (NRB), ECF No. 14 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC that "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus"); United States v. Lipsky, No. 19-CR-203 (NGG) (E.D.N.Y. Mar. 24, 2020) (declining to release defendant, previously detained as a danger to the community, based on general risks of COVID-19 pandemic); United States v. Amato, No. 19-CR-442 (ILG), ECF No. 237 (E.D.N.Y. Mar. 20, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release 61-year old defendant with asthma based on COVID-19 pandemic); United States v. Hamilton, No. 19-CR-54 (NGG), 2020 WL 1323036, at *1-2 (E.D.N.Y. Mar. 20, 2020) (declining to release defendant charged with two counts of murder while engaged in narcotics trafficking who had sought release due to the COVID-19 pandemic based on defendant's "advanced age and medical conditions," finding that defendant had not "met his burden to rebut the presumption of danger to the community that attaches based on" the charged acts of violence).

The defendant's reliance on United States v. Stephens, No. 15-CR-095 (S.D.N.Y. Mar. 19, 2020) (Nathan, J.), is unavailing. Stephens was a violation of supervised release proceeding involving a defendant accused of possessing a firearm while on supervised release. The court released the previously detained defendant after finding that "the strength of the primary evidence relied upon by the Government to demonstrate the danger the Defendant poses to the community has been undermined by new information not available to either party at the time of [the prior detention] hearing." Id. at 1-2. Specifically, while the government had previously argued that the defendant had possessed a loaded firearm in proximity to drugs, new facts showed that the arresting officer had "identified a different individual as holding the bag that contained the firearm." Id. at 2. The court therefore found that this change in the strength of the evidence, combined with the defendant's lack of violent background and the danger the defendant's detention posed to other inmates in light of the potential spread of COVID-19, established that the defendant did not pose a danger to the community and could be released into the custody of an appropriate third-party custodian (namely, his mother). The circumstances in this case are not comparable to those in Stephens. There has been no decrease in the strength of the evidence—if anything, its strength has only increased since the defendant's arraignment in this case, as reflected by the additional discovery the government has produced and additional witnesses the government has secured—and the defendant does not propose any "appropriate person" into whose custody he could be released.

9

The defendant's reliance on United States v. Perez, No. 19-CR-297 (S.D.N.Y. Mar. 18, 2020) (Engelmayer, J.), is similarly inapposite. The Court's order in that case made clear, at the outset, that its decision "is based on the unique confluence of serious health issues and other risk factors facing this defendant, including but not limited to the defendant's serious progressive lung disease and other significant health issues"—which are not present here—and "which place him at a substantially heightened risk of dangerous complications should he contract COVID-19 as compared to most other individuals. Accordingly, this Order should not be construed as a determination by this Court that pretrial detention is unsafe or otherwise inappropriate as a general matter or in any other specific case."

IV.     Release Is Not Warranted Under the Sixth Amendment

The defendant also urges the Court to release him on bail because "the current conditions interfere with [his] Sixth Amendment right to counsel, as he has not been able to adequately consult with counsel or adequately review discovery since late February 2020, when MDC barred in-person attorney visits."  ECF No. 96 at 2.

MDC suspended legal visitation on March 13, 2020.  Thereafter, on March 26, 2020, the Court held a telephonic status conference in this case during which defense counsel was asked to confirm that he had sufficient access to the defendant to confer about defense motions in limine in advance of April 2, 2020.  Defense counsel confirmed that he did have sufficient access and stated that he would inform the Court within a day if the circumstances were otherwise.  Defense counsel did not follow up with any such claims.

Moreover, effective April 13, 2020, the BOP is implementing additional procedures to ensure attorney access to inmates by telephone and videoconference, including:

- MDC will accommodate at least six half-hour attorney calls or calls with Pretrial or Probation in the afternoon and evening per floor and will dedicate two telephones per floor for this purpose.  MDC may schedule a call during the morning, if necessary to achieve the six calls per day, with prior notification to defense counsel of when the call will occur.  When additional staff arrives, MDC will review its capacity and increase the number of legal calls per day if possible.

