DMP:SK/JAM/AFM
F.#2016R02228

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                          No. 18-CR-633 (S-1) (EK)

ALEKSANDR ZHUKOV,
       also known as "Alexander
       Zhukov" and "ibetters,"

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S MOTIONS *IN LIMINE* REGARDING TRIAL PROCEDURES

SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Saritha Komatireddy
Artie McConnell
Alexander F. Mindlin
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND .............................................................................................................2

ARGUMENT ..................................................................................................................5

    1.  The Court Should Permit the Government to Admit Evidence Pursuant to Business
       Records Certifications ..............................................................................................5

    2.  The Court Should Permit Testimony By Live Two-Way Video Teleconference............8

    3.  The Court Should Permit Witnesses Who Are Exempted from the State's Quarantine
       Requirement to Testify.............................................................................................30

CONCLUSION...............................................................................................................32

## TABLE OF AUTHORITIES

### CASES

Flores v. Town of Islip, No. 18-CV-3549, ECF No. 190
    (E.D.N.Y. Sept. 1, 2020) (Brown, J.) ................................................................. 8

Maryland v. Craig, 497 U.S. 836 (1990) ....................................................... passim

Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009) ........................................ 6

Ohio v. Roberts, 448 U.S. 56 (1979) ..................................................................... 26

United States v. Trimarco, No. 17-CR-583, ECF No. 115
    (E.D.N.Y. Sept. 1, 2020) ................................................................................ 30

United States v. Ahmed, No. 12-CR-661 (JG) (E.D.N.Y. 2015) ........................... 21

United States v. al Farekh, No. 15-CR-268 (BMC) (E.D.N.Y. 2017) .................... 21

United States v. Al Fawwaz, No. S7-98-CRIM, 2014 WL 627083
    (S.D.N.Y. Feb. 18, 2014) ………………………………………………...27

United States v. Amodeo, 71 F.3d 1044 (2d Cir. 1995) ........................................ 9

United States v. Casher, No. 19-CR-065, 2020 WL 3270541
    (D. Mont. June 17, 2020) .......................................................................... 22, 23

United States v. Donziger, No. 19-CR-561, 2020 WL 5152162
    (S.D.N.Y. Aug. 31, 2020) (Preska, J.) ...................................................... passim

United States v. Ellis, 460 F.3d 920 (7th Cir.2006) ........................................... 6, 7

United States v. Gigante, 166 F.3d 75 (2d Cir. 1999) ................................... passim

United States v. Johnpoll, 739 F.2d 702 (2d Cir. 1984) ...................................... 26

United States v. Johnson, 688 F.3d 494 (8th Cir. 2012) ........................................ 6

United States v. Kaziu, No. 09-CR-660 (JG) (E.D.N.Y. 2011) ............................. 22

United States v. Komasa, 767 F.3d 151 (2d Cir. 2014). ......................................... 7

United States v. Mohamed, 18-CR-603 (ARR), 2020 WL 1545522
    (E.D.N.Y. Apr. 1, 2020) ................................................................................ 23

United States v. Morgan, 505 F.3d 332 (5th Cir. 2007) ......................................... 6

United States v. Mostafa, 14 F. Supp. 3d 515 (S.D.N.Y 2014)................................... 21,28, 29

United States v. Naseer, No. 10-CR-019 (RJD) (E.D.N.Y. 2015) ......................................... 21

United States v. Pangelinan, No. 19-CR-10077, 2020 WL 5118550
  (D. Kan. Aug. 31, 2020) ............................................................................... 22, 23

United States v. Qualls, 613 F. App'x 25 (2d Cir. 2015) ........................................................ 6

United States v. Sapse, No. 10-CR-00370, 2012 WL 5334630 (D. Nev. Oct. 26, 2012) ...... 26

United States v. Shipp, No. 19-CR-029 (E.D.N.Y. Oct. 13, 2020) (Kovner, J.).................... 22

United States v. Weiland, 420 F.3d 1062 (9th Cir. 2005) ........................................................ 6

United States v. Yeley-Davis, 632 F.3d 673 (10th Cir. 2011)................................................. 6

United States v. You, No. 19-CR-014, 2020 WL 3549828
  (E.D. Tenn. June 30, 2020)...................................................................................... 23

## STATUTES

18 U.S.C. § 1343 ..................................................................................................................... 4

18 U.S.C. § 1349 ..................................................................................................................... 4

18 U.S.C. § 1956(h) ................................................................................................................ 4

18 U.S.C. § 1957...................................................................................................................... 4

18 U.S.C. § 3505...................................................................................................................... 7

## RULES

Fedederal Rule of Evidence 804(a)(4)................................................................................... 26

Federal Rule of Evidence 902(11) ..................................................................................... 6, 7

Federal Rule of Criminal Procdure 15 .......................................................................... passim

## OTHER AUTHORITIES

United State Constitution, Amendment VI........................................................................ 5, 6

PRELIMINARY STATEMENT

The defendant is charged in a four-count superseding indictment with wire fraud conspiracy, wire fraud, money laundering conspiracy, and money laundering, for perpetrating a multimillion-dollar scheme to defraud U.S. businesses in the online digital advertising industry.  Trial is scheduled to proceed in November, with jury selection on November 23, 2020, and opening statements on November 30, 2020.

The government has been diligently preparing for trial, while monitoring the current public health situation, related restrictions, and witness availability.  The government now sets forth motions in limine for the adoption of certain trial procedures to: (i) permit the government to admit certain evidence pursuant to domestic and foreign business records certifications in lieu of live witnesses; (ii) permit the government to call certain witnesses to testify via two-way video teleconference ("VTC"); and (iii) permit witnesses traveling from one of the states on New York's "Restricted States" list or from abroad to enter the courthouse where the New York State Department of Health has exempted those witnesses from quarantine.

BACKGROUND

On December 20, 2016, researchers at a private cybersecurity firm based in New York, New York, published a white paper titled "The Methbot Operation," revealing the operation of an online digital advertising fraud scheme.  In the white paper, the cybersecurity firm revealed the Internet Protocol ("IP") addresses of computers used to carry out the fraud (the "Malicious IPs").  The cybersecurity firm explained that, based on its monitoring of network traffic related to advertisement impressions on behalf of various advertising clients, it had observed computers associated with the Malicious IPs transmitting false data to create the impression that a real human internet user was viewing an advertisement on a real internet webpage, when in fact a computer that was not controlled by any individual human (sometimes referred to as a "bot") was loading the advertisement on a fake webpage.  The cybersecurity firm further explained that the Malicious IPs were associated with false registration data in publicly available IP registration databases.

