DMP:SK/JAM/AFM
F.#2016R02228

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -                                  No. 18-CR-633 (S-1) (EK)

ALEKSANDR ZHUKOV,
     also known as "Alexander
     Zhukov" and "ibetters,"

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### THE GOVERNMENT'S REPLY IN SUPPORT OF ITS MOTIONS *IN LIMINE* REGARDING TRIAL PROCEDURES

                                           SETH D. DUCHARME
                                           ACTING UNITED STATES ATTORNEY
                                           Eastern District of New York
                                           271 Cadman Plaza East
                                           Brooklyn, New York 11201

Saritha Komatireddy
Artie McConnell
Alexander F. Mindlin
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

On October 24, 2020, the government filed motions requesting that the Court: (i) permit certain witnesses to testify via two-way video teleconference ("VTC"); (ii) permit the admission of certain evidence pursuant to business records certifications; and (iii) permit out-of-state witnesses to enter the courthouse without first quarantining for 14 days. Since the filing of those motions, there have been several significant developments in this case and in the world. First, the Court ruled on the third motion and decided that out-of-state witnesses from non-contiguous states must obtain a negative test before traveling, arrive in New York and quarantine for four days, and then obtain another negative test before entering the courthouse. Second, the Court stated its unwillingness to compel out-of-state witnesses to travel, quarantine as required, and testify in-person at trial. Third, the parties have engaged in extensive negotiations over possible stipulations, and the defendant has agreed to stipulate to certain items and "withdraw his objection" to others. Fourth, there have been changes in the public health situation, the availability of vaccines, and restrictions imposed by public and private entities, and those changes have affected witness availability. Finally, trial is now scheduled to proceed in the spring, with jury questionnaires distributed on March 29-30, 2021, in-person voir dire of potential jurors on April 5-6, 2021, and opening statements on April 12, 2021.

In light of the foregoing, the government respectfully revises and updates its remaining motions in limine—withdrawing four prior requests for VTC testimony and adding two new requests, and focusing the request to admit records via certifications on those that are in dispute. The Court has repeatedly encouraged the parties to be problem-solvers in this case, to do more "than simply point out the problems inherent in today's

environment and in addition make affirmative efforts . . . to move the ball forward here with respect to trial preparation." Sept. 16, 2020 Status Conf. Tr. at 18. The government has and continues to make such efforts and, it is in that spirit, that it makes these motions. The government respectfully submits that the relief it requests herein is necessary to proceed with a trial during the pandemic.

ARGUMENT

I. The Court Should Permit Testimony By Live Two-Way Video Teleconference

The government withdraws its request to call the Foreign Officer and Victim Representative 1 to testify by VTC. Both will testify in-person at trial. The government also withdraws its request to call Translator 1 and Translator 2 by VTC. The defendant has stipulated to enough translations to render the testimony of these two translators unnecessary (although the defendant's decision to dispute the remaining translations means that the government will still be calling three translators to testify in-person at trial).

The government adds a request to call Witness 1 and Witness 2 to testify by VTC, as further set forth below. These individuals, along with the two individuals that remain from the government's original motion, are unable or unwilling to travel to New York to testify, given their specific circumstances and the risks and burdens posed by the ongoing COVID-19 pandemic.

A. Additional Relevant Facts

1. ███████████ ("Witness 1")

Witness 1 is the Chief Executive Officer and founder of an ad network that was a downstream customer of the defendant's services and suffered losses as a result of the defendant's lies. Specifically, Witness 1 is expected to testify, in sum and substance, that in

3

the course of doing business, Witness 1 received the defendant's bot traffic and unwittingly sold it to clients. Upon revelation of the defendant's scheme, and widespread reporting on that scheme, Witness 1's business came under scrutiny and he was not paid for the services he rendered. Witness 1 sustained tens of thousands of dollars in losses; other companies suspended or severed ties with Witness 1; and Witness 1 was ultimately forced to lay off several employees and seek alternate employment for himself. Witness 1 will also testify that he expended resources to combat online digital advertising fraud, including by relying on independent fraud detection companies to assist in those efforts. McConnell Suppl. Decl., ¶ 7.

