# ZMO Law PLLC

April 21, 2021

*Via* ECF and email

Hon. Eric Komitee
Eastern District of New York
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    RE: *U.S. v. Aleksandr Zhukov*, 18 Cr. 633

Dear Judge Komitee:

This office represents Aleksandr Zhukov in the above-captioned matter. At the Court's direction, we write in further support of Mr. Zhukov's motion to suppress any statements made during the search of his apartment in Varna, Bulgaria, on November 6, 2018, including Mr. Zhukov's purported statement "that he owned all of the devices and documents seized" from the apartment. ECF No. 205. As discussed below, the evidence presented at the hearing on April 14, 2021 showed both that the questioning of Mr. Zhukov at the time of his arrest was a joint U.S.-Bulgarian operation and that Mr. Zhukov did not waive his right to counsel before the questioning began. Accordingly, the government did not meet its burden and the statements made during the search of Mr. Zhukov's home must be suppressed.

*Facts*

Testimony and exhibits introduced at the Suppression Hearing on April 14, 2021 revealed the following. In 2017, the United States began investigating Mr. Zhukov for his involvement in an alleged advertising fraud conspiracy. By the fall of 2018, the FBI and prosecutors from the Eastern District of New York were making final plans to apprehend Mr. Zhukov, seize electronic devices from his apartment in Varna, Bulgaria, and extradite Mr. Zhukov to the United States to be prosecuted. Bulgaria did not conduct its own criminal investigation of Mr. Zhukov.

260 Madison Avenue, 17th Floor • New York, NY 10016
(212) 685-0999 • info@zmolaw.com
www.zmolaw.com

ZMO Law PLLC

Between October 5 and October 7, 2018, the FBI Legal Attaché to Bulgaria, Jack Liao, exchanged emails with New York-based FBI agent Christopher Merriman regarding preparation for a search-and-seizure operation at Mr. Zhukov's apartment in Varna. The agents discussed how the operation would be carried out with the assistance of Agent Liao's "local partners" in Bulgaria. *See* 3500-JL-22 at 3. Liao advised Merriman that the SCPO, Bulgaria's "DoJ/OIA equivalent," would "work with us to draft an order to comply with" the 2007 U.S.-Bulgaria Mutual Legal Assistance Treaty ("MLAT"). *Id.* at 2.

On October 12, 2018, the Department of Justice sent the Bulgarian government an MLAT request, setting forth, *inter alia*, "procedures to be followed" during the search-and-seizure operation at Mr. Zhukov's apartment. *See* ECF No. 228-1. The MLAT request advised Bulgarian officials "to coordinate the scheduling of all searches and interviews with FBI Legal Attaché, Jack Liao," and to permit an FBI representative to be physically present at the search-and-seizure operation and at all questioning of Mr. Zhukov. ECF No. 228-1 at 8. The MLAT request also listed electronic devices and other property to be seized from the apartment as well as procedures for documenting and preserving that evidence for use in prosecuting Mr. Zhukov. ECF No. 228-1 at 8-9.

On November 5, 2018, Judge Julieta Shopova of the District Court of Varna signed an order authorizing the search of Mr. Zhukov's apartment, a translation of which was admitted at the Suppression Hearing as Exhibit 2T. The order provides:

> **We have received a request from the Prosecutor of DPO Varna regarding RLA No. 568/2018, that started with the execution of a request for legal assistance No. CRM-182-66022, dated 10/12/2018, from the DOJ of the USA, against the Russian citizen Aleksandr Mihailovich Zhukov, born on 04/10/1980, in Russia, who is being investigated pursuant to Title 18 of the United States Code, Section 1343 – fraud by means of wire, radio, or television communication, and Title 18 of the United States Code, Section 1349 – attempt and conspiracy. In order to execute the request for legal assistance, a search of the residence and body of the investigated person needs to be conducted.**

Also on November 5, 2018, Agent Liao met in Varna with a team of Bulgarian officials, including Commissioner Vladimir Dimitrov,[1] "to go over the operational plan for [] the

---

[1] Mr. Dimitrov's title at the time of Mr. Zhukov's arrest on November 6, 2018, was Inspector. Tr. 9:24.

