```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------x

UNITED STATES OF AMERICA,
                                        MEMORANDUM & ORDER
          -against-                     18-CR-633(EK)

ALEKSANDR ZHUKOV,

          Defendant.

-------------------------------x
```
ERIC KOMITEE, United States District Judge:

       At the request of the United States government, Bulgarian law enforcement arrested Aleksandr Zhukov, a Russian national, in Varna, Bulgaria in 2018.  Bulgarian officials also conducted a search of Zhukov's apartment at the time of his arrest.  During the search, Zhukov made certain statements in response to questions posed by Bulgarian officials.  Zhukov was subsequently extradited to the United States to face wire-fraud charges, among other charges.  The government seeks to introduce the statements he made during the search into evidence at Zhukov's upcoming trial before this Court.

       Zhukov moves to suppress the statements on the basis that they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  As discussed below, *Miranda* does not generally apply to statements taken by foreign officials; but there is an exception for statements obtained in the course of a "joint

venture" effectuated in tandem with United States law enforcement.  Zhukov argues that this exception applies here.

The Court held a fact hearing at which the parties elicited testimony from two witnesses — one each from Bulgarian and U.S. law enforcement.  Based on that testimony, the documentary record before the Court, and the submissions of the parties, I now hold that the statements at issue here were not obtained pursuant to a joint venture between United States and Bulgarian law enforcement.  I therefore deny the motion to suppress.

## I.   Background

Bulgarian police officers searched Zhukov's apartment in Varna on November 6, 2018, and arrested him.  Search and Seizure Report at 2, ECF No. 278-2.  Leading the team of Bulgarian police was Vladimir Dimitrov, then the Inspector of the Cybercrime Department of Bulgaria's General Directorate for Combatting Organized Crime ("GDBOP").  Declaration of Vladimir Dimitrov ¶ 1 ("Dimitrov Decl."), ECF No. 249.  The arrest and search were carried out at the request of United States law enforcement by way of a Mutual Legal Assistance Treaty ("MLAT") request.  See MLAT, ECF No. 228-1.  The parties agree that no

independent Bulgarian investigation existed.  *See* Gov't Post-Hearing Brief at 21, ECF No. 279.

Among other things, the United States' MLAT request asked Bulgarian officials to "[c]oordinate the scheduling of all searches and interviews with FBI Legal Attaché, Jack Liao" and to permit Liao to be present for, and participate in, the search and interview of Zhukov.  *Id*. at 8.  The MLAT also requested that certain electronic devices and other property be seized, if identified during the search.  *Id.* at 7-8.

During the search, Dimitrov asked Zhukov questions about various items recovered, such as "is this cell phone yours," and "is this computer yours."  Suppression Hearing Tr. 21:13-15 ("Tr"), ECF No. 274.  According to testimony that Dimitrov would offer at the upcoming trial here, Zhukov responded in the affirmative, indicating that he owned all of the devices and documents seized.  Def.'s Motion to Suppress at 1, ECF No. 205.[1]  It is this testimony that the defense now moves *in limine* to suppress.

FBI Special Agents Evelina Aslanyan and Christopher Merriman flew from New York, along with an Assistant U.S. Attorney still assigned to this case, timing their travel to

---

[1] The Bulgarian report of the search records Zhukov stating, "All items belong to me, with the exception of the LavAzza metal coffee box, which contains marijuana."  Search and Seizure Report at 4.

3

coincide with the search and arrest. Tr. 95:20-24. Special Agent Aslanyan attended the search, but only as an "observer"; Dimitrov testified that she asked no questions whatsoever during the search. Tr. 22:3-21; *see also* Search and Seizure Report at 4 (Aslanyan "was present during the search as an observer, without taking part in it"). Following Zhukov's arrest, however, Special Agents Aslanyan and Merriman conducted their own interview of Zhukov, after administering *Miranda* warnings, at the GDBOP office in Varna. FBI FD-302 Report, ECF No. 237.

There was thus some level of coordination between Bulgaria and the U.S. to carry out the search, arrest, and post-arrest interview. At issue here, however, is whether or not the U.S. officials, as part of that coordination, directed Dimitrov to ask questions attendant to Zhukov's arrest — that is, the questions Dimitrov asked during the search of Zhukov's apartment.

