

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:SK
F. #2016R02228

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 7, 2021

<u>By ECF</u>

The Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: <u>United States v. Aleksandr Zhukov</u>
     <u>Criminal Docket No. 18-633 (S-1) (EK)</u>

Dear Judge Komitee:

   The government respectfully submits this letter to follow up on an issue discussed in Court yesterday and that will likely arise again today and with future witnesses.

   During the trial day today, the government intends to call a representative from White Ops, the cybersecurity firm that detected and announced the defendant's bot operation in December 2016. The government intends to elicit from that witness that White Ops published its findings about Methbot in a public report on December 20, 2016, that the report received media attention, and that along with the report White Ops published a list of IP addresses and a list of domains, which the government has marked GX 1, GX 2, and GX 3 and will offer into evidence.

   The foregoing testimony is relevant and crucial for three reasons. First, this information is necessary to complete the narrative in this case. Mr. Bezruchenko has already testified that he received a call alerting him to a media report and a list of IPs, that he reviewed that list of IPs (GX 1) and determined that they all belonged to the defendant's servers, and that he then shut down the defendant's servers. Mr. Bezruchenko also testified that the December 2016 media reports were the first reports he received regarding the use of the defendant's servers. The government expects other witnesses to similarly testify that they heard about the publication and saw the list of IPs in GX 1 and GX 2, that the publication drew their attention to the IPs for the first time, and that they then took steps to protect themselves and their clients and/or determine the extent to which traffic coming from those IPs affected them. For example: brands (like Pepsi) and the platforms and agencies that handled their business determined the money they lost by tracing the traffic coming from

the IPs listed in GX 1; internet service providers (like Comcast) and regional internet registries (like AFRINIC) became aware of the defendant's false registration of IP addresses only after looking at the White Ops publication and GX 1 and then took steps to correct those registrations; and publishers (like the New York Times) only became aware that their domains were being counterfeited by the defendant after they saw the list of domains in GX 3.

Second, in addition to completing the narrative, this information directly addresses the defendant's argument that he operated his bot operation "openly and honestly" and corrects the misimpression that the jury is currently left with that companies in the digital advertising industry knew what the defendant was doing and were fine with it. In truth, the White Ops report was the first time that many, if not all, of the companies in the industry became aware of the defendant's bot operation, and their actions and reactions in response to that report evidence the materiality of the misrepresentations emanating from the defendant's bots.

Third, the publication of the report on December 20, 2016, and the media attention it received in the three days afterwards, led the defendant and his co-conspirators to delete emails and servers related to the scheme. For example, Ms. Loewenstein testified that more than 26,000 emails were deleted from the adw0rd.yandex.ru@gmail.com email account (including all of the emails related to the CentByCent server), the defendant's search history shows that he searched for White Ops's Methbot report on December 22, 2016 (GX 1707 ("Searched for new york times methbot"), read coverage related to the report, and then deleted emails from his ibetters2@gmail.com email account, which was the email account that he used to buy servers and conduct other business related to the scheme (GX 1709). These actions evidence the defendant's and co-conspirator's consciousness of guilt. However, the only way for the jury to understand the import of this deletion evidence is to understand what triggered it: White Ops's publication of its Methbot report – outing the defendant's scheme and the IPs and domains associated with the scheme – and the coverage that report received in the following days.

GX 1, GX 2, and GX 3 are not hearsay because they are not being offered to prove the truth of the matter asserted—rather, they are being offered for their effect on the listener. Moreover, the government is calling a representative from White Ops to testify about the truth of the matter asserted—that the White Ops logs show that the IPs and domains listed in GX 1, GX 2, and GX 3 were associated with non-human traffic—and that witness will be subject to cross-examination.[1] Therefore, there is no impropriety in

---

[1] The White Ops logs were turned over to the defense in discovery and the government provided early disclosures of § 3500 material for this witness, including a copy of his slide deck.

admitting the foregoing exhibits and eliciting the basic facts of that White Ops published its findings and that the finding received international media attention.  See United States v. Buck, No. 13 CR. 282 (JSR), 2017 WL 5201447, at *2 (S.D.N.Y. Oct. 30, 2017) (while "articles are ordinarily inadmissible hearsay if sought to be entered into evidence for the truth of the matter asserted therein, . . . articles offered not for the truth of the statements made therein, but rather to show that a party had notice about a specific set of facts" are admissible as non-hearsay evidence); United States v. Briguet, No. 2:17-CV-3482 (RJD), 2020 WL 6945929, at *1 (E.D.N.Y. Nov. 25, 2020) ("The newspaper articles are not inadmissible hearsay.  The Government seeks to admit them as evidence supporting Defendant's awareness of the FBAR filing requirement and not to prove the truth of the matter asserted in them.").

Any concern regarding prejudice can be addressed with a limiting instruction. See e.g. United States v. Zapata, 356 F. Supp. 2d 323, 325 (S.D.N.Y. 2005) (admitting records as non-hearsay and providing a limiting instruction that the records are "not for the truth of the matters stated therein . . . but rather for the limited purpose of showing that the recorded transaction occurred."); United States v. Asaro, No. 14-CR-26 (ARR), 2015 WL 5841804, at *2 (E.D.N.Y. Oct. 7, 2015)(Admitting recordings "for limited non-hearsay purposes," and stating that "should defense counsel seek a limiting instruction, she is directed to submit a proposed one.").

Respectfully submitted,

MARK J. LESKO
Acting United States Attorney

By:     /s/ Saritha Komatireddy
Saritha Komatireddy
Artie McConnell
Alexander F. Mindlin
Assistant U.S. Attorneys
(718) 254-7000

cc:   Clerk of the Court (EK) (via ECF)
      All counsel of record (via ECF)

3