DATED 6TH OF OCTOBER 2015

INTEGRA SYSTEMS LTD

AND

Plexious LLC

AGREEMENT FOR THE SALE AND
PURCHASE OF WEB TRAFFIC


DEFENDANT'S
EXHIBIT

Q

**THIS AGREEMENT** is made on 6th of October 2015

**PARTIES**

(1) **INTEGRA SYSTEMS LTD** incorporated and registered in Seychelles under company number 136103 whose registered office is at Tenancy 10, Marina House, Eden Island, Mahe, Seychelles (**Integra**).

(2) **THE PARTNER** of the Integra Systems LTD indicated in the attached Schedule (the **Partner**).

**BACKGROUND**

Integra is consigned to buy and sell web traffic from and to other partners of Integra.

By becoming a partner of Integra, the Partner agreed to enter into an agreement with Integra for the purchase and sale of web traffic, such agreement being on and subject to the terms and conditions of this Agreement.

**AGREED TERMS**

**1. Interpretation**

1.1 The following terms shall have the following meanings in this Agreement:

(1.a) **Advertisers:** a webmaster or other third party operator of an Online Inventory, or otherwise agreed in writing from time to time between Integra and the Partner as being a partner of the Buyer to receive Web Traffic sourced from the Seller or its Affiliates. Either Party may at any time notify the other Party that any person has ceased to be an Advertiser.

(1.b) **Affiliate: a webmaster or other third party operator of an Online Inventory or otherwise agreed in writing** from time to time **between Integra and the Partner. The Seller may at any time notify the Buyer that any person has ceased to be the Seller's Affiliate.**

(1.c) **Agreement: this agreement including its Schedules.**

(1.d) **Buyer: the Party buying the Web Traffic from the Seller or its Affiliates.**

(1.e) **Commencement Date:** the date on which the Partner becomes a partner of Integra.

(1.f) **Contract Term:** the period beginning on the Commencement Date and ending in accordance with Clause 6.

(1.g) **Data Protection Legislation:** all laws and regulations relating to the processing of personal data and to privacy in any applicable jurisdiction.

(1.h) **Online Inventory:** websites, mobile sites, web applications, web platforms and webstores, mobile applications, mobile platforms and mobile stores, and other Online Inventories operated by the Seller or its Affiliates, or the Buyer or its Advertisers, or a third party on their behalf or through whom they advertise their goods or services.

(1.i) **Party: Integra or the Partner, as applicable.**

2

- (1.j) **Referral Mechanism: the technical means or mechanism by which Web Traffic to the Online Inventory of the Seller or its Affiliates may be directed to the Online Inventory of the Buyer or its Advertisers.**
- (1.k) **Seller: the Party selling the Web Traffic to the Buyer or its Advertisers.**
- (1.l) **Web Traffic:** visitors to the Seller's or its Affiliates' Online Inventory who may be directed to click through to any of the Online Inventory of the Buyer or its Advertisers.

1.2   In this Agreement, save where the context otherwise requires:

- (2.a) words importing the singular shall include the plural and vice versa, words importing any particular gender shall include all other genders, and references to persons shall include bodies of persons whether corporate or incorporate;
- (2.b) a reference to a Clause or Schedule shall be a reference to a clause or Schedule (as the case may be) of or to this Agreement;
- (2.c) headings are for convenience only and shall not and shall not be deemed to be any indication of meaning of the clauses to which they relate; and
- (2.d) **writing** includes email.

1.3   Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words without limitation following them. Where the context permits, the words other and otherwise are illustrative and shall not limit the sense of the words preceding them.

1.4   Any obligation in this Agreement on a person not to do something includes an obligation not to agree, allow, permit or acquiesce in that thing being done.