- After the expansion of videophone capability, each of the floors will be equipped with videophone equipment, which will be used for attorney calls as well.

- Telephones on the unit may continue to be used for legal calls.

- MDC will keep a log that tracks all attorney calls, including when the call was requested, when the call was approved, whether the call was attempted, whether the call connected, and the approximate length of each call.

In addition, the government notes that, in accordance with a directive from the Second Circuit, Judge Brodie recently appointed former U.S. Attorney General Loretta E. Lynch to mediate the ongoing litigation related to BOP's provision of adequate legal visitation and "ultimately facilitate the adoption of procedures for dealing with ongoing and future emergencies, including the COVID-19 outbreak." Federal Defenders of New York v. BOP, No. 19-1778, slip op. at *28 (2d Cir. Mar. 20, 2020).

In any event, the defendant cites no statutory or legal authority authorizing the Court to release him on his own recognizance because of limitations on opportunities for legal consultation.[4] The Court should reject the defendant's attempt to turn the tables and use the mitigation efforts put in place by BOP to reduce the potential spread of COVID-19, principally the limitations on in-person legal visits, to suggest that those same efforts create circumstances justifying release. The defendant has not shown any significant, long-term infringement on his ability to consult with his attorney, much less provided a reason to believe the efficacy of his defense has been adversely impacted. He also has not demonstrated that the limitations put in place by the BOP fail to serve and further a "legitimate penological interest[]." Overton v. Bazzetta, 539 U.S. 126, 131-32 (2003) (upholding restrictions on prison visitation rights). They do serve such an interest, which is protecting the health of people like the defendant and the many employees who work at the MDC.

V.  There Is No Basis to Dismiss the Indictment

Finally, the defendant argues that the Court should dismiss the indictment and return the defendant to Europe because he "would not be extradited to the United States if the request were made today." ECF No. 96 at 1. The defendant cites no legal authority in support of his argument and the government submits that there is none. Indeed, the argument is entirely speculative and, in any event, is foreclosed by longstanding precedent. The law is clear that "a foreign government's decision to extradite an individual in response to a request from the United States is not subject to review by United States courts." United States v. Medina, 985 F. Supp. 397, 401 (S.D.N.Y. 1997); see Johnson v. Browne, 205 U.S. 309, 316 (1907); United States v. Campbell, 300 F.3d 202, 209 (2d Cir. 2002); United States v.

---

[4] Falcon v. BOP, 52 F.3d 137 (7th Cir. 1995), notes simply that the district court's detention order "must direct the BOP to provide [the defendant] with 'reasonable opportunity for private consultation with counsel'" and the district court "has discretionary authority . . . to order [the defendant] into the custody of a United States Marshal if he determines that such action is necessary for preparation of his defense." Id. at 139; see also United States v. Rodriguez, No. 12-CR-83S, 2014 WL 4094561 (W.D.N.Y. Mar. 12, 2015) (declining to "grant bail or intervene in the daily management of [the defendant's] detention" on account of legal consultation).

Salinas Doria, No. 01-CR-21, 2008 WL 4684229, at *2-3 (S.D.N.Y. Oct. 21, 2008). Since "our courts cannot second-guess another country's grant of extradition to the United States," the defendant's attempt to newly question the propriety of the extradition has no place here. Campbell, 300 F.2d at 209.

VI.     Conclusion

For the reasons set forth above, the government respectfully submits that the Court should deny the defendant's motion for bail. The Court's permanent order of detention should remain in effect because the defendant poses a risk of flight, and he has not presented a "compelling reason" for his temporary release under 18 U.S.C. § 3142(i). The government also respectfully submits that the Court should deny the defendant's motion to dismiss the indictment.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:     /s/
Saritha Komatireddy
Michael T. Keilty
Alexander F. Mindlin
Assistant U.S. Attorneys
(718) 254-7000

cc:     All counsel of record (via ECF)
        Clerk of Court (EK) (via ECF)