The Federal Bureau of Investigation (the "FBI") began investigating the Malicious IPs and the scheme associated with them (the "Methbot scheme").  The investigation revealed that the defendant, ALEXANDR ZHUKOV, also known as "Alexander Zhukov" and "ibetters," controlled the Malicious IPs.  Specifically, the defendant leased the Malicious IPs from various IP address leasing companies and assigned those IPs to thousands of datacenter computer servers that he also controlled, and that were located in commercial datacenters in the United States and elsewhere.  The defendant and his co-conspirators created false registration data for the Malicious IPs, making it appear that the Malicious IPs were associated with residential computers across the United States instead of datacenter computer servers in commercial datacenters.

The defendant and his co-conspirators then programmed the datacenter computer servers to simulate the internet activity of real human internet users, directing the servers to operate an automated browser, click on online advertisements a randomly determined number of times, simulate a mouse moving around and scrolling down a webpage, control and monitor video playback, falsely appear to be signed into popular social media services like Facebook, and circumvent fraud detection software deployed by certain U.S. cybersecurity firms.  In this way, the defendant and his co-conspirators created "fraudulent ad traffic"—employing the datacenter computer servers to load fabricated webpages, offer up advertising space on fabricated webpages for bidding, load advertisements on the fabricated webpages through an automated computer program, and reap the resulting revenue.  The defendant and his co-conspirators monitored the activity of the datacenter computer servers using an online control panel at a specific domain (centbycent.com); an email account associated with the domain sent regular emails to the defendant and his co-conspirators reporting on the performance of the thousands of datacenter computer servers employed in the scheme and the millions of fraudulent advertising impressions they created.

The defendant funneled his fraudulent ad traffic to others in the online digital advertising industry under the cover of his ad network Media Methane.  The defendant represented that Media Methane delivered advertisements to real human internet users accessing real internet webpages, when in fact it merely delivered advertisements to the defendant's datacenter computer servers.

3

The defendant made millions of dollars from the scheme.  He and his co-conspirators moved the resulting proceeds through multiple corporate bank accounts located around the world—including in Bulgaria, Latvia, and the Czech Republic—and re-invested some of the proceeds to perpetuate the fraud.

Through their perpetration of the fraudulent scheme, the defendant and his co-conspirators victimized multiple entities in the online digital advertising industry, including brands, publishers, ad platforms, and internet service providers, causing them to lose money, opportunities, and credibility.

On November 6, 2018, the defendant was arrested by Bulgarian law enforcement authorities in Varna, Bulgaria, pursuant to a U.S. provisional arrest warrant.  At the time of the arrest, Bulgarian law enforcement authorities searched the defendant's apartment and seized electronic devices and paper documents containing countless references to every aspect of the defendant's scheme.

On January 18, 2019, the defendant was extradited to the United States based on an indictment charging him with wire fraud conspiracy (in violation of 18 U.S.C. § 1349), wire fraud (in violation of 18 U.S.C. § 1343), money laundering conspiracy (in violation of 18 U.S.C. § 1956(h)), and money laundering (in violation of 18 U.S.C. § 1957).

The case is currently scheduled to proceed to trial in November, with jury selection on November 23, 2020, and opening statements on November 30, 2020.  In order to ensure that jury trials and other in-person court appearances can safely proceed during the COVID-19 pandemic, the Eastern District of New York has adopted health and safety protocols for its courthouses, attached hereto as Exhibit A.

ARGUMENT

I.    The Court Should Permit the Government to Admit Evidence Pursuant to Business Records Certifications

The government moves in limine to admit evidence pursuant to business records certifications.  The government brings this motion to significantly simplify and shorten the jury trial in this matter by making the testimony of more than 20 witnesses—including foreign witnesses—unnecessary.

A.    Relevant Facts

The defendant and his co-conspirators perpetrated the fraudulent scheme by using various instrumentalities in the United States, including email accounts provided by U.S email providers, servers provided by U.S. server providers, and websites registered by U.S. domain providers.  The defendant and his co-conspirators laundered proceeds from the fraudulent scheme using bank accounts and shell companies located in the United States and around the world, including in Bulgaria, Latvia, and the Czech Republic.  The government requested records from these providers and banks using subpoenas and Mutual Legal Assistance Treaties.  As a result, the government obtained certified records showing the defendant's and his co-conspirators' use and ownership of emails, servers, websites, and bank accounts used to commit the crimes charged in the indictment.

The defense has indicated to the government that it does not intend to enter into any stipulations in this case, including stipulations as to the authenticity of these records.

B.    Legal Standards

The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

5

him." U.S. Const. amend. VI.  In discussing the contours of this right, the Supreme Court

has held that admitting business records that have been authenticated by affidavit or

certificate does not violate a defendant's right to confrontation.  See Melendez-Diaz v.

Massachusetts, 557 U.S. 305 (2009).

      In Melendez-Diaz, the Court held that a particular affidavit prepared by a drug

analyst as part of a criminal investigation was testimonial.  Id. at 307.  The affidavit stated

that certain powder seized from the defendant was determined to be "cocaine."  Id.  In

responding to the dissent's concern that the holding would eviscerate the usefulness of Rule

902(11), the Court explained that "[a] clerk could by affidavit authenticate or provide a copy

of an otherwise admissible record, but could not do what the analysts did here: create a

record for the sole purpose of providing evidence against a defendant."  Id. at 322-23

(emphasis in original).  The Court further explained: "Business and public records are

generally admissible absent confrontation . . . because—having been created for the

administration of an entity's affairs and not for the purpose of establishing or proving some

fact at trial—they are not testimonial."  Id. At 324.

      Relying on Melendez-Diaz, the Second Circuit and at least five other circuits

have concluded that certifications authenticating records are not testimonial and therefore are

permissible.  See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015); United

States v. Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632

F.3d 673, 680-81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir.

2007); United States v. Ellis, 460 F.3d 920 (7th Cir.2006); United States v. Weiland, 420

F.3d 1062, 1077 (9th Cir. 2005).  As the Seventh Circuit explained in United States v. Ellis,

an authenticating certification under Rule 902(11) is "nothing more than the custodian of

records . . . attesting that the submitted documents are actually records kept in the ordinary course of business" and "merely establish the existence of the procedures necessary to create a business record." Ellis, 460 F.3d at 927.  It is the underlying records, not the certification, that are introduced to establish the facts at trial.