Witness 1's testimony is crucial to the government's case. Witness 1's testimony not only demonstrates the existence of the fraudulent scheme, but it also establishes a specific connection between the defendant's renting and programming of datacenter computer servers to deceive businesses in the online digital advertising industry and those deceptions causing actual losses to actual victims. His expected testimony is also important to establishing that the misrepresentations that the defendant made and directed as part of the fraudulent scheme were material to, and victimized, ad networks, as charged in the indictment, and refuting the defense that other ad networks freely accepted "bot" traffic without objection. Witness 1's testimony is also important to explaining how ad networks rely on fraud detection companies and demonstrates why the defendant's efforts to deceive specific fraud detection companies and "fuck[] them over," Ind. ¶ 17(g), caused the scheme to succeed—because Witness 1 attempted to use those same fraud detection companies to protect himself and his business but was instead deceived too. McConnell Suppl. Decl. ¶ 8.

4

Witness 1 resides in California. U.S. government officials have communicated with Witness 1 by telephone on multiple occasions, including earlier this week. While Witness 1 is concerned about contracting COVID-19, he is required to travel frequently for professional reasons. However, the Court's requirements for courthouse entry would require that Witness 1 quarantine for several days in a hotel. This would have serious professional repercussions for Witness 1 under normal circumstances. Exacerbating this, in April 2021, Witness 1 will be launching a new venture involving the rental of electric scooters in Orange County, which will require his daily on-site supervision and management. Quarantining for several consecutive business days, in addition to the time needed for cross-country travel, would be prohibitively burdensome and seriously jeopardize Witness 1's livelihood. McConnell Suppl. Decl. ¶ 9.

Witness 1 is unwilling to travel to New York to testify in person at trial, but is willing to testify by VTC from his current location. McConnell Suppl. Decl. ¶¶ 9, 10.

The government has served Witness 1 with a subpoena to testify at the April trial.

2. ██████████ ("Witness 2")

Witness 2 is an employee of the African Network Information Centre (or "AfriNIC"), a regional internet registry. Witness 2 is expected to testify, in sum and substance, that: AfriNIC is a regional internet registry that handles the registration of Internet Protocol ("IP") addresses in the publicly-available WHOIS database; that during the years 2015 and 2016, a number of the IP addresses associated with the Methbot scheme were registered with AfriNIC under the names of major U.S. internet service providers; that during the years 2015 and 2016, it was possible for an individual to register IP addresses with

AfriNIC in such a manner and that AfriNIC did not have practices and protocols in place to prevent such misappropriation of corporate identities; and that in December 2016, after the public revelation of the Methbot scheme, AfriNIC received communications from a U.S. telecommunications company alerting it to the fact that certain IP addresses associated with the Methbot scheme had been inappropriately registered in the company's name. Komatireddy Decl. ¶ 1.

Witness 2's testimony is critical to the government's case. Witness 2's testimony demonstrates how the defendant carried out a key part of his scheme—specifically, how he created false entries for the datacenter computer servers in the global register of IP addresses, and how those entries misappropriated or mimicked the corporate identities of major U.S. internet service providers and victimized those service providers, as charged in the indictment. Witness 2's testimony further corroborates internet chat communications between the defendant and his co-conspirators, in which he specifically discusses falsifying entries in the global register of IP addresses using AfriNIC. Komatireddy Decl. ¶ 2.

Witness 2 resides in Mauritius. U.S. government officials have communicated with Witness 2 and her supervisor by email and telephone on multiple occasions, including earlier today. Witness 2's supervisor has advised the government that Witness 2 is fearful of contracting COVID-19 and suffering illness or death from contracting the virus. This fear is made more acute by the relative paucity of COVID-19 cases in Mauritius.[1] Witness 2's

---

[1] According to the New York Times COVID Tracker, the average number of daily cases in Mauritius is currently 1.0, whereas the average number of daily cases in New York

6

supervisor has advised the government that COVID-19 is generally considered to have been eliminated in Mauritius and life in Mauritius has returned to normal, with individuals carrying out their daily activities without masks, social distancing, or other COVID-related restrictions.  In light of this, Witness 2 and her supervisor view traveling to a location with any level of COVID-19 in the community as placing Witness 2 at a significantly higher, and unnecessary, risk.  Witness 2 has not yet received the opportunity to be vaccinated. Komatireddy Decl. ¶ 3.

Witness 2's supervisor has also advised the government that quarantine requirements—both upon arrival in New York and when returning to Mauritius—would present severe personal and professional hardships.  Specifically, the Court's requirement that out-of-state witnesses quarantine and obtain a negative test four days after arriving in New York in order to enter the courthouse would compel Witness 2 to quarantine for days in a hotel in New York City, where COVID-19 remains prevalent and community spread of the virus is ongoing.  In addition, to prevent the community spread of COVID-19 in Mauritius, the government of Mauritius requires a 14-day mandatory quarantine for all inbound travelers and four separate PCR tests over the span of 20 days.[2]  Either or both of these quarantine requirements would seriously disrupt Witness 2's personal life and professional responsibilities.  Komatireddy Decl. ¶ 4.