Page 2

coming day [.]" Transcript of April 14, 2021, Suppression Hearing (hereinafter "Tr."), at 104:11. Later that day, three additional American law enforcement officials arrived in Varna, including FBI agents Christopher Merriman and Evelina Aslanyan, and Assistant United States Attorney Alexander Mindlin. Tr. 36:12 – 37:3; 103:11-13. That night, Dimitrov and the four Americans spent several hours together at dinner.[2] FBI funds were used to pay for Dimitrov's dinner and for the Varna hotel where Dimitrov and his Bulgarian colleague stayed because, as Agent Liao put it, the Varna operation was being conducted "exclusively at [the] request and for [the] benefit of" the United States. Tr. 98:5-18. The following morning, on the day of the search, the four Americans met with Bulgarian officials (including Dimitrov) for a second operational briefing. Tr. 95:18-25.

On November 6, 2018, after the second briefing with American officials, Dimitrov led a team of Bulgarian officers to Mr. Zhukov's apartment to carry out the search-and-seizure described in the MLAT request. Agent Aslanyan attended the search on behalf of the FBI.[3] Dimitrov testified that, once inside the apartment, he placed Mr. Zhukov in custody and advised him of his right to remain silent, to receive medical attention, and to inform a relative of his arrest. Tr. 18:21 - Tr. 19:1-4. When asked a leading follow-up question about whether he advised Mr. Zhukov of his right to an attorney, Dimitrov testified that he did. Tr. 19:8-17, 20:18-19. Dimitrov did not testify that he advised Mr. Zhukov that he was entitled to have questioning delayed until a lawyer was present; rather, Dimitrov conceded that it would have taken "10, 20 minutes to call a lawyer." Tr. 52:8-19. On cross examination, Dimitrov admitted that at the time he supposedly read Mr. Zhukov his rights, Mr. Zhukov was clad only in his underwear, handcuffed behind his back, and on the floor. Tr. 42:11-13, 71:8-10. Agent Aslanyan was not present at that time. Tr. 15:18-20.

Dimitrov's testimony is directly contradicted by Mr. Zhukov's affidavit swearing that nobody advised him of any rights inside the apartment. ECF No. 205. Subsequently, and in the presence of Agent Aslanyan, Dimitrov asked Mr. Zhukov whether he owned certain electronic devices inside the apartment and, according to the Government, Mr. Zhukov responded "that he owned all of the devices and documents seized" from the apartment. *See* ECF No. 205; Tr. 51:18-25; Tr. 44:22 – 45:1. The electronic devices seized from the

---

[2] At the suppression hearing on April 14, 2021, Dimitrov testified on cross-examination that discussion at dinner concerned "the weather." Tr. 37:5. When asked again, this time by the Court, Dimitrov testified that "we briefly discussed [the search]" but could not recall further details about the conversation. Tr. 61:4-11.

[3] According to Agent Liao, the rest of the American team stayed behind so as "not to crowd the scene," even though the Bulgarian orders authorized them to be present if they wished. Tr. 113:5-6.

apartment purportedly contained much of the evidence the Government expects to put forth at trial. Tr. 76:5-18.

## *Argument*

### Mr. Zhukov's statement should be suppressed because the government has not met its burden of showing either a "joint venture" or that Mr. Zhukov was adequately advised of his rights under *Miranda v. Arizona*

The Court should suppress Mr. Zhukov's purported statement that he "owned all of the devices and documents" seized from the apartment in Varna, Bulgaria. First, the Government has not proved by a preponderance of the evidence that, before questioning, Mr. Zhukov was advised of his Fifth and Sixth Amendment rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Second, Commissioner Dimitrov, the Bulgarian officer who elicited the statement, was acting as an agent of the United States and for the purpose of advancing an American investigation, so the joint venture doctrine requires suppression of the unwarned custodial statement. *See, e.g., U.S. v. Emery*, 591 F.2d 1266, 1268 (9th Cir. 1978).

### A. The Government has not met its burden of proving that Mr. Zhukov was advised of his *Miranda* rights.

The Government has not met is burden of proving that, prior to questioning, Mr. Zhukov was advised of and waived his rights under the Fifth and Sixth Amendments. *See U.S. v. Juv. Male*, 968 F. Supp. 2d 490, 503 (E.D.N.Y. 2013) (citations omitted) ("[T]he government bears the burden of proving by a preponderance of the evidence both that a defendant was advised of his constitutional rights under *Miranda* and that he knowingly, intelligently, and voluntarily waived those rights.").