Prior to the November 6 search and arrest, American law enforcement had engaged in extended discussions about whether and how Zhukov could be arrested, questioned, and extradited to the United States. In the course of these discussions — and, indeed, in the formal MLAT request itself — the Americans were initially explicit about their desire to coordinate with Bulgarian law enforcement regarding the questioning that Bulgarian law enforcement would conduct. In an

4

October 7, 2018 email exchange with legal attaché Liao, FBI Special Agent Merriman wrote that U.S. personnel would "ideally" seek "face time with Sofia police to help coach them through some of the question[s]" that the U.S. wanted asked.  3500-JL-22 at 1.  And the MLAT request itself — submitted less than a week later, on October 12 — asked that Bulgaria "[c]onduct a voluntary police interview of Zhukov" and stated that a "list of questions will be provided to the Bulgarian police on a law-enforcement-to-law-enforcement basis."  MLAT at 8.

But according to the government, and as discussed in greater detail below, the U.S. position on whether to submit questions or engage in coaching evolved in the lead-up to Zhukov's November 6 arrest.  Specifically, according to the government, the U.S. had contemplated submitting questions and coaching at a time when they understood Bulgarian law and policy to prohibit them from any direct questioning on Bulgarian soil.  But, as the government points out, the Bulgarian position shifted; and once the U.S. authorities received authorization to conduct their own interview, they declined to follow up on any intention to submit questions to the Bulgarians, or to "coach" them on what to ask.

The U.S. prosecutor ultimately drafted a list of questions.  This list begins with *Miranda* warnings, and was intended for use in the post-search questioning that U.S.

5

personnel would be permitted to conduct. *See* Exhibit A to Declaration of Jack Liao ("Liao Decl."), ECF No. 249. Liao forwarded this list of questions to his counterpart, Bulgarian Inspector Dimitrov, attached to an email that read simply, "For printing." Exhibit 1 to Gov't Letter dated March 10, 2021, ECF No. 254. Liao testified that he forwarded the questions list because he was traveling to Varna, Bulgaria (where Zhukov's apartment was located), far from his office in Sofia, and did not have access to his own printer. Tr. 91:1-5.

It bears noting that, at an earlier stage in the suppression briefing, both Liao and Dimitrov submitted sworn statements attesting — incorrectly, it turned out — that Liao did not transmit any list of questions to Dimitrov, and Dimitrov did not receive any such list from Liao. Liao attested that he sent the list of questions only to a "local employee" of the GDBOP for printing. Liao Decl. ¶¶ 4, 5 ("I did not send the list of questions to Inspector Vladimir Dimitrov of GDBOP or any other Bulgarian government employee besides the individual who printed it for me . . . ."); Dimitrov Decl. ¶ 3 ("I did not receive a list of suggested questions from U.S. officials . . . ."). The government explains these inaccuracies by stating that Liao and Dimitrov honestly did not recall the "For printing" exchange, and neither had access to that email when they submitted their declarations. Tr. 26:4-9; 90:12-21. Instead,

6

the email was discovered after the declarations were filed, when the government belatedly received productions of archived emails from the FBI and State Department. Gov't Letter dated April 12, 2021, ECF No. 268.

Nevertheless, the list of questions that Dimitrov received *does not* contain the question at issue here — "are these your devices?" — that elicited the positive response the government now seeks to admit at trial. The U.S. questions list *does*, in contrast, contain the full set of *Miranda* warnings right up front. *See* Exhibit A to Liao Decl., ECF No. 249.

At the suppression hearing, Liao and Dimitrov both testified that apart from the "For printing" email, there was no sharing of proposed questions from U.S. personnel to their Bulgarian counterparts, and no effort by the U.S. to direct the Bulgarians' questioning of Zhukov. Tr. 22:1-22:2; 22:12-21; 23:16-24:2; 96:13-18. Dimitrov testified that he did not prepare or use a list of questions when he spoke with Zhukov. Tr. 21:20-25. He also explained that it is "ordinary police standard procedure" to ask questions about the items recovered during a search, and the ownership thereof. Tr. 39:3-7; *see also* 21:13-19.