**2.   Sale of Web Traffic**

2.1   The Seller shall, during the Contract Term:

- (1.a) procure from its Online Inventory and sell Web Traffic to the Buyer and its Advertisers;
- (1.b) arrange that its Affiliates procure from their Online Inventories and sell Web Traffic to the Buyer and its Advertisers;
- (1.c) perform this Agreement with reasonable skill and care;
- (1.d) comply, and instruct its Affiliates to comply, with the terms and conditions applicable to the Buyer's and its Advertisers' Online Inventories, including any such terms prohibiting the referral or generation of false Internet traffic or Web Traffic.  The Seller shall not be responsible for any failure by its Affiliates so to comply, provided that the Seller has instructed them in good faith to do so; and
- (1.e) not, and instruct each of its Affiliates not to, hold itself out as the agent or representative of the Buyer or its Advertisers.  The Seller shall not be responsible for any failure by its Affiliates to comply with the foregoing, provided that the Seller has instructed them not to do so in good faith.

2.2   The Seller shall be responsible for the contents of its Online Inventory from which it redirects Web Traffic to the Online Inventory of the Buyer and its Advertisers, but shall not be responsible for the contents of its Affiliates' Online Inventories provided that it shall reasonably co-operate with the Buyer with regard to any claims of the Buyer or its Advertisers related to the content of the Online Inventories of the Seller's

        Affiliates from which Web Traffic is redirected to Online Inventory of the Buyer or its Advertisers.

3. **Receipt of the Web Traffic**

The Buyer shall:

3.1    permit and license, on a non-exclusive, non-transferable, royalty-free basis, the Seller and its Affiliates to display on the their Online Inventories such Referral Mechanism as the Buyer may provide from time to time to enable Web Traffic to be redirected to the Buyer's Online Inventory, and shall use reasonable endeavours to obtain and maintain all necessary licences and consents required to enable the Seller and its Affiliates to so display the Referral Mechanisms of the Buyer's Advertisers;

3.2    have in place a reasonable means of tracking and reporting visitor numbers comprised in the Web Traffic redirected to its Online Inventory from the Online Inventories of the Seller and its Affiliates, and shall use reasonable endeavours to ensure that the Buyer's Advertisers have such means;

3.3    be responsible for the contents of its Online Inventory, including any descriptions of goods or services advertised there, but shall not be responsible for the contents of its Advertisers' Online Inventories provided that it shall reasonably co-operate with the Seller with regard to any claims of the Seller or its Affiliates related to the content of the Online Inventories of the Buyer's Advertisers to which Web Traffic is redirected from Online Inventories of the Seller or its Affiliates; and

3.4    be responsible for the supply of the goods or services via its Online Inventory, including as regards any defects in such goods and services, and any late delivery or delivery failure, or after-sales support or warranties, but shall not be responsible for its Advertisers' supplies of goods and services, provided that it shall reasonably co-operate with the Seller with regard to any claims of the Seller or its Affiliates or their Web Traffic visitors related to such supplies.

4. **Intellectual Property**

    Each Party agrees and acknowledges that the rights in the marks and Referral Mechanisms supplied by the other Party or its Affiliates or Advertisers for display on the Online Inventory of the first such Party or its Advertisers and Affiliates shall be retained by the person so supplying the marks and any goodwill derived from the use of those marks shall accrue to person who supplied them, and that the intellectual property rights in any other materials and content provided by a person in connection with this Agreement, shall be retained by such person.

5. **Charges and payment**

5.1    Where the Partner is the Seller of Web Traffic to Integra or its Advertisers, Integra shall pay the Partner an amount equal to the aggregate of:

        (1.a)    all payments received by Integra from Integra's Advertisers in respect of the Web Traffic provided by the Partner or procured by the Partner from its Affiliates.

        Integra shall pay such amount into the Partner's bank account or and the Partner hereby authorized to obtain from Integra details of such account (if it changes or for confirmation), including any identification number, in order to make such payments. Integra shall make such payments to the partner within 30 days of receiving the relevant payment from its Advertisers, either by direct transfer to the said bank

    account of the partner or by loading the account itself or by arranging for its applicable Advertisers to do so.

5.2  Where the Partner is the Buyer of Web Traffic from Integra sourced from Integra's own or its Affiliates' Online Inventories, the Partner shall pay Integra an amount equal to the aggregate of:

  (2.a)  all payments received from the Partner's Advertisers at their list prices in respect of the Web Traffic provided by Integra or procured by Integra from its Affiliates.