Consistent with this understanding of the confrontation right, federal law permits the authentication of business records by certification and sets forth specific requirements for their admission.  Federal Rule of Evidence 902(11) expressly permits the authentication of domestic business records by certification.  Title 18, United States Code, Section 3505 expressly permits the authentication of foreign business records by certification.  And courts in the Second Circuit have routinely applied these provisions to admit certified business records at trial.  See, e.g., United States v. Komasa, 767 F.3d 151 (2d Cir. 2014).

C.    Discussion

The government should be permitted to authenticate and admit bank records and other business records using certifications because it is entirely proper under the law and because doing so would eliminate unnecessary persons from the courtroom, shorten the amount of time that jurors will need to sit for trial, and ensure that more than 20 witnesses, including individuals from Bulgaria, Latvia, and the Czech Republic, need not travel to New York to appear at trial.

The government encloses the certifications in its possession for the Court's inspection and submits that they satisfy the relevant requirements.  See Exhibit B.  The government notes that it may receive additional certifications and expects those certifications to likewise satisfy the relevant requirements.

7

II.     The Court Should Permit Testimony By Live Two-Way Video Teleconference

The government moves in limine for permission to call six of its witnesses to testify via live two-way video teleconference ("VTC").[1]

A.     Relevant Facts

As an initial matter, the government has made every effort to procure in-person testimony and avoid remote testimony wherever possible, including by identifying substitute witnesses who are able to appear at trial to testify, eliminating witnesses who may be cumulative or marginally relevant, and providing witnesses with alternatives to traveling by airplane or public transportation.  For those witnesses who are willing to travel, the government has obtained exemptions from the U.S. State Department and the New York State Department of Health to enable witnesses to travel to New York without an attendant quarantine.  As a result, the vast majority of testimony in the government's case will come from witnesses who are present in the courtroom with the defendant and the jury, including witnesses who are traveling from such far off places as Greece and Hawaii.

The government brings this motion to request authorization to elicit VTC testimony from the following six witnesses who are unable or unwilling to travel to New

---

[1] The government intends to engage the trial services company Impact Trial Consulting LLC ("Impact") to facilitate the logistical and technical aspects of the proposed VTC testimony.  Impact is currently providing these services in a case occurring in the Central Islip Courthouse.  See, e.g., Flores v. Town of Islip, No. 18-CV-3549, ECF No. 190 at 2 (E.D.N.Y. Sept. 1, 2020) (Brown, J.) (noting that Impact Trial Consulting LLC will be acting as a "secure host" to facilitate remote proceedings in a civil bench trial).  Members of the Impact team have already met with personnel from the Brooklyn Courthouse, toured the trial courtroom, and determined that it is possible for them to provide secure VTC testimony during this trial.  Should the Court grant the government's motion, the government will submit a separate proposed order for the Court's signature that would authorize the necessary personnel and equipment from Impact.

York to testify, given their specific circumstances and the risks and burdens posed by the ongoing COVID-19 pandemic.

    1.    ████████████████  ("Foreign Officer")[2]

The Foreign Officer is the officer in charge of cybercrime investigations at the General Directorate for Combatting Organized Crime, a law enforcement agency in Bulgaria. The Foreign Officer is expected to testify, in sum and substance, that on November 6, 2018, he and a team of Bulgarian police officers searched the defendant's apartment in Varna, Bulgaria, pursuant to a treaty request submitted by the United States.  The Foreign Officer is expected to testify that the search team seized numerous electronic devices, including computers and cellphones, from the defendant's apartment, as well as paper documents and identity cards.  The Foreign Officer is further expected to testify that the defendant was present at the apartment and said that he owned all of the devices and documents seized. Mindlin Decl., ¶ 1.

The Foreign Officer's testimony is crucial to the government's case.  The Foreign Officer's testimony is important to authenticating, admitting, and establishing the origin and ownership of the defendant's electronic devices—which the evidence will show contained thousands of emails and online chats in which the defendant and his co-conspirators discussed committing the fraudulent scheme and laundering the proceeds from that fraudulent scheme, and in which the defendant admitted that he was the "king of fraud."

---

[2] The government has redacted the witnesses' names from its public filings because the filings discuss the witnesses' personal circumstances and health conditions.  See United States v. Amodeo, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (privacy interests of third parties may be compelling reason justifying sealing).

The Foreign Officer's testimony is also important to authenticating, admitting, and establishing the origin and ownership of paper documents found in the defendant's apartment.  These documents include certificates of incorporation, bank records, and other corporate documents establishing that the defendant was the beneficiary of shell companies that received profits from the scheme.  These documents also include handwritten notes referencing specific lies, co-conspirators, and victims involved in the fraudulent scheme. These documents also include identity cards that bear the defendant's name and photograph and match identification documents found in his email accounts, providing helpful attribution evidence for the defendant's email accounts.  Mindlin Decl., ¶ 2.

        The Foreign Officer resides in Bulgaria. U.S. government officials have communicated with the Foreign Officer by telephone on multiple occasions, including earlier this week.  The Foreign Officer advised the government that he was recently promoted to the rank of Commissioner, given broad responsibility for cybercrime investigations in Bulgaria, and appointed by the Prime Minister of Bulgaria to be the national cybersecurity coordinator for the country.  The Foreign Officer further advised the government that if he were to travel to the United States and then return to Bulgaria, he would be required under Bulgarian law to self-quarantine at home for at least 14 days.  The Foreign Officer advised the government that he would not be able to perform his duties in his new role from home, and he is therefore unwilling to travel to New York to testify in person at trial.  Mindlin Decl., ¶ 3.  The Foreign Officer is willing to testify by two-way video teleconference from his current location. Mindlin Decl., ¶ 4.

        The Foreign Officer is beyond the subpoena power of the Court.

2. ███████████ ("Victim Representative 1")

Victim Representative 1 is an employee of SpotX, a platform in the online digital advertising industry.  Victim Representative 1 is expected to testify, in sum and substance, that during a period of less than two months in 2016, certain computers—which the evidence will show were computers that the defendant rented and that he and his co-conspirators programmed—represented that humans had viewed the advertisements of SpotX's clients more than 318 million times.  Victim Representative 1 is further expected to testify that SpotX's clients paid approximately $2.3 million dollars for these advertising impressions.  Victim Representative 1 is also expected to testify that SpotX expended resources to combat online digital advertising fraud, including by dedicating certain employees to those efforts and relying on independent fraud detection companies to assist in those efforts.  Mindlin Decl., ¶ 5.