---

City is 4,083.  See Coronavirus Maps and Cases, N.Y. Times, https://www.nytimes.com/news-event/coronavirus (last visited February 26, 2021).

[2] See Latest Information on Coronavirus (Covid-19), https://www.mymauritius.travel/mauritius-travel-alerts (last visited February 26, 2021).

7

Witness 2 is unwilling to travel to New York to testify in person at trial, but is willing to testify by VTC from her current location. Komatireddy Decl. ¶¶ 4, 5.

Witness 2 is beyond the subpoena power of the Court.

3. ▮▮▮▮▮▮▮ ("Victim Representative 2") [3]

Victim Representative 2 continues to be a crucial and material witness in the government's case. Mindlin Suppl. Decl. ¶ 1.

Victim Representative 2 continues to reside in California. U.S. government officials have communicated with Victim Representative 2 and his attorney by email and telephone on multiple occasions, including earlier this week. Victim Representative 2 and his attorney have advised the government that Victim Representative 2 remains unwilling to travel to New York to testify in person at trial because he resides with his elderly father-in-law, who is 72 years old, has diabetes, has had five heart stents placed including one earlier this year, and is therefore at high risk of serious complications if he were to contract COVID-19. As a result, Victim Representative 2 is still practicing extreme care in managing his personal exposure and seeks to avoid traveling away from the Bay Area during the pandemic. Victim Representative 2 informed the government that he continues to be would be extremely fearful about traveling by airplane to New York, given the need to sit in close proximity to others, because of his concern that he might bring the virus home to his father-in-law. Victim Representative 2's attorney also informed the government that neither Victim

---

[3] The government has redacted the witnesses' names from its public filings because the filings discuss the witnesses' personal circumstances and health conditions. See United States v. Amodeo, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (privacy interests of third parties may be compelling reason justifying sealing).

Representative 2 nor his father-in-law have yet had the opportunity to receive a COVID-19 vaccine. Victim Representative 2's attorney also informed the government that Victim Representative 2 is managing a hybrid arrangement of both in-person and remote schooling for his children, and a prolonged absence from home would impose a burden on his household. Mindlin Suppl. Decl. ¶ 2.

Victim Representative 2 remains willing to testify by VTC from his current location. Mindlin Suppl. Decl. ¶ 3.

The government has served Victim Representative 2 with a subpoena to testify at the April trial.

4. [redacted] ("Victim Representative 3")

Victim Representative 3 continues to be a crucial and material witness in the government's case. McConnell Suppl. Decl. ¶ 1.

Victim Representative 3 continues to reside in Texas. U.S. government officials have communicated with Victim Representative 3's attorney by email and telephone on multiple occasions, including earlier this week. Victim Representative 3's attorney has advised the government that Victim Representative 3 will be 62 years old at the time of trial and that he continues to practice extreme care in managing his potential exposure to COVID-19. Specifically, Victim Representative 3's attorney has informed the government that, despite being a hospital employee and having the opportunity to be vaccinated, Victim Representative 3 is concerned about contracting COVID-19 and passing it to family members and individuals at his workplace, thereby affecting the health of others and hospital employees' abilities to carry out their mission. Victim Representative 3's responsibilities at the Children's Hospital require him to interact with hospital personnel; and the Children's

Hospital continues to provide much-needed orthopedic surgeries to children, such as scoliosis-related back surgery, surgeries addressing severe hip and feet disorders, and surgeries dealing with limb lengthening. McConnell Suppl. Decl. ¶¶ 2, 3.

Victim Representative 3's attorney also informed the government that Victim Representative 3 is still recovering from two separate hip-replacement surgeries performed last year, which would make airplane travel more difficult for him. McConnell Suppl. Decl. ¶ 4.