Although Commissioner Dimitrov testified at the suppression hearing that he advised Mr. Zhukov of his right to remain silent and to have an attorney present, Dimitrov's testimony lacks sufficient credibility to satisfy the Government's evidentiary burden. Only in response to a leading follow-up question did Dimitrov claim that he advised Mr. Zhukov of his right to an attorney.[4]

More generally, Dimitrov's credibility was undermined because he testified falsely in an effort to minimize the American role in the questioning of Mr. Zhukov. He claimed he was only involved in the Zhukov investigation for a couple of months, when email traffic

---

[4] Dimitrov did not testify that he would have delayed questioning if Mr. Zhukov had called an attorney.

ZMO Law PLLC

showed he had in fact been providing information to the Americans about Zhukov for about a year. Tr. 63-65. He falsely characterized his dinner conversation with American officials on the eve of Mr. Zhukov's arrest, initially claiming they only talked about "the weather." Tr. 37:5, 61:4-11. Prior to the suppression hearing, Dimitrov falsely stated in a sworn affidavit that he never received a list of questions from Agent Liao. Tr. 106.

Further, immediately following the operation, Bulgarian investigators prepared a detailed "Search and Seizure Report," which the Government included in its voluminous discovery but omitted from the 3500 material provided in advance of the suppression hearing. A copy of this report is attached hereto as Exhibit A and a translation provided by the government is attached as Exhibit B. The report documents the seizure of evidence from Mr. Zhukov's apartment and attributes to Mr. Zhukov the custodial statement at issue ("All items belong to me"). The report includes signatures by two civilian witnesses whose presence was required by Bulgarian law, underneath the statement "We are aware of our rights and obligations [as civilian witnesses] per art. 137, para 3 and 4 of CPC." In contrast, the report does not state that Mr. Zhukov was advised of any rights, nor does it document any written waiver of those rights. Dimitrov appears to have signed the final page of the report. *See* Ex. A at 4.

Mr. Zhukov has provided an affidavit swearing that he was *not* advised of his rights by Dimitrov. Dimitrov's testimony that he advised Mr. Zhukov of his right to counsel should not be credited. Accordingly, the Government has failed to prove that Mr. Zhukov was adequately advised of his constitutional rights and that Mr. Zhukov knowingly, intelligently, and voluntarily waived those rights. The Court should proceed to analyze whether a joint venture existed between the United States and Bulgaria.

**B. The Government has not demonstrated the absence of a joint venture between the United States and Bulgaria.**

Unwarned custodial statements taken abroad by foreign officers are generally admissible at trial, because *Miranda*'s purpose is to deter American, not foreign, officials. Suppression of such statements *does* vindicate *Miranda's* deterrent rationale, however, when the United States "simply used foreign police officials as instruments in conducting investigation and interviews." *U.S. v. Bary*, 978 F.Supp.2d 356, 367 (S.D.N.Y. 2013) (citations omitted). Thus, under the joint venture doctrine, *Miranda* requires suppression if American officials initiated the investigation, orchestrated the defendant's capture, and were present when the defendant was arrested and questioned. *See U.S. v. Emery*, 591 F.2d 1266, 1268 (9th Cir. 1978). *See also U.S. v. Harun*, 232 F. Supp. 3d 282, 287 (E.D.N.Y. 2017) (citing *U.S. v. Abu Ali*, 528 F.3d 210, 229 (4th Cir. 2008)) (acknowledging that

ZMO Law PLLC

suppression is appropriate where there is American "coordination and direction of an investigation or interrogation" on foreign soil.).