## II. Discussion

"[T]he law is settled that statements taken by foreign police in the absence of *Miranda* warnings are admissible if

7

voluntary." *United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003).  Because "the threat of suppression in U.S. courts for failure to comply with *Miranda* holds little sway over foreign authorities," the Second Circuit has "declined to suppress unwarned statements obtained overseas by foreign officials."  *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 202 (2d Cir. 2008); *United States v. Welch*, 455 F.2d 211, 213 (2d Cir. 1972) ("[S]ince the *Miranda* requirements were primarily designed to prevent United States police officers from relying upon improper interrogation techniques and as the requirements have little, if any, deterrent effect upon foreign police officers, the *Miranda* warnings should not serve as the *sine qua non* of admissibility.").

 This general rule does not apply, however, to a "joint venture" between U.S. and non-U.S. law enforcement.  Under the joint venture doctrine, "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities."  *Yousef*, 327 F.3d at 146.  Active participation requires "coordination and direction" of a foreign investigation or interrogation.  *United States v. Harun*, 232 F. Supp. 3d 282, 287 (E.D.N.Y. 2017) (quoting *United States v. Abu Ali*, 528 F.3d 210, 229 (4th Cir. 2008)); *United States v. Getto*,

8

729 F.3d 221, 230 (2d Cir. 2013) (no joint venture where "U.S. officials neither controlled nor directed the foreign investigation").  In addition, the Court of Appeals suggested in *Yousef* that even where U.S. officials do not participate in questioning, the joint venture doctrine may still apply if the U.S. personnel "use foreign officials as their interrogation agents to circumvent the requirements of *Miranda*."  327 F.3d at 145; *Getto*, 729 F.3d at 230 (joint venture doctrine applies "where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials").  "'[M]ere presence at an interrogation' or indirect involvement of United States law enforcement agents," however, does not suffice.  *Harun*, 232 F. Supp. 3d at 287 (quoting *Abu Ali*, 528 F.3d at 229).

In support of the contention that a joint venture existed, the defense relies on the following assertions:

(i)     Bulgaria did not, at any relevant time, initiate its own criminal investigation of Mr. Zhukov.

(ii)    The MLAT request asked Bulgaria to "[c]oordinate the scheduling of all searches and interviews with FBI Legal Attaché, Jack Liao," and to permit FBI agents to be present for such searches and interviews.

9

(iii) American law enforcement attended briefings before the search was executed, and at one point referred to Bulgarian law enforcement as their "local partners."

(iv) The night before the search, Special Agents Merriman, Aslanyan and legal attaché Liao went to dinner with Inspector Dimitrov, along with the Assistant U.S. Attorney who traveled to Bulgaria. That dinner, which lasted "between one and two hours," was paid for by the FBI. Tr. 104:8-13; 108:4-8.

These allegations are not sufficient, under the prevailing case law in this Circuit, to establish the existence of a joint venture. The Second Circuit has expressly held that a joint venture does not arise from the U.S. requesting investigative actions and arrest overseas, even where the recipient nation maintains no investigation of its own. *See Yousef*, 327 F.3d at 146 ("[E]vidence that the United States may have solicited the assistance of a foreign government in the arrest of a fugitive within its borders is insufficient as a matter of law to constitute United States participation under the joint venture doctrine."); *United States v. Gasperini*, 894 F.3d 482, 489 (2d Cir. 2018) ("A mere request is not sufficient to show control."); *Getto*, 729 F.3d at 230 ("It is not enough

10

that the foreign government undertook its investigation pursuant to an American MLAT request"); *United States v. Molina-Chacon*, 627 F. Supp. 1253, 1262-63 (E.D.N.Y. 1986) ("The fact that it was the United States that initiated [the defendant's] arrest by requesting the assistance of Bermuda in apprehending him is irrelevant . . . . The role of the United States in helping to plan the arrest of [the defendant] does not impose the requirements of *Miranda* on the 'interrogation' by Bermudian officials."); *but cf. U.S. v. O'Neal*, No. 15-CR-353, 2018 WL 3145523, at *9 (D. Colo. June 27, 2018) ("When foreign officials institute their own prosecution, it is evidence that they are not mere instruments of United States officials." (internal quotations omitted)); *U.S. v. Karake*, 281 F. Supp. 2d 302, 309 (D.D.C. 2003) (evidence of a joint venture includes "information that defendants were held at U.S. officials' request . . . .").