  In the case of payments for Web Traffic directed to the Partner's Online Inventory, the Partner shall arrange to pay such amount into Integra's bank account. In the case of payments for Web Traffic directed to the Partner's Advertisers' Online Inventories, the Partner shall procure that the Advertisers pay such amount to the said bank account of Integra.  Such payments shall be due to Integra within 30 days of the Partner receiving the relevant payment from its Advertisers.

5.3  Following the end of each month of the Contract Term (or part month or such period if the Contract Term begins or ends in the middle of a month), the Buyer shall send the Seller a statement setting out reasonable details of the Web Traffic redirected from the Sellers's and its Affiliates' Online Inventory to the Online Inventory of the Buyer and its Partners, and the applicable charges and shall, within a reasonable time of such request, supply such additional information to support such calculation as the Seller may reasonably request and which the Service Recipient possesses or can reasonably obtain.

5.4  The Buyer agrees and acknowledges that it will be responsible for making any registrations or obtaining any approvals with or from its bank or any applicable regulator where required under applicable law in connection with paying the charges for the Web Traffic sold to it under this Agreement, including obtaining any transaction passport and submitting to its bank or any applicable regulator any other documents or information necessary for making payments to the Seller under this Agreement.  The Seller agrees that the Buyer may supply a copy of this Agreement to the bank or regulator where required for such purpose, provided that the Buyer shall first notify the Seller.

**6.**  **Commencement and duration**

6.1  This Agreement shall have effect from the Commencement Date and continue in force while the Partner remains a partner of Integra until and unless terminated earlier in accordance with this Clause 6.

6.2  Integra may terminate this Agreement at any time by giving the Partner not less than one month's written notice.

6.3  Without prejudice to any other rights or remedies which the Parties may have, either Party may terminate this Agreement without liability to the other immediately on giving notice to the other if:

  (3.a)  the other Party fails to pay any amount due under this Agreement on the due date for payment and remains in default not less than 45 days after being notified in writing to make such payment; or

  (3.b)  the other Party commits a material breach of any of the material terms of this Agreement and (if such a breach is remediable) fails to remedy that breach within 30 days of that Party being notified in writing of the breach; or

|      |      |                                                                                                                                                                                                                                                                  |
|------|------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|      | (3.c) | the other Party is unable to pay its debts as they fall due or is insolvent under the laws of any applicable jurisdiction or ceases to carry on all or a substantial part of its business. |
| 6.4  |      | On termination of this Agreement for any reason: |
|      | (4.a) | all charges payable to either Party under this Agreement shall become due immediately on its termination, despite any other provision; |
|      | (4.b) | the Seller shall, within a reasonable time, remove from its websites any logos and mechanisms provided the Buyer's or its Advertisers and direct its Affiliates to do the same; |
|      | (4.c) | the accrued rights, remedies, obligations and liabilities of the Parties as at termination shall not be affected; and |
|      | (4.d) | the provisions of this Agreement which expressly or by implication have effect after termination shall continue in full force and effect. |

## 7. Confidentiality

7.1  Each Party (**Receiving Party**) shall keep in strict confidence all technical or commercial know-how, specifications, inventions, processes or initiatives which are of a confidential nature and have been disclosed to it by the other party (Disclosing Party), its employees, agents, consultants or subcontractors and any other confidential information concerning the Disclosing Party's business or products which the Receiving Party may obtain.

7.2  The Receiving Party may disclose such information**:**

- (2.a) to its employees, officers, representatives, advisers, agents, subcontractors or professional advisers who need to know such information for the purposes of carrying out the Receiving Party's obligations or exercising its rights under this Agreement; and
- (2.b) as may be required by law, court order or any governmental or regulatory authority.

7.3  The Receiving Party shall ensure that its employees, officers, representatives, advisers, agents or subcontractors to whom it discloses such information comply with this Clause 7.

7.4  The Receiving Party shall not use any such information for any purpose other than to perform its obligations or exercise its rights under this Agreement.

## 8. Limitation of liability

8.1  This Clause 8 sets out the entire financial liability of Integra (including any liability for the acts or omissions of its employees, agents, consultants and subcontractors) to the Partner in respect of:

- (1.a) any breach of this Agreement;
- (1.b) any use made by the Partner as Buyer or its Advertisers of the Web Traffic sold to them by Integra;
- (1.c) any use by Integra as Seller or its Affiliates of the Partner's or its Advertiser's Referral Mechanisms; and
- (1.d) any representation, statement or tortuous act or omission (including negligence) arising under or in connection with this Agreement.