Victim Representative 1's testimony is crucial to the government's case. Victim Representative 1's testimony is important to demonstrating the existence of the fraudulent scheme—because the scheme worked—and establishes a specific connection between the defendant's renting and programming of datacenter computer servers to deceive businesses in the online digital advertising industry and those deceptions causing actual losses to victims.  Victim Representative 1's testimony is also important to establishing that the misrepresentations that the defendant made and directed as part of the fraudulent scheme were material to, and victimized, ad platforms, as charged in the indictment, and refuting the defense that such ad platforms freely accepted "bot" traffic without objection.  Victim Representative 1's testimony is also important to explaining how ad platforms rely on fraud detection companies and demonstrates why the defendant's misrepresentations to fraud

11

detection companies, and circumvention of those companies' filters, were also material. Mindlin Decl., ¶ 6.

Victim Representative 1 resides in Colorado.  U.S. government officials have communicated with Victim Representative 1 and his attorney by email and telephone on multiple occasions, including earlier this week.  Victim Representative 1 and his attorney have advised the government that Victim Representative 1 has high blood pressure and is fearful of severe illness or death if he were to contract COVID-19.  The Centers for Disease Control and Prevention ("CDC") lists high blood pressure as a condition that might increase the risk of severe illness from COVID-19.[3]  Victim Representative 1 also informed the government that out-of-state travel would impose a significant burden on the individual with whom he lives (the "co-habitant").  Victim Representative 1's co-habitant is a nurse who works in multiple hospitals in the Denver area and is subject to strict screening and reporting requirements.  If Victim Representative 1 were to travel out-of-state, Victim Representative 1's co-habitant would be obligated to report that travel to the hospitals where she has upcoming shifts, which could result in the loss of shifts.  For this reason, Victim Representative 1 and his co-habitant recently canceled a long-planned out-of-state trip to avoid disqualifying Victim Representative 1's co-habitant from upcoming work shifts.  For the same reason, Victim Representative 1 is unwilling to travel to New York to testify in

---

[3] See Coronavirus Disease 2019 (COVID-19), People with Certain Medical Conditions, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated October 16, 2020).

person at trial.  Mindlin Decl., ¶ 7.  Victim Representative 1 is willing to testify by two-way video teleconference from his current location.  Mindlin Decl., ¶ 8.

On September 30, 2020, Victim Representative 1 was served with a subpoena to testify at the November trial.

3.  ██████████ ("Victim Representative 2")

Victim Representative 2 is an employee of The Clorox Company.  Victim Representative 2 is expected to testify, in sum and substance, that Clorox paid thousands of dollars for online digital advertising, that in doing so Clorox expected that its ads would be shown to real human internet users, and that Clorox would not have paid money for its ads to be shown to bots.  Victim Representative 2 is also expected to testify that Clorox took measures to detect and respond to online digital advertising fraud, that he was involved in such efforts, and that Clorox relied on independent fraud detection companies to assist it in combating online digital advertising fraud.  Victim Representative 2 is further expected to testify that online digital advertising fraud harms Clorox and its customers because it wastes the company's money and diverts resources away from providing important information to real human internet users who may buy Clorox's products.  Mindlin Decl., ¶ 9.

Victim Representative 2's testimony is crucial to the government's case. Victim Representative 2's testimony is important to establishing that the misrepresentations that the defendant made and directed as part of the fraudulent scheme were material to—and victimized—brands, as charged in the indictment.  Victim Representative 2's testimony is also important to explaining how brands rely on fraud detection companies and demonstrates why the defendant's misrepresentations to fraud detection companies, and circumvention of those companies' filters, were also material.  Furthermore, Victim Representative 2's

13

testimony is important to refuting one of the expected defenses to materiality that brands advertising online were aware of, and accepted that, they would have to pay for "bot" traffic. Mindlin Decl., ¶ 10.

Victim Representative 2 resides in California.  U.S. government officials have communicated with Victim Representative 2 and his attorney by email and telephone on multiple occasions, including earlier this week.  Victim Representative 2 and his attorney have advised the government that Victim Representative 2 is unwilling to travel to New York to testify in person at trial because he resides with his elderly father-in-law, who is 72 years old, has diabetes, has had five heart stents placed including one earlier this year, and is therefore at high risk of serious complications if he were to contract COVID-19.  As a result, Victim Representative 2 has been practicing extreme care in managing his personal exposure and seeks to avoid traveling away from the Bay Area during the pandemic.  Victim Representative 2 informed the government that he would be extremely fearful about traveling by airplane to New York, given the need to sit in close proximity to others, because of his concern that he might bring the virus home to his father-in-law.  Victim Representative 2's attorney also informed the government that Victim Representative 2 is managing remote schooling for his two children, and a prolonged absence from home would impose a burden on his household.  Mindlin Decl., ¶ 11.  Victim Representative 2 is willing to testify by two-way video teleconference from his current location.  Mindlin Decl., ¶ 12.

On October 18, 2020, Victim Representative 2 was served with a subpoena to testify at the November trial.

4.   ██████████████ ("Victim Representative 3")

Victim Representative 3 is an employee of the Texas Scottish Rite Hospital for Children. Victim Representative 3 is expected to testify, in sum and substance, that the Children's Hospital paid thousands of dollars for online digital advertising, that in doing so the Children's Hospital expected that its ads would be shown to real human internet users, and that the Children's Hospital would not have paid money for its ads to be shown to bots. McConnell Decl., ¶ 11.

Victim Representative 3's testimony is crucial to the government's case. Victim Representative 3's testimony is important to establishing that the misrepresentations that the defendant made and directed as part of the fraudulent scheme were material to—and victimized—brands, as charged in the indictment, and in particular non-profit brands. Furthermore, Victim Representative 3's testimony is important to refuting the expected defenses to materiality that businesses advertising online were aware of, and accepted that, they would have to pay for "bot" traffic, and that such wasted advertising dollars were of little or no importance to the large sophisticated corporations who suffered losses from the defendant's scheme. Victim Representative 3 is the only one of the government's victim witnesses who represents a non-profit. McConnell Decl., ¶ 12.