Victim Representative 3's attorney further informed the government that quarantine requirements—both upon arrival in New York and when returning to Texas—would present severe personal and professional hardships. Specifically, the Court's requirement that out-of-state witnesses quarantine and obtain a negative test four days after arriving in New York in order to enter the courthouse would compel Victim Representative 3 to quarantine for days in a hotel in an unfamiliar city, all to provide what the government expects to be roughly thirty minutes of largely uncontroverted testimony. Additionally, given the sensitive nature of its work and patients, the Children's Hospital has enacted its own considerable quarantine requirement for inbound travelers. As applicable here, Victim Representative 3 would have to quarantine for ten days upon his return to Texas before being able to return to work at the Children's Hospital. Either or both of these quarantine requirements would cause a serious disruption to Victim Representative 3's professional responsibilities and to operations at the Children's Hospital. McConnell Suppl. Decl. ¶ 5.

Victim Representative 3 remains willing to testify by two-way video teleconference from his current location. McConnell Suppl. Decl. ¶ 6.

The government has served Victim Representative 2 with a subpoena to testify at the April trial.

C. Discussion

The four witnesses discussed above should be permitted to testify by VTC at trial because each meets the "exceptional circumstances" standard set forth in the law.

1. The Witnesses Will Offer Material Testimony

Each of the witnesses will offer testimony that is material to the government's case.

The testimony of Witness 1 is relevant, material, and necessary to the first two counts of the indictment. This is so because those counts allege that the scheme was designed to defraud "brands, ad platforms and others in the digital advertising industry" through "materially false and fraudulent pretenses, representations and promises" (Sup. Ind. ¶¶ 21, 23), and thereby victimized various players in the digital advertising industry (Sup. Ind. ¶ 15). Witness 1 speaks directly to how an ad network—one of the "others" in the digital advertising industry—was materially deceived and defrauded, and does so in a unique way because Witness 1 will be the only witness at trial from an ad network not complicit in the defendant's fraudulent scheme. Witness 1 explains the defrauding and victimization of an ad network (as opposed to a brand or an ad platform, as other witnesses do) and how that resulted in losses to the ad network and its clients.

Witness 1's testimony also shows how the scheme worked: in the chain of entities between the defendant's fake traffic and the brands that ultimately paid for that traffic, Witness 1's business sat in the middle, and Witness 1's testimony explains how his business unwittingly resold the defendant's fake traffic and paid the price for doing so. This

11

is particularly relevant in light of the defendant's specific focus on the question of how the government intends to show the connection between the defendant's creation of fake ad traffic and the ultimate losses sustained by advertisers.  See Oct. 21, 2020 Status Conf. Tr. at 42-45 (defense counsel asking "how the analysis connects the allegations to the dollar amounts").  Witness 1's testimony is critical to showing that connection.

Witness 1's testimony also shows how the defendant's misrepresentations deceived others in the digital advertising industry, directly and indirectly through their manipulation and circumvention of fraud detection companies (Sup. Ind. ¶ 8), which Witness 1 relied on (to no avail) to keep him away from ad fraud.

The testimony of Witness 2 is also relevant, material, and necessary to the first two counts of the indictment.  This is so because the indictment alleges that one of the manners and means that the defendant used "[t]o further deceive SSPs and others in the digital advertising industry into believing that the datacenter computer servers were genuine human users" was to lease IP addresses and then "create[] false entries for the datacenter computer servers in a global register of IP addresses" under false names that "misappropriated or mimicked the corporate identities of major U.S. internet service providers" (Sup. Ind. ¶ 9).  Witness 2's testimony is relevant and necessary because it explains that global register and how the defendant went about registering the IP addresses under his control in the register under false corporate identities.  Witness 2's testimony is also material because it corroborates the defendant's internet chat communications in which he specifically references the regional registry that Witness 2 works for as he discusses aspects of his scheme with co-conspirators.

The government previously explained how the testimony of Victim Representative 2 and Victim Representative 3 is relevant, material, and necessary. See ECF No. 162 at 25-26.

2. The Witnesses Are Unavailable

The government has made a good-faith effort to produce each of the four witnesses at trial and persuade them to appear voluntarily. The government has made clear that it will pay for travel expenses and arrange for testing ahead of courthouse entry. However, the witnesses remain unwilling to appear voluntarily and are unavailable due to the global pandemic and the specific risks and burdens it imposes on these witnesses.

Witness 2 is unavailable because she is beyond the subpoena power of the Court and is unwilling to travel to New York to testify in person at trial. See United States v. Al Fawwaz, No. S7-98-CRIM, 2014 WL 627083, at *1 (S.D.N.Y. Feb. 18, 2014) ("Foreign witnesses who are not subject to the government's subpoena power and, despite the moving party's appropriate efforts, refuse to travel to this country to testify are routinely found unavailable."). Witness 2 is also unavailable because she is unwilling to travel from a COVID-free area to an area where COVID remains prevalent, and the cumulative 20-day quarantine and travel requirements would pose an undue burden on her personal and professional life.