Here, the Government has not proved the absence of a joint venture between the United States and Bulgaria.[5] The record shows that the United States used Commissioner Dimitrov and the other Bulgarian officers as "instruments" in an American criminal investigation. *See U.S. v. Bary*, 978 F.Supp.2d at 367. As Agent Liao testified, the search-and-seizure operation that generated the statement at issue was carried out "exclusively at [the] request and for [the] benefit of" the United States. Tr. 98:16-18. The Government does not contend that Bulgaria conducted an independent investigation into Mr. Zhukov's business activities. Indeed, the Bulgarian court order stated that the search would be conducted "in order to execute the [U.S.] request for legal assistance" and that Mr. Zhukov was only being investigated for violating American law. In short, Mr. Zhukov was interrogated at his apartment in the presence of an American agent, during a search-and-seizure operation devised by American officials for the purpose of prosecuting Mr. Zhukov in an American court. Under these circumstances, suppression is necessary to deter American officials from using foreign agents to conduct unwarned custodial interrogations in the future.

Although no court in this circuit has confronted a similar set of facts, courts elsewhere have found that American involvement leading up to an interrogation can be so substantial as to create an agency relationship with foreign officials—particularly where the investigation was initiated by the United States with the expectation of prosecuting the suspect in an American court. *See U.S. v. Emery*, 591 F.2d 1266, 1268 (9th Cir. 1978) (reversing the defendant's conviction based on the district court's failure to suppress custodial statements made to Mexican officials, where the DEA "alerted the Mexican police of the [drug] activity, coordinated the surveillance . . . and gave the signal that instigated the arrest[.]"); *U.S. v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987)(finding a joint venture where American officials described the operation as a "joint investigation" and "the DEA was involved daily in translating and decoding intercepted transmissions . . . advising the Philippine authorities of their relevance . . . [and] treated the affair as one in which the marijuana was destined for the United States, and so assumed a substantial role in the case."); *U.S. v. Prowler*, 06-cr-00391 (RMT), 2007 WL 9711930, at *4 (C.D. Cal. Feb. 14, 2007) (suppressing statements under the joint venture doctrine where "participation of U.S. agents in the events that led" to the custodial interview "was substantial."). *See*

---

[5] *See U.S. v. Bary*, 978 F. Supp. 2d at 366-67 ("[T]he Court assumes without deciding that the government must establish the absence of a joint venture."). *Cf. U.S. v. Capers*, 627 F.3d 470, 480 (2d Cir. 2010) (holding that the government carries the burden of disproving the applicability of the two-step interrogation exception to *Miranda*).

ZMO LAW PLLC

*generally U.S. v. Straker*, 800 F.3d 570, 616-17 (D.C. Cir. 2015) (distinguishing "limited cooperation" between foreign investigators and the FBI from the "extensive coordination, active participation, and direction by U.S. law enforcement officers" in *U.S. v. Emery*, 591 F.2d at 1268); *U.S. v. Karake*, 281 F. Supp. 2d 302, 309 (D.D.C. 2003) (holding that the existence of a joint venture depends on evidence of "cooperation between the United States and Rwandan governments sufficient to reveal an agency relationship . . . including but not limited to information that defendants were held at U.S. officials' request or were questioned at U.S. officials' direction."); *U.S. v. Flath*, No. 11-CR-69, 2011 WL 6296759, at *5 (E.D. Wis. Nov. 18, 2011), *report and recommendation adopted*, 845 F.Supp.2d 951 (E.D. Wis. 2012)(citing *U.S. v. Peterson*, 812 F.2d at 490)("When foreign authorities are acting on behalf of the United States agents or at the United States agents' behest, this participation may be substantial enough to convert the search into a joint venture.").

Where American involvement in an investigation is substantial, courts have admitted unwarned extraterritorial statements only where a foreign nation was independently conducting its own investigation. *See U.S. v. Straker*, 800 F.3d at 581 (noting that Trinidadian police "were conducting their own investigation"); *U.S. v. Frank*, 599 F.3d 1221, 1226 (11th Cir. 2010) (noting that "Cambodian officers acted out of their own interest in determining whether Frank violated Cambodian laws"); *U.S. v. Bagaric*, 706 F.2d 42, 69 (2d Cir. 1983) (declining to find a joint venture in light of an "ongoing Canadian investigation"); *U.S. v. Heller*, 625 F.2d 594, 599-600 (5th Cir. 1980) (declining to apply the joint venture doctrine where "participation of American law enforcement officers in appellant's arrest was peripheral at most . . . [and the defendant] was charged initially with violating British, not American, law."); *U.S. v. O'Neal*, No. 15-CR-353-WJM, 2018 WL 3145523, at *9 (D. Colo. June 27, 2018) ("[I]t is clear that Dominican Republic officials were investigating O'Neal for violation of local laws regarding firearms importation and trafficking . . . When foreign officials institute *their own* prosecution, it is evidence that they are not 'mere instruments of United States officials.'") (emphasis added, citations omitted).