Nor does the "mere presence," without more, of U.S. agents at a search or interrogation suffice. *Harun*, 232 F. Supp. 3d at 287 (quoting *Abu Ali*, 528 F.3d at 229); *United States v. Nagelberg*, 434 F.2d 585, 587 n.1 (2d Cir. 1970) ("The presence of an American officer should not destroy the usefulness of evidence legally obtained on the ground that methods of interrogation of another country . . . vary from ours."); *see also United States v. Bary,* 978 F. Supp. 2d 356, 371 (S.D.N.Y. 2013) (no joint venture where FBI agent only

11

"observe[d] the search" of the defendant's residence in the U.K.).

In the Second Circuit in particular, the joint-venture analysis focuses less on the overall level of cooperation between the two nations, and more on the U.S. agents' efforts to direct the specific *questioning* at issue. This is because the purpose of *Miranda*'s exclusionary rule is to "deter future unlawful police conduct," *Michigan v. Tucker*, 417 U.S. 433, 446 (1974), and U.S. suppression would have "little, if any, deterrent effect upon foreign police officers." *Welch*, 455 F.2d at 213. Thus in *Yousef*, the Court of Appeals framed the joint venture analysis as turning on whether U.S. officials "actively participate *in questioning*" or, in the alternative, "use foreign officials as their interrogation agents to circumvent *Miranda*" despite asking no questions directly. *Yousef*, 327 F.3d at 145 (emphasis added); see also *Bary,* 978 F. Supp. 2d at 367 (focusing on the U.S. conduct with respect to the *interview* itself, "even where U.S. authorities are involved in the investigations leading up to or following the interrogation in question").

This approach stands in contrast, at least to a modest degree, with the more wholistic approach the Ninth Circuit took in *United States v. Emery*, 591 F.2d 1266, 1267 (9th Cir. 1978), on which the Defendant relies. In finding a joint venture in

12

*Emery* between the U.S. and Mexico, the Ninth Circuit focused not on the post-arrest interrogation at issue, but instead on the U.S.'s conduct throughout the "entire arrest," from alerting the Mexican police of possible unlawful activity, to coordinating surveillance in Mexico, and ultimately supplying an undercover agent. *Id.*; *see also United States v. Straker*, 800 F.3d 570, 615-16 (D.C. Cir. 2015) (comparing the Ninth Circuit's inquiry into the "totality of the involvement of U.S. law enforcement" to the Second Circuit's focus on U.S. "participation in the interrogations").

Thus, it does not suffice that the questioning at issue may have taken place in response to an American request for the Defendant's arrest and for the search of his premises, or that an American FBI agent was on the search premises when the questioning occurred. The Defendant must show that the Americans directed their Bulgarian counterparts regarding the questions to ask, or that the Bulgarian officials acted as the Americans' "agents" in carrying out such questioning.

Here, there is simply no evidence in the record that would support the conclusion that the Americans "directed" Dimitrov's questioning of Zhukov; and the government has carried its burden of demonstrating the opposite.[2] Both witnesses denied

13

that such direction occurred. See Tr. 22:1-2 (Q: "Did anyone tell you what questions to ask him?" Dimitrov: "No."), Tr. 22:20-21 (Q: Did [Special Agent Aslanyan] ask you to pose questions to the defendant?" Dimitrov: "No."); Tr. 23:25-24:2 (Q: "Did any American official suggest that you question Mr. Zhukov about anything?" Dimitrov: "No."); Tr. 96:17-18 (Liao: "We had no authority to direct Bulgarian authorities to do anything with respect to the search[.]"). The contemporaneous email record reflects that the only questions shared by one side with the other were "for printing," Exhibit 1 to Gov't Letter dated March 10, 2021; and in any event those questions (a) contained *Miranda* warnings right up front and (b) did not contain the question at issue here, or any near facsimile.

      To be sure, the record suggests (as discussed above) that the American government did intend — at an earlier stage of the investigation — to coordinate, direct and even "coach" Bulgarian law enforcement on how the Bulgarians' questioning of Zhukov should proceed. But the government has a compelling response to this suggestion — namely, that the Merriman email and the MLAT request spoke to the need for coordination and

---

² The Court of Appeals has not held explicitly whose burden it is to establish the existence of a joint venture. *E.g.*, *Bary*, 978 F. Supp. 2d at 366 (noting that the burden of proof is unsettled in this context). Assuming it is the government's burden, the government need only "show that the United States and foreign law enforcement went no further than providing assistance and sharing information" to disprove a joint venture. *Id.* "This is particularly true where U.S. authorities do not themselves conduct the interview in question." *Id.* The government has carried this burden here.