6

8.2     All warranties, conditions and other terms implied by statute or common law are, to the fullest extent permitted by law, excluded from this Agreement.

8.3     Nothing in this Agreement limits or excludes the liability of either Party for death or personal injury resulting from its negligence, or for fraud or fraudulent misrepresentation or for any liability which cannot be excluded by applicable law.

8.4     Subject to Clause 8.3:

(4.a)     neither Party shall be liable for any special, indirect or consequential loss, costs, damages, charges or expenses, whether or not foreseen or reasonably foreseeable.

## 9. Data protection

9.1     Integra hereby guarantees to use any information received from the Partner, including Partner's personal data solely for the purposes of Agreement performance.

9.2     Each Party shall be responsible for ensuring that it has all necessary consents, permissions and registrations, and that it has given all necessary notifications to the relevant regulators and to the data subjects as may be necessary to allow it to process the personal data of its Affiliates and to send such data to the other Party for the purposes of performing this Agreement. When the Partner is an individual it consents to Integra processing its personal data for such purposes.

9.3     When acting as data processor for a Party as data controller, in respect of its Affiliates' personal data, or personal data of Web Traffic redirected by it or its Affiliates, the other Party will:

(3.a)     process those personal data only in accordance with the data controller Party's instructions or as is necessary to fulfil its obligations under this Agreement;

(3.b)     take appropriate technical and organisational measures to protect those personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorised disclosure or access. Such measures shall ensure a level of security appropriate to the risks represented by the processing and the nature of the data to be protected, having regard to the state of the art and the cost of implementation;

(3.c)     promptly refer to the data controller Party any data subject access request or complaint in relation to the personal data and any enquiry from a relevant regulator, and allow the data controller Party to handle such matter;

(3.d)     not supply those personal data to any third party save as strictly necessary to perform this Agreement; and

(3.e)     process those data in such a way as will enable the data controller Party to comply with Data Protection Legislation.

## 10. Force majeure

10.1     A Party shall not be in breach of this Agreement, nor liable for any failure or delay in performing any obligations under this Agreement arising from or attributable to acts, events, omissions or accidents beyond its reasonable control (**Force Majeure Event**), including the following:

(1.a)     acts of God, including fire, flood, earthquake, windstorm or other natural disaster;

(1.b) war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, breaking off of diplomatic relations or similar actions;

(1.c) terrorist attack, civil war, civil commotion or riots;

(1.d) nuclear, chemical or biological contamination or sonic boom;

(1.e) compliance with any law;

(1.f) fire, explosion or accidental damage;

(1.g) adverse weather conditions;

(1.h) collapse of building structures, failure of plant machinery, machinery, computers or vehicles;

(1.i) non-performance by suppliers or subcontractors; and

(1.j) interruption or failure of utility service, including but not limited to electric power, gas or water,

provided that it took reasonable precautions to avoid, and all reasonable steps to mitigate, the effects of Force Majeure Events having regard to all the matters known to it before the Force Majeure Event.

10.2 Any Party that is subject to a Force Majeure Event shall promptly notify the other Party in writing of the nature and extent of the Force Majeure Event causing its failure or delay in performance.

10.3 If the Force Majeure Event prevails for a continuous period of more than two months, either Party may terminate this Agreement by giving 14 days' written notice to the other Party.

**11. Governing law and jurisdiction**

11.1 This Agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims), shall be governed by, and construed in accordance with, the law of Seychelles.

**12. General**

12.1 No variation of this Agreement shall be valid unless it is in writing and signed by or on behalf of each Party.

12.2 A waiver of any right or remedy under this Agreement is only effective if given in writing and shall not be deemed a waiver of any subsequent breach or default. A failure or delay by a Party to exercise any right or remedy provided under this Agreement or by law shall not constitute a waiver of that or any other right or remedy, nor shall it preclude or restrict any further exercise of that or any other right or remedy.  No single or partial exercise of any right or remedy provided under this Agreement or by law shall preclude or restrict the further exercise of any such right or remedy.