Victim Representative 3 resides in Texas. U.S. government officials have communicated with Victim Representative 3's attorney by email and telephone on multiple occasions, including earlier this week. Victim Representative 3's attorney has advised the government that Victim Representative 3 will be 62 years old at the time of trial and is fearful of severe illness or death if he were to contract COVID-19. The CDC warns that the risk for severe illness from COVID-19 increases with age and that people in their 60s or 70s

are, in general, at higher risk for severe illness than people who are younger.[4]  Victim Representative 3's attorney also informed the government that Victim Representative 3 is still recovering from two separate hip-replacement surgeries performed earlier this year, which would make airplane travel more difficult for him.  Victim Representative 3's attorney further informed the government that: Victim Representative 3's responsibilities at the Children's Hospital require him to interact with hospital personnel; the Children's Hospital continues to provide much-needed orthopedic surgeries to children, such as scoliosis-related back surgery, surgeries addressing severe hip and feet disorders, and surgeries dealing with limb lengthening; and should Victim Representative 3 become infected with COVID-19 as a result of his travel to New York to testify, he could infect staff at the Children's Hospital and affect hospital employees' abilities to carry out their mission.  McConnell Decl., ¶ 13. Victim Representative 3 is willing to testify by two-way video teleconference from his current location.  McConnell Decl., ¶ 14.

On October 19, 2020, Victim Representative 3 was served with a subpoena to testify at the November trial.

5.  ███████████  ("Translator 1")

Translator 1 is a linguist who is an expert in the Czech language.  Translator 1 is expected to testify, in sum and substance, that she accurately translated bank records received from the Czech Republic—specifically, bank records pertaining to accounts in the

---

[4] See Coronavirus Disease 2019 (COVID-19), Older Adults, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated September 11, 2020).

name of Must Trade Ltd. held at Ceska Sporitelna Bank—from Czech to English.
McConnell Decl., ¶ 1.

Translator 1's testimony is crucial to the government's case.  The English
translations of the aforementioned bank records are important to establishing that the
defendant was involved in the fraudulent scheme, received proceeds from the scheme, and
laundered those proceeds.  Specifically, the Ceska Sporitelna Bank records for the
defendant's Must Trade Ltd. accounts show, inter alia, that the defendant directed in excess
of $1,000,000 to pay for servers and IP addresses used to effectuate the scheme.  Translator
1's testimony is a significant part of the government's evidence establishing that the
defendant knowingly and intentionally participated in the fraudulent scheme, and received
and re-invested proceeds from the scheme to perpetuate the fraud, as charged in the
indictment.  McConnell Decl., ¶ 2.

The defense has refused to stipulate to the accuracy of Translator 1's
translations.  McConnell Decl., ¶ 3.

Translator 1 resides in Arizona.  U.S. government officials have
communicated with Translator 1 and her supervisors by email and telephone on multiple
occasions, including earlier this week.  Translator 1 and her supervisors have advised the
government that Translator 1 will be 63 years old at the time of trial and is fearful of severe
illness or death if she were to contract COVID-19.  As noted above, the CDC has advised
that the risk for severe illness from COVID-19 increases with age and that people in their 60s
or 70s are, in general, at higher risk for severe illness than people who are younger.
Translator 1 also informed the government that she recently underwent eye surgery and
expects that she will still be recuperating at the time of trial, which would make travel more

17

difficult for her.  Translator 1 further informed the government that she is the sole caretaker

for her 71-year-old husband, whom she characterized as "increasingly forgetful," and she

does not wish to leave him alone for long periods of time during the pandemic.  McConnell

Decl., ¶ 4.  Translator 1 is willing to testify by two-way video teleconference from her

current location.  McConnell Decl., ¶ 5.

On October 19, 2020, Translator 1 was served with a subpoena to testify at the

November trial.

6.  ███████████████   ("Translator 2")

Translator 2 is a linguist who is an expert in Latvian.  Translator 2 is expected

to testify, in sum and substance, that he accurately translated bank records received from

Latvia—specifically, bank records pertaining to accounts in the name of Mintek Group

Limited and Integra Games Ltd. held at PNB Bank—from Latvian to English.  McConnell

Decl., ¶ 6.

Translator 2's testimony is crucial to the government's case.  The English

translations of the aforementioned bank records are important to establishing that the

defendant was involved in the fraudulent scheme, received proceeds from the scheme, and

laundered those proceeds.  Specifically, the PNB Bank records for the defendant's Mintek

Group Limited and Integra Games Ltd. accounts show, inter alia, that the defendant received

payments from co-conspirators in the fraudulent scheme, used shell corporations to conceal

the nature, source, ownership, and control of those payments, and redirected some of the

money from those payments to pay for servers and IP addresses used to effectuate the

scheme.  Translator 2's testimony is a significant part of the government's evidence

establishing that the defendant knowingly and intentionally participated in the fraudulent

scheme, and received and re-invested proceeds from the scheme to perpetuate the fraud, as charged in the indictment.  McConnell Decl., ¶ 7.

The defense has refused to stipulate to the accuracy of Translator 2's translations.  McConnell Decl., ¶ 8.

Translator 2 resides in Illinois.  U.S. government officials have communicated with Translator 2 and his supervisors by email and telephone on multiple occasions, including earlier this week.  Translator 2 and his supervisors have advised the government that Translator 2 will be 71 years old at the time of trial and is fearful of severe illness or death if he were to contract COVID-19.  As discussed above, the CDC warns that the risk for severe illness from COVID-19 increases with age and that people in their 60s or 70s are, in general, at higher risk for severe illness than people who are younger.  Translator 2 also informed the government that he is a cancer survivor and believes that he is also at increased risk for severe illness from COVID-19 due to his prior condition.  The CDC has listed cancer as a condition that increases the risk of severe illness from COVID-19.[5]  McConnell Decl., ¶ 9.  Translator 2 is willing to testify by two-way video teleconference from his current location.  McConnell Decl., ¶ 10.

On October 19, 2020, Translator 2 was served with a subpoena to testify at the November trial.

_____

[5] See Coronavirus Disease 2019 (COVID-19), People with Certain Medical Conditions, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated October 16, 2020).

B.    Legal Standards

The Second Circuit has held that testimony by live two-way video is permissible, but only in "exceptional circumstances."  See United States v. Gigante, 166 F.3d 75 (2d Cir. 1999).  The Court noted: "Because [two-way closed-circuit television testimony] may provide at least as great protection of confrontation rights as [Federal Rule of Criminal Procedure] 15, we decline to adopt a stricter standard for its use than the standard articulated by Rule 15.  Upon a finding of exceptional circumstances, such as were found in this case, a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." Gigante, 166 F.3d at 81.  Judge Weinstein had found that such exceptional circumstances existed in Gigante because it was "medically unsafe" for the witness to travel to New York to testify in person.  See id. at 79.