Witness 1, Victim Representative 2, and Victim Representative 3 are likewise unavailable because—in light of the Court's stated unwillingness to compel witness travel, quarantine, and in-person attendance at trial during the pandemic—those witnesses are also not subject to the government's subpoena power and are likewise unwilling to travel to New York voluntarily to testify in person at trial. United States v. Sandoval, No. 94-CR-714,

13

1997 WL 458424, at *1 (N.D. Ill. Aug. 4, 1997) (citing cases finding that witnesses are "unavailable" when they are beyond the power of the United States and they have declared their unwillingness to testify at trial).  In addition, Witness 1 is unavailable because of the financial hardship that a four-day quarantine and cross-country travel would impose on his livelihood at a time when he is launching a new business (given that he lost his prior business as a result of the defendant's fraud).   Victim Representative 2 is unavailable because of the increased risk of severe illness that his father-in-law, with whom he resides, faces from COVID-19.  And Victim Representative 3 is unavailable because of the increased risk of severe illness that he faces from COVID-19, the specific burden that airplane travel and the cumulative 14-day quarantine requirements would impose on him, and the acute risk that he would pose on hospital employees and patients were he to contract COVID-19.  See Donziger, No. 19-CR-561, 2020 WL 4747532, at *3 ("allowing remote testimony may be needed to promote the strong public interest in avoiding exposing at-risk individuals to COVID-19").

Therefore, exceptional circumstances exist such that all four witnesses are "unavailable" to testify at trial in-person.

### 3. Allowing the Witnesses to Testify via VTC Will Further the Interests of Justice

As the government previously explained, permitting these witnesses to testify via VTC will further the interests of justice by allowing the trial to go forward as-scheduled, enabling the government to present a coherent case to the jury, and preserving face-to-face confrontation through VTC.  See ECF No. 162 at 28-30.  In addition, none of the four

14

witnesses physically met the defendant and none of them will be asked to identify the defendant, eliminating any significant issues related to veracity and reliability.

II. The Court Should Permit the Government to Admit
Evidence Pursuant to Business Records Certifications

The government refocuses its request to admit records via certifications on those that are in dispute.

A. Additional Relevant Facts

After extensive negotiations between the parties, the defendant has agreed to "withdraw the objection" to selective documents being authenticated as business records via certifications. See ECF No. 233 at 1-2. Notably, the defendant has refused to affirmatively stipulate to the authenticity of these records—or any records for that matter. Rather, the defendant states that he "agree[s]" that certain exhibits are "properly certified" and lists them in his letter. Id. In addition, the defendant has indicated that he will stipulate that certain records from Dropbox, Apple, and Google are accurate extractions of accounts held at those entities. The government will move to admit these exhibits into evidence at trial pursuant to the certifications and stipulations, and has previously submitted the certifications for the Court's inspection.

However, it is important to note that the defendant has taken a tactical approach to the government's exhibits—withdrawing his objection to certain records from a particular provider and maintaining his objection to other records from the same provider—even though a records custodian would provide the same authentication testimony as to all the records, namely, that they are all business records of the company. The defendant has taken this approach with GoDaddy and DomainsByProxy. In addition, the defendant

15

maintains his opposition to <u>any</u> records from the following entities coming in via certification: MaxMind, 24Shells, Linode, Sabre, Digital Ocean, Domaintools, and the Internet Archive.

The government has identified representatives of MaxMind, Linode, Sabre, Digital Ocean, and Domaintools who can testify in-person at trial, and withdraws its request with respect to those entities absent a change in circumstance. The government continues to seek to admit records via certification from GoDaddy, DomainsByProxy, 24Shells, and the Internet Archive.[4]

B. <u>Discussion</u>

The defendant's line-drawing as to what records are "properly certified" or not is purely tactical and evidences a defense strategy to agree to the minimum required to argue that trial should go forward as-scheduled during the pandemic, while also taking advantage of the pandemic (and related issues of witness availability and the Court's stated unwillingness to compel trial witnesses to appear) to eliminate government witnesses and exhibits and gut the government's case.