In denying the existence of a joint venture, the Government has relied on *U.S. v. Yousef*, where the Second Circuit held that "solicit[ing] the assistance of a foreign government" does not alone constitute a joint venture. *U.S. v. Yousef*, 327 F.3d 56, 146 (2d Cir. 2003) (citations omitted).[6] In *Yousef*, the Second Circuit reasoned that "United States law

---

[6] Eyad Ismoil, the defendant who raised the joint venture issue in *Yousef*, was ultimately convicted of driving a van containing bombs into the parking level of the World Trade Center, killing six people and injuring more than a thousand others. *U.S. v. Yousef*, 327 F.3d at 79. Although it is unclear whether the Jordanian officials who interrogated Ismoil had been conducting their own investigation, the scope of Jordan's sovereign interest in

4/21/21
Page 7

ZMO Law PLLC

enforcement officers are not required to 'monitor the conduct' of foreign officials who execute a request for extradition or expulsion." *Id.* Yet, the defendant in *Yousef*, Eyad Ismoil, put forth no evidence that Americans were involved in planning his arrest; nor were there any Americans physically present when Jordanian officials arrested the defendant and elicited the statement that became the subject of the defendant's suppression motion. *See U.S. v. Yousef*, No. S12 93 CR. 180 (KTD), 1997 WL 411596, at *1 (S.D.N.Y. July 18, 1997). Indeed, the logic underlying *Yousef*—that "United States law enforcement officers are not required to 'monitor the conduct' of foreign officials"—is less compelling where, as here, the unwarned interrogation occurred in the physical presence of an FBI agent, during an operation that American officials had been planning for at least a month. *Cf. U.S. v. Lopez-Imitola*, 03-cr-294 (RPP), 2004 WL 2534153, at *2 (S.D.N.Y. Nov. 9, 2004) (declining to apply the joint venture doctrine where "United States law enforcement agents were not in Cucuta, Colombia" when the defendant was questioned); *U.S. v. Vallee*, No. 96-CR-284, 2007 WL 9771131, at *5 (N.D.N.Y. June 19, 2007), *aff'd*, 304 F. App'x 916 (2d Cir. 2008) (finding no joint venture because no Americans "were present during the questioning . . . [t]here is no evidence that American officials controlled, directed, participated in or were, in any way, involved with the Canadian authorities in the [] questioning . . . [and] there is no evidence that Vallee was arrested at the behest of officials from the United States.").

Finally, suppression in this instance would not, as the Government has argued, transform every foreign arrest into a joint venture. *See* Transcript of April 16, 2021 Oral Argument at 27. As explained above, the United States' involvement in the events leading up to Mr. Zhukov's custodial statement was far more substantial than requesting extradition, and there was a team of four American officials in Bulgaria to oversee the operation. Suppression may, however, cause future MLAT requests to include a simple admonition that, prior to questioning, suspects whom American officials plan to prosecute in the United States should be advised of their rights under the United States Constitution.

*Conclusion*

Because the questioning of Mr. Zhukov at the time of his arrest was a joint American-Bulgarian venture led by American officials "exclusively" for the benefit of a U.S.

---

apprehending and extraditing a global terrorism suspect, who fled to Jordan on the day he committed the bombing, cannot seriously be compared to Bulgaria's interest in helping the United States apprehend Mr. Zhukov, who is accused of fraud and was never independently investigated by the Bulgarian authorities.

4/21/21
Page 8

ZMO Law PLLC

investigation *and* because the claim that Mr. Zhukov waived his right to counsel lacks credibility, his motion to suppress should be GRANTED.

Very truly yours,

ZMO Law PLLC

*Zachary Margulis-Ohnuma*

Zachary Margulis-Ohnuma

*Benjamin Notterman*

Benjamin Notterman

CC: All Counsel (via email and ECF)

Encls.