14

coaching because they were written at a time when no separate U.S. interview was expected. It makes sense, the government argues, that the government would send questions to Bulgarian law enforcement when only Bulgarian law enforcement would be in a position to question Mr. Zhukov. But the plan changed; the Bulgarian government later authorized the Americans to conduct their own interrogation, thus obviating the need to feed questions to the Bulgarian police.

The record supports this explanation. Liao emailed Special Agent Merriman on October 7, 2018 that "[d]omestic law requires the interview to be conducted by a Bulgarian officer"; that the "interview would have to be back at the local police station or prosecutor's office after arrest processing"; and that Merriman "may want to draft questions in advance for this purpose." 3500-JL-22 at 2. But it is undisputed that when the arrest actually occurred, the U.S. government did conduct its own interview of Mr. Zhukov, virtually immediately after the search concluded.

As Liao testified, the "facts . . . changed between the October operation and the November operation." Tr. 119:23-24. And this change was not entirely unforeseen: the MLAT request, sent on October 12, did contemplate sending a list of questions to Bulgarian police; but it also specifically requested, seemingly in the alternative, that the FBI be

15

permitted to conduct the interview itself "[t]o the extent permissible under Bulgarian law." MLAT at 8; *see also* Tr. 119:5-6 (Liao: the MLAT "included the request to have U.S. personnel interview Mr. Zhukov").

And Liao testified to the timing of this change of plan. He stated that he participated in two briefings with Bulgarian officials immediately before Zhukov's arrest on November 6. Tr. 95:6-96:3. It was only at these meetings, he explained, that he confirmed with the Bulgarian officials that "an [FBI] agent would be permitted to observe the search and that [FBI] agents," not Bulgarian law enforcement, "would be conducting the post-arrest interview." Tr. 96:4-12.

Ultimately, the government has adequately demonstrated that it did not direct or coordinate Inspector Dimitrov's questioning. And the government is correct that the defense has adduced no direct evidence demonstrating that the U.S. "actively participated" in such questioning, coordinated it, or used their foreign counterparts as their "agents."

The defense asks the Court, essentially, to infer the existence of this agency relationship from the fact that the U.S. personnel spent a fair bit of time, at a critical juncture, with their Bulgarian counterparts, and that credibility issues emerged as to the law-enforcement witnesses' declarations. But these premises do not lead to the defense's suggested

16

conclusion. If the defense had questioned the other agents present — Special Agent Evelina Aslanyan or Special Agent Christopher Merriman — it is conceivable that they might have developed additional evidence regarding the purported agency relationship, or direction or coordination. But the defense did not call these agents. As a consequence, we are left with the essentially uncontested testimony of Liao and Dimitrov. There is no evidence of "a joint willful attempt to evade the strictures of *Miranda*." *United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir. 1983); *cf*. *Getto*, 729 F.3d at 233 ("[N]othing in the record suggest[s] an *intent* to evade the Fourth Amendment's requirements."). I therefore decline to order suppression.[3]

---

[3] The government also argues that even if Inspector Dimitrov's questioning occurred in the course of a joint venture, the statements at issue are still admissible because Dimitrov "advised the defendant of his rights under Bulgarian law before any questioning took place, and those rights were the functional equivalent of *Miranda*." Gov't. Post-Hearing Brief at 24. Defendant Zhukov submitted a sworn affidavit attesting that no one advised him of any rights prior to the questioning in his apartment. Exhibit A to Def.'s Motion to Suppress, ECF No. 205-1. Having held that no joint venture existed, however, I need not reach the question of whether Zhukov was given adequate *Miranda*-type warnings prior to Dimitrov's questioning.

## III. Conclusion

For the foregoing reasons, the Defendant's motion to suppress is denied.

SO ORDERED.

<u>/s Eric Komitee</u><br>
ERIC KOMITEE<br>
United States District Judge

Dated: May 3, 2021
       Brooklyn, New York