12.3 Unless specifically provided otherwise, rights arising under this Agreement are cumulative and do not exclude rights provided by law.

12.4 If any provision of this Agreement (or part of any provision) is found by any court or other authority of competent jurisdiction to be invalid, illegal or unenforceable, that provision or part-provision shall, to the extent required, be deemed not to form part of the Agreement, and the validity and enforceability of the other provisions of the agreement shall not be affected, provided that such provision (or part of a provision), provided that the underlying commercial purpose of this Agreement is not affected.

12.5 This Agreement and any documents referred to in it constitute the entire agreement between the parties and supersede and extinguish all previous drafts, arrangements, understandings or agreements between them, whether written or oral, relating to the subject matter of this Agreement.

12.6 Each Party acknowledges that, in entering into this agreement it does not rely on, and shall have no remedies in respect of, any representation or warranty (whether made innocently or negligently) that is not set out in this Agreement or those documents. Each Party agrees that its only liability in respect of those representations and warranties that are set out in this agreement or those documents (whether made innocently or negligently) shall be for breach of contract. Nothing in this Clause shall limit or exclude any liability for fraud.

12.7 Neither Party shall, without the prior written consent of the other Party, assign or transfer, or deal in any other manner with all or any of its rights or obligations under this Agreement.

12.8 Nothing in this Agreement is intended to, or shall operate to, create a partnership between the Parties or to authorise either Party to act as agent for or in the name of the other.

12.9 A person who is not a Party to this Agreement shall not have any rights under or in connection with it.

12.10 A notice given to a Party under or in connection with this Agreement shall be in writing, signed by or on behalf of the Party giving it, sent for the attention of the person, at such address, fax number or person as that Party may notify to the other in accordance with the provisions of this Clause, and delivered personally or sent by commercial courier, fax or pre-paid recorded delivery or equivalent post. If a notice has been properly sent or delivered in accordance with this Clause, it will be deemed to have been received as follows:

(10.a) if delivered personally, at the time of delivery; or

(10.b) if delivered by commercial courier, at the time of signature of the courier's receipt; or

(10.c) if sent by fax, at the time of transmission; or

(10.d) if sent by pre-paid recorded delivery or equivalent post, at the time recorded by the post office.

For the purposes of this Clause, all times are to be read as local time in the place of deemed receipt, and if deemed is not within business hours (meaning 9.00 am to 5.30 pm Monday to Friday on a day that is not a public holiday in the place of receipt), the notice is deemed to have been received when business next starts in the place of receipt. The foregoing shall not apply to the service of any process in any legal action or proceedings.

This Agreement has been entered into on the date stated at the beginning of it.

Signed by Tahira Ledadazafimamonjy         ...............................

for and on behalf of **INTEGRA SYSTEMS**    Director
**LIMITED**


Signed by Sergey Denisoff                   .......................................

**Plexious LLC**                            Authorised Representative

10

## SCHEDULE 1 – INTEGRA and PARTNER ACCOUNT

The Partner:
    Name: Plexious LLC
    Country of establishment: United States of America (USA)
    Corporate number: 201110210157
    Address: 2600, W Olive Avenu 5th floor, Burbank, California, CA 91505, United States of America (USA)
    Representative: Sergey Denisoff

The Partner's bank account (USD):
    Bank: Wells Fargo NA
    Bank Address: 433 N Camden Dr 1st floor, Beverly Hills, CA 90210, United States of America (USA)
    Account name: Plexious LLC
    Account number: 7884097614
    SWIFT: WFBIUS6S
    ABA/Routing: 121000248

Integra's bank account (USD):
    Bank: AS LATVIJAS PASTA BANKA
    Bank address: 54 Brivibas street, Riga, LV-1011, Latvia
    Account name: Mayzus Financial Services Limited
    Account address: 869 High Road, London N12 8QA, United Kingdom
    SWIFT: LAPBLV2X
    IBAN: LV09LAPB0000006033331

## SCHEDULE 2 – ADVERTISERS AND AFFILIATES

The Partner wishes to be a Buyer.

11