The Second Circuit further held that, so long as the above standard is met, the Confrontation Clause does not prevent the use of testimony by two-way video.  In Maryland v. Craig, 497 U.S. 836 (1990), "the Supreme Court indicated that confrontation rights 'may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.'" United States v. Gigante, 166 F.3d 75, 80-81 (2d Cir. 1999) (quoting Craig, 497 U.S. at 850).  "However, the Supreme Court crafted this standard to constrain the use of one-way closed-circuit television, whereby the witness could not possibly view the defendant." Id. at 81.  Where the district court uses "a two-way system that preserve[s] the face-to-face confrontation," the Second Circuit held, "it is not necessary to enforce the Craig standard." Id.  Indeed, because the witness testifying by two-way video "was sworn," "was subject to full cross-examination," "testified in full view of the jury,

20

court, and defense counsel," and "gave this testimony under the eye of [the defendant] himself," the Second Circuit found that the defendant "forfeited none of the constitutional protections of confrontation."  Id. at 80.

Therefore, while testimony by live two-way video "should not be considered a commonplace substitute for in-court testimony," courts may allow it under "exceptional circumstances" when "(1) the witness's testimony is material; (2) the [government] has made good-faith and reasonable efforts to obtain the witness's presence and is unable to do so (that is, that the witness is 'unavailable' within the meaning of the case law); and (3) allowing testimony by such means furthers the interests of justice."  United States v. Buck, 271 F. Supp. 3d 619, 622-23 (S.D.N.Y. 2017).  District courts in the Second Circuit have applied this standard and permitted witnesses to testify remotely in criminal trials through live two-way video.  See, e.g., United States v. Mostafa, 14 F. Supp. 3d 515, 521 (S.D.N.Y 2014).

This practice is comparable to the longstanding practice of permitting witnesses to testify in a different location than the defendant through previously recorded two-way video.  See Fed. R. Crim. P. 15 (permitting witnesses to testify from a different location than the defendant in criminal trials through previously-recorded two-way video where there are exceptional circumstances and it is in the interests of justice); see, e.g., United States v. al Farekh, No. 15-CR-268 (BMC) (E.D.N.Y. 2017) (permitting remote Rule 15 deposition of former al-Qaeda member); United States v. Ahmed., No. 12-CR-661 (JG) (E.D.N.Y. 2015) (permitting remote Rule 15 depositions of former al-Shabaab members); United States v. Naseer, No. 10-CR-019 (RJD) (E.D.N.Y. 2015) (permitting remote Rule 15

deposition of foreign intelligence officer); United States v. Kaziu, No. 09-CR-660 (JG) (E.D.N.Y. 2011) (permitting remote Rule 15 deposition of civilian witness).[6]

Courts in New York have granted motions to permit live two-way video teleconference testimony in criminal trials occurring during the COVID-19 pandemic, taking into consideration the specific circumstances of the witness.  See, e.g., United States v. Shipp, No. 19-CR-029 (E.D.N.Y. Oct. 13, 2020) (Kovner, J.) (granting government's request to permit witness to testify at trial using live two-way video link from another room in the Brooklyn Courthouse, where witness will be in third trimester of pregnancy and her doctor advised that it would be medically unsafe for her to testify in the main trial courtroom during the COVID-19 pandemic) (citing Gigante); United States v. Donziger, No. 19-CR-561, 2020 WL 5152162, at *2-4 (S.D.N.Y. Aug. 31, 2020) (Preska, J.) (granting government's request to permit witness to testify at trial using live two-way video link from a courthouse in Texas, where witness's quarantine obligations were burdensome and witness's age and health conditions put him at heightened risk of life-threatening complications if he were to contract COVID-19).[7]

---

[6] In those circumstances, the government established that extraordinary circumstances existed by submitting AUSA affidavits or declarations detailing the government's good-faith efforts to secure a witness's presence at trial, indicating that government officials have spoken with the witness, and indicating the circumstances rendering the witness unable or unwilling to travel to the trial location to testify.  The government has done the same for its witnesses here.

[7] Elsewhere, in United States v. Pangelinan, No. 19-CR-10077, 2020 WL 5118550 (D. Kan. Aug. 31, 2020), Judge Broomes denied the government's request to permit sworn testimony by video.  In doing so, Judge Broomes applied the Craig standard, which he acknowledged does not apply in the Second Circuit.  See id. at *2 (noting application of Craig standard, which the Tenth Circuit and other courts have recognized as the applicable standard, "[w]ith the exception of the Second Circuit, which applied a more lenient standard").  Similarly, in United States v. Casher, No. 19-CR-065, 2020 WL 3270541, at *2

In a similar vein, courts in New York and elsewhere have granted motions to

permit pre-recorded two-way video teleconference testimony through the taking of Rule 15

depositions in advance of trial.  Cf. United States v. Mohamed, 18-CR-603, 2020 WL

1545522, at *7 (E.D.N.Y. Apr. 1, 2020) (Ross, J.) (granting government's motion to take

Rule 15 depositions of witnesses located in Somalia, concluding that the testimony was

material and there was "no real question of whether the witnesses are unavailable" because

there is a travel ban prohibiting almost all travel from Somalia to the United States, and

"[w]e are also in the midst of a global pandemic which puts further health and safety

restraints on travel"); United States v. You, No. 19-CR-014, 2020 WL 3549828, at *3 (E.D.

Tenn. June 30, 2020) (granting government's motion to take Rule 15 depositions of

witnesses located in Italy, concluding that the witnesses were unavailable because they were

outside the subpoena power of the United States and because "the world is also in the midst

of a global pandemic which puts additional health and safety restraints on travel").