For example, the government proposed that the defendant stipulate that certain records from DomainsByProxy are properly considered business records for authenticity and hearsay purposes. DomainsByProxy is a domain registration obfuscation service that the defendant used to perpetrate the scheme. The defendant agreed to "withdraw his objection"

---

[4] The government will provide the Court with a binder of the exhibits that pertain to each certification. The government has already provided these exhibits to the defense. The government also notes that it is not seeking to admit the business records <u>certifications</u> into evidence, only the records that they certify.

to GX 406 and GX 409 (which show that the defendant registered the domain name for his ad network Media Methane), but refused to "withdraw his objection" to GX 407 and GX 408 (which show that the defendant also registered the domain name for centbycent.com, the secret command and control server that only the defendant and his co-conspirators could access, and that provided direction to the defendant's bots, collected statistics about the number of fake ad impressions being generated, and was generally central to running the fraudulent scheme). The exhibits GX 408 and GX 409 are indistinguishable in terms of their format and the types of information they contain—but the one he agreed to permits the defendant to maintain his story that he ran an ad network for benign purposes, and the one he objects to links him with a server that was operating exclusively for malicious purposes.

The defendant takes this approach time-and-time again. In another example, the defendant agrees to the first page of the GoDaddy exhibit GX 403, which shows only that centbycent.com is registered to a private registrant, and enables him to argue that the domain was registered to someone else entirely. But he objects to the remaining two pages of the GX 403, which contain the IP addresses of the servers that hosted centbycent.com—servers that are registered to the defendant's true name. This is so even though a GoDaddy records custodian's testimony would be the same as to both records—that the records are true and accurate copies of records kept by GoDaddy, created by a person with knowledge or a computerized process, and created and maintained in the ordinary course of business.

While it is the defendant's right to approach stipulations in this tactical manner, it is important to recognize that the line in the sand that the defendant draws is not principled and not in any way tethered to the law governing the use of certifications—and so the Court need not, and should not, draw the same line.

17

The government previously explained that business records—including those from GoDaddy, DomainsByProxy, and 24Shells—are properly admitted under Federal Rule of Evidence 902(11). See ECF No. 162 at 5-7. In addition, the recent passage of Federal Rule of Evidence 902(13) enables the admission of records generated by an electronic process—as Internet Archive certification establishes that Wayback Machine records are—to be admitted by certification. See United States v. Bondars, No. 16-CR-228, 2018 U.S. Dist. LEXIS 229393 (E.D.Va. Aug. 20, 2018) (admitting Wayback Machine records pursuant to certification under Rule 902(13)); Hon. Paul Grimm, Gregory Joseph & Daniel Capra, Best Practices for Authenticating Digital Evidence, at 16-17, n. 50, West Academic Publishing (2016) ("Under a proposed amendment to the Federal Rules of Evidence, the reliability of the Wayback machine process could be established by a certificate of the Internet Archive official, rather than in-court testimony. See Proposed Rule 902(13).").

The defendant argues that the records need further explanation, and should not be admitted by certification for that reason. This is not true—courts have permitted business records to be admitted by certification and explained by other witnesses with sufficient knowledge to explain them. See United States v. Espinal-Almeida, 699 F.3d 588, 611-13 (1st Cir. 2012) (affirming use of government agent's non-expert testimony to admit evidence derived from GPS device and Google Earth software); United States v. Cameron, 729 F.Supp. 2d 411, 416-18 (D. Me. 2010) (discussing the government's intended use of testimony from FBI agent to "explain how Google Hello operated; how the user created an account and set options; how the user identified and accepted 'friends;' how chat occurred; how images were traded and saved; how the chat and images were displayed during chat sessions; and how the chat logs and the images were available for later access and use by the

18

user."); United States v. Hallock, No. 10–10421, 2011 WL 4894398, at *2 (9th Cir. Oct. 14, 2011) (affirming testimony by FBI agent regarding Google service). For example, the government has provided expert notice for two computer scientists who will testify at trial, and either of those computer scientists is equipped to explain the domain registration records discussed above. See Fed. R. Evid. 703 (permitting experts to testify about facts and data of the kind that experts in the particular field would reasonably rely on). To the extent that the defendant wishes to argue that the government has not provided a sufficient explanation of the records, those arguments go to the weight of the records, not their admissibility, and the defendant can make that argument to the jury.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court grant the government's motions in advance of trial.

Dated:   Brooklyn, New York
         February 26, 2021

                                        Respectfully submitted,

                                        SETH D. DUCHARME
                                        Acting United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

                                By:     _____/s/_____
                                        Saritha Komatireddy
                                        Artie McConnell
                                        Alexander F. Mindlin
                                        Assistant United States Attorneys
                                        (718) 254-7000