In Donziger, Judge Preska held that "allowing remote testimony may be

needed to promote the strong public interest in avoiding exposing at-risk individuals to

COVID-19 and minimizing further spread of the virus."  United States v. Donziger, No. 19-

CR-561, 2020 WL 4747532, at *3 (S.D.N.Y. Aug. 17, 2020).  Judge Preska further held that

"depending on the witness's situation, the health risks and travel restrictions occasioned by

_____

(D. Mont. June 17, 2020), Judge Watters denied two witnesses' requests to permit sworn
testimony by video.  However, as Judge Preska has recognized, "Casher was compelled by
the Ninth Circuit Court of Appeals' ruling in United States v. Carter, 907 F.3d 1199 (9th Cir.
2018), which is not controlling authority for the Court. . . . [T]o whatever extent Ninth
Circuit precedent might bar [a witness] from testifying via two-way video, Second Circuit
precedent, which is binding on the Court, does not."  Donziger, No. 19-CR-561, 2020 WL
5152162, at *3 n.5.  Therefore, Pangelinan and Casher are not persuasive here.

the ongoing pandemic may also constitute 'exceptional circumstances' that would permit the use of video testimony." Id.

      C.    Discussion

      The six witnesses discussed above should be permitted to testify by VTC at trial because each meets the "exceptional circumstances" standard set forth in the law.

      1.    The Witnesses Will Offer Material Testimony

      Each of the witnesses will offer testimony that is material to the government's case.

      The Foreign Officer's testimony is relevant, material, and necessary to each of the four counts in the indictment.  This is so because the Foreign Officer is the first link in the chain of custody for the defendant's computers and cellphones, and those devices contain thousands of emails and online chats in which the defendant and his co-conspirators discussed committing the fraudulent scheme and laundering of proceeds from that fraudulent scheme, and in which the defendant admitted that he was the "king of fraud."  In these communications, the defendant can be seen explicitly discussing each of the means and methods of the fraudulent scheme—including the creation of the ad network Media Methane (Sup. Ind. ¶ 6), the renting of thousands of datacenter computer servers (Sup. Ind. ¶ 6), the programming of those datacenter computer servers to fabricate ad impressions (Sup. Ind. ¶ 7), the spoofing of thousands of webpages (Sup. Ind. ¶ 7), the simulation of human activity to deceive ad platforms and fraud detection companies (Sup. Ind. ¶ 8), and the theft of corporate identities to further disguise the scheme (Sup. Ind. ¶ 9).  In these communications, the defendant can also be seen directing proceeds from the scheme to various bank accounts in the names of various shell companies, and re-investing some of the proceeds to perpetuate the fraud (Sup. Ind. ¶¶ 12-13).  The Foreign

24

Officer is also the first link in the chain of custody for the paper documents and identity cards found in the defendant's apartment, which include the defendant's handwritten notes referencing specific lies, co-conspirators, and victims involved in the fraudulent scheme, corporate documents that establish that the defendant was the beneficiary of shell companies that received profits from the scheme, and identification documents that help attribute email accounts in the names of aliases to the defendant.

The testimony of Victim Representative 1, Victim Representative 2, and Victim Representative 3 is relevant, material, and necessary to the first two counts of the indictment. This is so because those counts allege that the scheme was designed to defraud "brands, ad platform and others in the digital advertising industry" through "materially false and fraudulent pretenses, representations and promises" (Sup. Ind. ¶¶ 21, 23.), and thereby victimized brands and ad platforms, among others (Sup. Ind. ¶¶ 15-19). Victim Representatives 1-3 speak directly to how brands, ad platforms, and others in the digital advertising industry were materially deceived and defrauded, and each does so in a unique way. Victim Representative 1 explains the defrauding and victimization of ad platforms and how that resulted in losses to the platform and its clients; Victim Representative 2 explains the defrauding and victimization of a well-known corporate brand, even where that brand expended enormous resources to defend itself against fraud, and how that resulted in losses to the brand's customers; and Victim Representative 3 explains the defrauding and victimization of a non-profit brand, which considered every dollar spent on digital advertising to be material. This testimony is particularly relevant in light of the defendant's anticipated defense, which he previewed in his post-arrest statements: that his false and fraudulent representations were immaterial because he was simply selling "low quality" ad

traffic that everyone in the industry knowingly accepted.  Victim Representatives 1-3 refute that defense by demonstrating that brands and ad platforms valued their advertising dollars, took measures to protect those dollars from being stolen, and detrimentally relied on the false representations coming from the defendant.

The testimony of Translator 1 and Translator 2 is relevant, material, and necessary to all four counts in the indictment.  This is so because the English translations of the bank records show that the defendant was involved in the fraudulent scheme, received proceeds from the scheme, re-invested some of the proceeds to perpetuate the fraud, and concealed other proceeds by transferring them to and through multiple corporate bank accounts located around the world (Sup. Ind. ¶¶ 12-13).

### 2.    The Witnesses Are Unavailable

The witnesses are unavailable due to the global pandemic and the specific risks and burdens it imposes on these witnesses.

"Unavailability is to be determined according to the practical standard of whether under the circumstances the government has made a good-faith effort to produce the person to testify at trial."  United States v. Johnpoll, 739 F.2d 702, 709 (2d Cir. 1984) (citing Ohio v. Roberts, 448 U.S. 56, 74 (1979)).  Witnesses who are too ill to travel are generally considered unavailable.  See, e.g., Gigante, 166 F.3d at 81-82 (witness's terminal illness and participation in witness protection program satisfied exceptional circumstances requirement); see also Fed. R. Evid. 804(a)(4) (declarant unavailable as witness if cannot be present or testify at the trial because of a "then-existing infirmity" or "physical illness"); United States v. Sapse, No. 10-CR-00370, 2012 WL 5334630 (D. Nev. Oct. 26, 2012) (allowing disabled

victim witnesses to testify remotely via live two-way video at federal courthouses close to their homes).

The government has made a good-faith effort to secure the witnesses' presence at trial and has, for the vast majority of its witnesses, secured in-person trial testimony. The specific circumstances of these six witnesses, as set forth in the enclosed declarations, render them unavailable.

The Foreign Officer is unavailable because he is beyond the subpoena power of the Court and he is unwilling to travel to New York to testify in person at trial. See United States v. Al Fawwaz, No. S7-98-CRIM, 2014 WL 627083, at *1 (S.D.N.Y. Feb. 18, 2014) ("Foreign witnesses who are not subject to the government's subpoena power and, despite the moving party's appropriate efforts, refuse to travel to this country to testify are routinely found unavailable.").

Victim Representative 1 is unavailable because of the increased risk of severe illness that he faces from COVID-19 and the specific burden that out-of-state travel would impose on his co-habitant in the form of lost work and earnings. Victim Representative 2 is unavailable because of the increased risk of severe illness that his father-in-law, with whom he resides, faces from COVID-19. Victim Representative 3 is unavailable because of the increased risk of severe illness that he faces from COVID-19, the specific burden that airplane travel would imposed on him, and the acute risk that he would pose on hospital employees and patients were he to contract COVID-19. See Donziger, No. 19-CR-561, 2020 WL 4747532, at *3 ("allowing remote testimony may be needed to promote the strong public interest in avoiding exposing at-risk individuals to COVID-19").

27

Translator 1 is unavailable because of the increased risk of severe illness that she faces from COVID-19, the specific burden that airplane travel would impose on her, and the specific burden that her absence from home would impose on her husband.  Translator 2 is unavailable because of the increased risk of severe illness that he faces from COVID-19. Id.

Therefore, exceptional circumstances exist such that all six witnesses are "unavailable" to testify at trial in-person.

      3.    Allowing the Witnesses to Testify via VTC Will Further the Interests of Justice

Permitting these witnesses to testify via VTC will further the interests of justice in several ways.

First, the government bears the burden of proving the defendant guilty of each count beyond a reasonable doubt, and the interests of justice are served by permitting the government to present evidence in order to meet that burden and in support of its efforts to present the whole truth to the jury.  See Mostafa, 14 F. Supp. 3d at 524 (holding that live video testimony furthered interest of justice because "[i]t is important that the Government be able to present the material and relevant evidence in its search for truth.").  The materiality of the testimony is an important consideration in this analysis, and it is significant that the six witnesses discussed above, collectively, possess relevant, material, and necessary evidence related to all four of the charges against the defendant.

Second, the proposed VTC method furthers the interests of justice by preserving face-to-face confrontation between the defendant and the witnesses and ensuring that the defendant has "forfeited none of the constitutional protections of confrontation."

28

Gigante, 166 F.3d at 80.  The Second Circuit has specifically endorsed such testimony as reliable where it is conducted by two-way live video, under oath, with the ability for the Court, jury, counsel and defendant to view the witness while providing testimony.  Id. at 81. This procedure preserves "the salutary effects of face-to-face confrontation[,]" including "1) the giving of testimony under oath; 2) the opportunity for cross-examination; 3) the ability of the fact-finder to observe demeanor evidence; and 4) the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence."  Id. at 80.  With respect to this last criterion, the proposed procedure will permit the witnesses, who would be under oath, to see the defendant as they testify, and for the defendant to see the witnesses.

Third, the testimony of these witnesses presents no significant issues related to veracity and reliability.  It is notable that five of the six witnesses never physically met the defendant and will not be asked to identify the defendant at all.  The remaining witness—the Foreign Officer—will be asked to identify the defendant from identification cards that he seized from the defendant's apartment, and will not be asked to identify the witness via video link, eliminating any concerns regarding the veracity of an identification of the defendant.  It is also notable that Translator 1 and Translator 2 will testify concerning their translation of documents from a foreign language to English, which translations are undisputed notwithstanding the defendant's refusal to stipulate to their accuracy.  Accordingly, concerns regarding their veracity and reliability are also reduced. Cf. Mostafa, 14 F. Supp. 3d at 523 ("One of the primary concerns of the Confrontation Clause is the reliability of testimony.").

Fourth, permitting the witnesses to testify by VTC furthers the interest in holding a public jury trial in a federal criminal case where there now exists "a window of opportunity for holding a public trial . . . and it is not clear how long those conditions will

remain." Donziger, 2020 WL 4747532 at *2.  Indeed, as Judge Azrack has noted, "the Court

should not squander the opportunity to conduct a trial while utilizing all of the health and

safety precautions at its disposal."  See United States v. Trimarco, No. 17-CR-583, ECF No.

115 at 14 (E.D.N.Y. Sept. 1, 2020).[8]

III.     The Court Should Permit Witnesses Who Are Exempted from the State's Quarantine
         Requirement to Testify

          The government moves in limine for the Court to permit witnesses traveling

from one of the states on New York's "Restricted States" list or from abroad to enter the

courthouse where the New York State Department of Health has exempted those witnesses from

quarantine.

          On June 24, 2020, the Governor of the State of New York issued Executive Order

No. 205 requiring travelers entering New York from a state with a positive test rate higher than

10 per 100,000 residents, or higher than a 10% test positivity rate, over a seven day rolling

average, to quarantine for a period of 14 days upon arrival in New York.  Under current

courthouse protocols, such travelers are also excluded from the courthouse.  See Ex. A at 2.

          The government expects to call 14 witnesses who currently reside in states that

are on New York's "Restricted States" list—specifically, Arizona, Colorado, Florida, Georgia,

Illinois, Louisiana, Missouri, Virginia, and Texas—and one witness who currently resides in

---

          [8] For these reasons, even under the Craig standard, which the Second Circuit has
rejected in this context, the proposed VTC testimony would pass muster.  See Craig, 497
U.S. at 850 (setting forth two preconditions for permitting one-way video testimony: (1)
"denial of such confrontation is necessary to further an important public policy" and (2) "the
reliability of the testimony is otherwise assured"); Gigante, 166 F.3d at 81 (declining to
extend Craig, which dealt with one-way video testimony, to two-way video testimony, which
is more comparable to a Rule 15 deposition).

Greece (collectively, the "Restricted Witnesses").[9]  While these witnesses are willing to travel to New York to testify at trial, they are unwilling to travel to New York 14 days before their testimony because of the burden that such a quarantine would place on their work and personal lives.

The New York State Department of Health is authorized to issue individual quarantine exemptions for necessary travel "based upon extraordinary circumstances, which do not warrant quarantine, but may be subject to the terms and conditions applied to essential workers or terms and conditions otherwise imposed" by the Department of Health.[10]  The Department of Health has issued quarantine exemptions for the Restricted Witnesses.  In light of these exemptions, the government respectfully requests that the Court permit the Restricted Witnesses to enter the courthouse to testify at trial.

---

[9] The New York State Department of Health periodically updates its "Restricted States" list based on New York Executive Order No. 205.  As a result, the precise number of Restricted Witnesses may increase or decrease by the time of trial.

[10] See Exemptions for Essential Workers, https://coronavirus.health.ny.gov/covid-19-travel-advisory (last updated October 23, 2020).

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court

grant the government's motions in advance of trial.

Dated:     Brooklyn, New York
           October 23, 2020

Respectfully submitted,


SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:     _____/s/_____
        Saritha Komatireddy
        Artie McConnell
        Alexander F. Mindlin
        Assistant United States Attorneys
        (718) 254-7000

32