UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- AGAINST -

ALEKSANDR ZHUKOV,

DEFENDANT.

18 Cr. 633 (EK)

**SENTENCING MEMORANDUM**

ZMO Law PLLC
260 Madison Avenue, 17th Fl.
New York, NY
(212) 685-0999
tc@zmolaw.com

*ATTORNEYS FOR DEFENDANT ALEKSANDR ZHUKOV*

**TABLE OF CONTENTS**

FACTS ..................................................................................................................1

I.   ALEKSANDR ZHUKOV'S PERSONAL HISTORY AND CHARACTERISTICS ...1

II.  THE NATURE AND CIRCUMSTANCES OF MR. ZHUKOV'S PARTICIPATION THE METHBOT FRAUD ..............................................................................6

III. THE SENTENCING GUIDELINES RANGE ....................................................9

    A.  Loss Amount Calculation......................................................................10

    B.  The "authentication feature" enhancement does not apply..................14

ARGUMENT ......................................................................................................15

I.   PROBATION'S CALCULATED GUIDELINES SENTENCE OVERSTATES MR. ZHUKOV'S CRIMINAL AND MORAL CULPABILITY. ...................................15

    A.  Whatever the loss amount in this case, it is a poor proxy for the seriousness of Mr. Zhukov's conduct. ...................................................16

    B.  Overlapping § 2B1.1 specific offense characteristics in addition to the money laundering enhancement create an unwarranted increase in the Guideline sentence for substantially similar conduct. ..........................23

II.  A SENTENCE OF THIRTY-SIX MONTHS IS APPROPRIATE IN LIGHT OF THE CRIME COMMITTED, MR. ZHUKOV'S PERSONAL HISTORY AND CHARACTERISTICS, THE NATURE OF IMPRISONMENT IN A FOREIGN COUNTRY DURING THE COVID-19 PANDEMIC, AND OTHER SENTENCES IMPOSED IN THIS DISTRICT FOR COMPARABLE WIRE FRAUD SCHEMES. 25

    A.  Mr. Zhukov's ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ should be taken into account when considering the appropriate sentence. ................................................................................................26

    B.  Mr. Zhukov is not, contrary to the Government's depiction, a uniquely prolific creator of bots and programmatic advertising, and a below-Guideline sentence is sufficient to deter others engaging in similar schemes....................................................................................................28

    C.  A reduced sentence is warranted given the effect of the COVID-19 pandemic on the conditions at MDC and the added hardship of imprisonment in a distant foreign country. ..........................................30

    D.  Sentencing Mr. Zhukov to thirty-six months is consistent with other sentences issued in the Eastern District of New York in light of the unique conditions of imprisonment during the COVID-19 pandemic...34

CONCLUSION....................................................................................................36

Aleksandr Zhukov was convicted after a four-week trial of wire fraud, wire fraud conspiracy, money laundering, and money laundering conspiracy arising out of a business he conducted in Bulgaria that provided services to "supply side platforms"—middlemen in the online advertising ecosystem who sold internet traffic to ad exchanges and "demand side platforms," who, in turn, sold the traffic to advertisers. The service that Mr. Zhukov sold was non-human traffic generated by servers he rented. After trial, we do not deny that at least some end users were deceived into thinking that the traffic they bought generated by Mr. Zhukov was genuine human traffic. Mr. Zhukov testified at trial and the full record of his business dealings was preserved in tens of thousands of Skype and Jabber messages recovered by the government at the time of Mr. Zhukov's arrest. Accordingly, there are few facts in dispute: the main issue at sentencing, we submit, is likely to be the appropriate punishment to reflect Mr. Zhukov's level of moral culpability in using his product to deceive advertisers. In assessing that question, we ask the Court to consider Mr. Zhukov's hardscrabble upbringing, the precise harms caused by his conduct, the roles of other actors responsible for those harms, sentences in other fraud cases of similar scope, and the unique conditions of confinement in a distant land during a deadly pandemic.

## FACTS

I.     **Aleksandr Zhukov's personal history and characteristics**

Aleksandr Zhukov was born in 1980 in St. Petersburg, Russia. PSR ¶ 77. ███████ ██████████████████████████████████████████████████████████████ Mr. Zhukov's parents separated when he was ten years old. *Id.* at ¶ 78. When he was eleven, his mother remarried, and left the family residence. Aleksandr stayed alone at the family's apartment

1

during the week, a single bedroom with a kitchen he shared with another family. During the weekends, he traveled to the home of his mother and stepfather and stayed with them. *Id.* His mother gave him money for food, but it was often insufficient, and he would sell postcards, wash cars, or beg from American tourists for money. *Id.* From eleven years old, he was solely responsible for making sure that he was fed, groomed, went to school, and did his schoolwork. *Id.* Despite these difficulties, he continued his education, graduating from the Russian equivalent of high school. He studied at university, focusing on public relations, but left school when his daughter was born so he would be better able to support her and her mother. He also spent two years in mandatory service with the Russian Army, was honorably discharged, and left with the rank of sergeant. *Id.* at 83. He was stationed for one year in Siberia and one year in St. Petersburg.

███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████

2

Mr. Zhukov lived a boom-and-bust lifestyle for many years. Frequently, he had success in various business ventures in the short term, only for them to fail or fold in the longer term. His income varied widely; however, he views it as a point of pride that he always assisted his family financially, including his daughter, his wife, both of his ex-wives, and even the families of his wife and ex-wife. He has many close friendships, and his family and friends have rallied around him, writing letters of support detailing his kind, loving and joyful personality. In these letters, Mr. Zhukov's kindness and generosity to others, not just his family, but anyone in need, is described in detail. Attached to this memorandum are the following exhibits, all letters of support from people who care deeply about Mr. Zhukov[1]:

| | |
|---|---|
| Exhibit A | Letter from daughter, Marta Zhukova |
| Exhibit B | Letter from wife, Svetlana Cherenkova |
| Exhibit C | Letter from mother, Marina Khodosova |
| Exhibit D | Letter from ex-wife Olga Zhukova |
| Exhibit E | Letter from grandmother Shan'kova, Rimma Konstantinova |
| Exhibit F | Letter from grandmother Inna Khodosova |
| Exhibit G | Letter from friend, Alevtina Zhuravleva |
| Exhibit H | Letter from Maxim Igorevich Klinov, husband of Alevtina Zhuravleva |
| Exhibit I | Letter from friend, Svetlana Konstantinovna Smayls |
| Exhibit J | Letter from friend, Victoria Zhuravleva |
| Exhibit K | Translation of email from friend, Evgenia Smirnova |

---

[1] These letters were all received by email to counsel and translated from the original Russian by translator Isabelle Avrutin. The original Russian-language letters are on file with this office and available upon request.

| Exhibit L | WhiteOps Report entitled *2015 Bot Baseline: Fraud in Digital Advertising* (Jan. 2016) |
| Exhibit M | Federal Defenders Memo re MDC Conditions, 12/31/2020 |
| Exhibit N | Screenshot from Sentencing Commission Data Analyzer showing fraud sentences in the Eastern District of New York |

Mr. Zhukov's devotion to his family is clear in his letters of support. He is very close to his now 18-year-old daughter, Marta. Marta wrote, "My father is a wonderful person. For me, he, without exaggeration, is my best friend. He understands me, sometimes not right away, but he always tries to do whatever is best." Ex. A. She also explained, "I can do basically whatever I wish, knowing that my father will support me." *Id.* Prior to his arrest, Mr. Zhukov saw Marta at least once per month while her school was in session, and she would stay with him during all her vacations, including summer break.

His wife, Svetlana Cherenkova, explained how he handled finding nursing care for her grandmother, rehab for her stepfather, and, eventually, planned funerals for them both. Ex. B at 1-2. She explained that she was deeply depressed after her family members' illnesses and deaths, and, "Sasha has always supported me in everything. He brought me back to life after that prolonged period of stress. He returned me back to normal life, pulled me out of a depression. His optimism, his kind words, his support – all that was very valuable and thanks to him – I came back to life again." *Id.* at 1-2.

Until his arrest, Mr. Zhukov financially supported his 88-year-old grandmother and his 61-year-old mother, and he remains close with both of them, as well as to his paternal grandmother. His mother described him as kind and supportive, explaining, "Aleksandr is a romantic by nature, but his head is not in the clouds. He tries to realize his dreams. It is

4

natural for him to hear out another person and help him. " Ex. C at 2. One of his grandmother's explained that he is "very kind" and "helped those in need." Ex. E. His other grandmother described him as "a very good and kind boy" who was "respectful" and "always asked me about my health and if I needed anything." Ex. F.

His friends, and even his ex-wife, wrote of him with fondness, describing his lively and generous personality. Olga Zhukova, who was married to Alex in 2010, explained that even though the marriage ended, he supported her as she studied to become a doctor and "always motivated" her to open her own private practice, which she has now done. Ex. D at 1. She described Mr. Zhukov's generosity, explaining, "he sympathized and helped people who were in difficult life situations. He was very generous and donated money to church. There are very few people around who are worried about others and help those in need, but Aleksandr was making his contribution to society and was helping others unselfishly." *Id.*

One friend, Alevtina Zhuravleva, explained that Mr. Zhukov "saved [her] life." Ex. G. She said that when she was "deeply depressed," Mr. Zhukov "called me every single day and we always talked for a long time. He was charging me with his energy and I began to feel better with every passing day. I wanted to live again." *Id.* She said, "Aleksandr is an extraordinary person. He is cheerful, responsive and responsible….He finds a common language with adults, elderly people and children. Everyone adores him. He is very kind." *Id.* Mr. Zhukov had such a powerful influence on Ms. Zhuravleva's life that her husband, Maxim Klinov, wrote a letter of support for Mr. Zhukov despite not knowing him personally, explaining that he wrote because, "Alexandr did a lot of kind deeds for people.

5

People constantly talk about him with gratitude. I really want to get to know him and thank him personally for all the good that he did for the loved ones of my wife. He was there in difficult times and always helped them with his words and with his actions. Alexander helped my wife to cope with depression, I am grateful to him for that." Ex. H.

Another friend described his intelligence, and how he supported her by going to business meetings with her when she joined an IT start-up business. Ex. I. Yet another friend recounted how Mr. Zhukov's ability to joke about his own braces inspired her to get braces herself, and that he not only encouraged her to get braces but physically went with her to the orthodontist to support her. Ex. J.

These letters show that Mr. Zhukov is more than the crime that he committed or the ugly text messages presented at trial. Despite an incredibly difficult childhood, Mr. Zhukov was able to achieve education and, at times, financial success. He shared that success freely with others in need. He also shared his time and provided emotional support to many people in his life. In other words, although Mr. Zhukov ignored the harm his crime did to corporate advertisers, his personal life shows that he was *not* indifferent to other people. Rather, he was generous, kind, and thoughtful in his treatment of his friends, family, and those in need.

II.    **The Nature and Circumstances of Mr. Zhukov's Participation the Methbot Fraud**

In 2014, Mr. Zhukov began looking for a new business. He researched programmatic internet advertising and the proliferation of bots used to trigger programmatic ads. He came to learn that many individuals exploited programmatic

6

advertising by using malware that infected the computers of unknowing individuals and then used those computers to generate ad traffic without the owner of the computer's knowledge or consent. He believed he could provide a similar service without using malware which, in his mind, would make the generation of bot traffic legitimate; unaware of American fraud statutes, he did not know that this conduct was illegal.[2]

As became clear at trial, Mr. Zhukov, with others, developed sophisticated computer code, purchased IP Addresses, and leased servers to run the code. Compared to an operation that used malware, Mr. Zhukov's business required significantly more investment; he spent millions of dollars on the servers and IP addresses needed to operate Methbot. *See e.g.* Ex. 348 at 59-83 (PowerPoint of forensic analyst showing more than $3 million in payments for these expenses).

Once Mr. Zhukov's code was up and running, he found a ready market of buyers willing to purchase bots. Mr. Zhukov made no effort to hide what he was selling, but admittedly ignored signs that those he was selling his traffic to were lying in turn to their customers. As shown by the government at trial, Mr. Zhukov's largest customer, Vertamedia, understood that it was buying bots from Mr. Zhukov. Cooperating witness Sergei Denisoff also testified that he was well aware that Mr. Zhukov's traffic was not human.

---

[2] The jury did not, by virtue of its verdict, find that Mr. Zhukov knew his conduct was illegal. As stated in the jury instructions, "The government need not prove, for any count, that the defendant knew that his conduct was *illegal*. Ignorance of the law is no defense if you find that the government has proved the required mental state for each count beyond a reasonable doubt." ECF No. 368 at 11.

The government presented only one customer of Mr. Zhukov's at trial which claimed that it was unaware that his traffic was not real: AdKarma. The two testifying witnesses from AdKarma, Josh Hulen and Ann Wilhem, claimed that they unknowingly purchased bots from Mr. Zhukov. However, internal emails and skype chats between Hulen and Mr. Zhukov show that Mr. Zhukov made no attempt to hide that he was selling bot traffic and at best the AdKarma executives were willfully blind to the situation. See Defense Exs. A, K. Even if the Court credits Hulen's testimony that he did not know Zhukov was selling bot traffic (which it should not), the record shows that Mr. Zhukov made no attempt to hide that he was selling bots.[3] The defense also submits that the executives at AdKarma, such as Ann Wilhelm, turned a blind eye to what they were purchasing, ignoring all of the "red flags" they themselves identified, and instead choosing to rely on flawed filters merely to claim deniability even as they profited enormously off of Mr. Zhukov's scheme. *See e.g.* GX 1641; DX P-2 (Wilhelm email stating Zhukov's traffic "has red flags all over it" two months before terminating the relationship, Tr. 1526:12-15). In fact, AdKarma only stopped selling Mr. Zhukov's traffic when it was told to do so by SpringServe, its

---

[3] As shown at trial, during skype chats with Mr. Hulen, Mr. Zhukov said: (1) "we can drive you traffic from any site you want"; (2) "we need any server which is still without White Ops .. this filter is too modern and we didnt optimized the traffic for that filter"; (3) "with limit of 4 imps [impressions] from one IP address per 24 hours"; (4) "we can tune the quality. But need reports to tune"; (5) "We can also use any cookie for any client If you will teach us how it can helps we can change cookies". Defense Exhibit A-E. If Mr. Zhukov was attempting to hide the fact that he was selling bot traffic, he would not have made these statements to Mr. Hulen, all of which are inconsistent with the notion that Mr. Zhukov was selling human traffic.

exchange platform that was selling the traffic upstream to DSPs and then to advertisers. *See* Tr. 1525:19-1526:9.

The trial evidence showed that most of Mr. Zhukov's income during the relevant time period came from VertaMedia, no one from VertaMedia testified, and no details were provided as to what VertaMedia—a U.S. company "acknowledged as one of the fastest growing independent technology companies by Inc. 5000 in 2016 and 2017" now known as AdTelligent[5]—did with Mr. Zhukov's traffic.

III.  **The Sentencing Guidelines Range**

The Department of Probation has calculated that Mr. Zhukov has a total offense level of 39, with a corresponding Guideline imprisonment range of 262 months to 327 months (one level higher than the Guideline range for second-degree murder). We object to this determination on two grounds: the $7.6 million loss amount calculation is not supported by the record, and the addition of two levels for "possession or use of an authentication feature" does not apply. We respectfully submit that the only loss amount actually proven by the government was money earned with Sergei Denisoff, who testified that Mr. Zhukov knew that he (Denisoff) was representing to some buyers that the bot traffic was real. As discussed below, that amount was somewhere between what Mr. Denisoff paid Mr. Zhukov for the traffic, about $12,000 and $30,000. Accordingly, the specific offense characteristic for loss found at USSG § 2D1.1(b)(1)(C) (more than

---

[5] *See* https://adtelligent.com/about/, https://www.prnewswire.com/news-releases/vertamedia-the-global-video-technology-provider-rebrands-to-adtelligent-300591010.html

$15,000 but not more than $40,000) and the correct Guideline level is 23, corresponding to a Guidelines sentencing range of 46-57 months.

A.    **Loss Amount Calculation**

Probation calculated an 18-level increase based on a loss estimate of $7.6 million provided by Google. This loss amount is summarized in Government Exhibit 1503, which was created by Google. Tr. 2494:1-7. However, Government Exhibit 1503 is based on conjecture about the source of the traffic, which makes it an impermissible basis for the calculation of loss amount.

Google's loss amount was based on a list of IP address created by WhiteOps that was admitted as Government Exhibit 1. Tr. 2497:17-2498:2. Google determined how much traffic was purchased from each IP address listed in Government Exhibit 1 to come to the totals described in Government Exhibit 1503. Government Exhibit 1503 lists the total amount purchased by every advertiser that purchased traffic from the IP addresses listed in Government Exhibit 1 during the relevant time period. Probation used the total amount contained in Government Exhibit 1 as the loss amount for the purposes of calculating Mr. Zhukov's offense level. However, the mechanism for creating the list contained in Government Exhibit 1 was not explained during the trial. Rather, government expert Lena Lowenstein testified that she had compared the list from WhiteOps to IP addresses she found on GX 101, a hard drive seized from the server farm that contained the Metan code and other related data. Tr. 616:9-617:3. But Ms. Lowenstein did not find all the IP addresses contained in the WhiteOps list, GX 1, on the server farm hard drive,

GX 101. Tr. 616:14-617:1; 623:15-624:6. Accordingly, not all of the IP addresses in GX 1 have actually been linked to Mr. Zhukov.[6]

To compound this issue, Lowenstein's testimony casts doubt on the reliability of IP addresses to determine of the source of internet traffic.  Lowenstein testified that IP addresses could be spoofed—i.e. that a traffic can appear to be coming from a particular IP address but actually comes from a different one. Tr. 624:12-21. She also stated that with the Metan code the traffic was not really coming from the specified IP addresses, but "it spoofs that the traffic was coming from these IPs." Tr. 624:14-21.

Since IP addresses can be spoofed, there is no way to know conclusively whether or not the loss amount totals in GX 1503 came from the IP addresses that Ms. Lowenstein found on GX 101. It is entirely possible that IP addresses *not* definitively connected to Mr. Zhukov are accountable for a large portion of traffic purchases summarized in GX 1503.

Google witness Per Bjorke's testimony casts even further doubt on the reliability of the loss amount calculated by Google as the testimony revealed that neither Google nor the advertisers actually paid the entire $7.6 million on the list. Mr. Bjorke explained that GX 1503 reflected, "the amounts that were the total cost of the advertising space that [advertisers] bought. Most part [sic] of this was likely spent earlier in 2016, so it would have been charged and paid. If it was during the month that – when we did this work, then *we may have been able to avoid charging them and avoid paying it*[.]**" Tr. 2569:12-16 (emphasis added). In addition, Mr. Bjorke stated that Google "communicated to all

---

[6] The government, for strategic reasons not known to the defense, chose not to call any witness with knowledge about how the WhiteOps list was created.

11

impacted advertisers and offered then a refund for those who chose to take a refund." Tr. 2571:22-24. Mr. Bjorke did not testify about the actual amount refunded by Google, nor the reasoning behind some advertisers choosing not to collect the refund. Tr. 2566:18-2568:20.[7]

It is, of course, permissible for the Court to estimate the loss amount for purposes of calculating guideline sentences. USSG § 2B1.1 Application Note 3(C) ("The court need only make a reasonable estimate of the loss."). However, here the issue is not calculating the *value*—the advertisers paid a specific amount for the traffic which is easily calculable—but rather whether the government has sufficiently linked the amounts paid by the advertisers listed in GX 1503 to the fraud that Mr. Zhukov was convicted of committing. In this sense, the case law related to calculating drug weights is instructive. In the context of estimating drug weights when calculating guidelines sentence, the Second Circuit has stated that weights may be approximated, but "this approximation must be based upon 'specific evidence,' not mere 'surmise and conjecture.'" *U.S. v. Martinez*, 133 Fed. Appx. 762, 765 (2d Cir. 2005). "Case law uniformly requires specific evidence…to calculate drug quantities for sentencing purposes…. This careful practice is essential where a defendant's sentence depends in such large measure on the amount of drugs deemed attributable to his conduct." *U.S. v. Shonubi*, 998 F.2d 84, 89-90 (citations omitted). In *Martinez*, the Second Circuit rejected the District Court's estimation of drug weight as unduly speculative

---

[7] According to the PSR, Google did not fill out the requested victim impact statement, so is still unknown at this time how much money Google actually claims to have lost. PSR § 73.

where there was testimony that a defendant had created nine drug traps and about the weight of drugs handled by the defendant on three occasions, and the District Court averaged the three weights and multiplied the average weight by nine to come to a total. 133 Fed. Appx. at 765.

Similarly here, all that has been shown is that *some*, but not all, of the IP addresses listed on Government Exhibit 1 were on servers owned by Mr. Zhukov, and that $7.6 million was purchased (though not paid) by advertisers for traffic from *all* the IP addresses listed on the WhiteOps report, 1. The Court has no way of knowing how much money was paid by advertisers (or at least bid by them) for traffic from the IP addresses that Ms. Lowenstein *actually* found on the servers owned by Mr. Zhukov. Thus, relying on the totals contained in GX 1503 requires the same types of impermissible speculation as were at issue in calculating drug weight in *Martinez*. While *Martinez* and *Shonubi* apply specifically to the drug context, their reasoning is instructive here, where the connection from Mr. Zhukov to the specific proffered loss amount is based on a series of surmises and conjectures, rather than on specific evidence, and where the sentencing guideline calculation "depends in such large measure" on the loss amount. Thus, the Court should reject Probation's use of $7.6 million for the loss amount calculation.

At the same time the Court need not guess at a loss amount. Cooperating witness Sergei Denisoff testified that he schemed with Mr. Zhukov to deprive his customers of around $30,000, of which about $11,700 was paid to Mr. Zhukov. Mr. Denisoff testified that he forfeited $3,000, which was an amount supplied by the Government representing what he had received illegally. Tr. 1233:2-23. Mr. Denisoff was unsure of exactly how

much money he made with Mr. Zhukov, testifying that "[i]t was not $3 million" he did not "believe" it was $300,000 and he did not "know" if it was $30,000. Tr. 1233:24-8. Bank records put into evidence by the government showed that three payments were made from Denisoff's company, Plexious, to Integra Games LTD, a bank account used by Mr. Zhukov, for a total of $11,542.41 during the period Mr. Densioff and Mr. Zhukov worked together. *See* GX 308A at 2 (schedule of Plexious bank records). During this time period, there were also payments to Ksandria Group from Plexious, but during cross examination of the government's financial expert it was revealed that Plexious appeared to have been paying Mayzus, not Ksandria, in order to pay Mr. Zhukov, and Plexious had only paid Mayzus $183.69. *See* Tr. 2426:4-2432:9 (testimony of financial Expert Jonathan Gaeta).

Accordingly, the appropriate loss amount—the only amount that the government actually proved—is between $15,000 and $40,000, and the Base Offense Level from the loss table in USSG § 2B1.1 is 13.

B.     **The "authentication feature" enhancement does not apply.**

The Department of Probation erroneously applied the specific offense characteristic for "the possession or use an authentication feature" under USSG § 2B1.1(b)(11)(A)(2). *See* PSR ¶ 57 ("Since Zhukov used the IP addresses of the victim computers to make it seem as if the bots were being controlled by real people browsing the internet, the offense involved the use or possession of an authentication feature"). The PSR is wrong on both the law and the facts, apparently confusing Mr. Zhukov's scheme with a botnet scheme from other cases. The Sentencing Guidelines Application Notes for subsection (11) state that the term "authentication feature" in the Guidelines has the same meaning as it does

14

in 18 U.S.C. § 1028(d)(1). *See* U.S.S.G. § 2B1.1, Application Note 10(A). Title 18 defines "authentication feature" as "any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified." 18 U.S.C. § 1028(d)(1). No technology used by Mr. Zhukov remotely resembles this description. Moreover, Mr. Zhukov never "used the IP address" of any victim computer: the trial testimony showed that he used IP addresses that he purchased on the open market. Accordingly, the "authentication feature" specific offense characteristic does not apply, further reducing Probation's proposed base offense level by two levels.

## ARGUMENT

I. **Probation's calculated Guidelines sentence overstates Mr. Zhukov's criminal and moral culpability.**

Under the Sentencing Reform Act of 1984 and *U.S. v. Booker*, 543 U.S. 220 (2005), a sentencing court must impose a sentence that is "sufficient but not greater than necessary" to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2), including punishment, deterrence, protection of the public, and effective provision of correctional services. Since *Booker*, appellate courts and the government have recognized that sentencing courts are free to impose non-guidelines sentences based on policy disagreements with the applicable guidelines. *See, e.g., Kimbrough v. U.S.*, 552 U.S. 85, 101 (2007) ("the guidelines 'are now advisory' and … as a general matter, 'courts may

15

vary [from guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.'"). Moreover, certain provisions of the Sentencing Guidelines are entitled to minimal, if any, deference because the development of these provisions was not based on the Sentencing Commission's "exercise of its characteristic institutional role." *Id.* (upholding categorical variance from Guidelines governing crack cocaine); *accord, Spears v. U.S.*, 555 U.S. 261, (2009) ("district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines). In this case, the Guideline sentence proposed by Probation is excessive due to too much emphasis on loss amounts to increase levels, and specific offense characteristics based on overlapping factors.

A. **Whatever the loss amount in this case, it is a poor proxy for the seriousness of Mr. Zhukov's conduct.**

In this case, in which losses were diffuse and borne by corporations with multimillion dollar advertising budgets, the loss amount proposed by Probation vastly overstates the seriousness of the offense and the appropriate sentence. We do not doubt that the crime Mr. Zhukov committed is serious and created harm to Google and other companies, but by driving the sentence up based almost entirely on loss amount, the Sentencing Guidelines create a situation in which (in Probation's view at least) Mr. Zhukov would be presumptively subject to a sentence orders of magnitude larger than Guidelines sentences for far more harmful offenses.

Courts have long criticized using the Sentencing Guidelines loss enhancement as a proxy for determining the seriousness of the offense and the appropriate sentence. The

16

Guidelines loss enhancement was developed "without the benefit of empirical study of actual fraud sentences by the Sentencing Commission." *U.S. v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J. concurring); *see also U.S. v. Musgrave*, 647 F. App'x 529, 538–39 (6th Cir. May 4, 2016) ("there is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances"). The consequence of the loss enhancement lacking an empirical basis, combined with the often-disproportionate role loss plays in determining the Guidelines sentence, is that "sentencing judges are discouraged from undertaking close examination of the circumstances of the offense and the background and characteristics of the offender." *U.S. v. Corsey*, 723 F.3d at 380 (Underhill, J. concurring).

Courts have explained how loss amounts in fraud cases are poor arbiters of fault and create unjust sentences. For example, Judge Gerald Lynch, now of the Second Circuit, explained:

> The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes—to assign precise weights to the theft of different dollar amounts. In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.

*U.S. v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004). Loss calculations obscure the fact that not all economic losses are equally serious:

> A fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to absorb the financial consequences without a need to close plants, fire employees, or even declare the loss as material in public financial reports.

*Corsey*, 723 F.3d at 380 (Underhill, J. concurring). Here, eighteen of the levels Probation would assign to Mr. Zhukov come purely from loss amount calculation. Thus, loss amount alone brings Mr. Zhukov from a guideline sentence of 37 to 46 months to a guideline sentence of 262 to 327 months. The proposed increase, beyond lacking factual support, is out of step with the harm caused by Mr. Zhukov's conduct.

Other instances of wire fraud sentences in this district demonstrate that hinging a more-than-eighteen-year increase in incarceration based solely on loss amount is patently unreasonable. Frauds targeting vulnerable victims that were materially and demonstrably harmed, and were harmed by lies and threats made by the defendant directly to the victim, have resulted in much shorter sentences in this district than the one proposed by Probation for Mr. Zhukov. For example:

- **Lorindo Powell** was sentenced to 51 months' imprisonment for defrauding elderly victims. Her sentencing guideline range was 51-63 months, a quarter of Mr. Zhukov's PSR sentence, largely because of the difference in loss amounts. *See U.S. v. Powell*, 17-CR-00311 (MKB), ECF No. 52 at 7 (Government Sentencing Memorandum noting the loss was $383,780.80). According to the government, Ms. Powell "empt[ied] the bank accounts of her elderly victims" and "targeted the financial cushions that they relied on to keep them comfortable in their final years.

Having gained their trust, she not only stole their cash, but emptied their retirement accounts and got them thrown out of their homes." *Id.*

- **Paul Cronin**: Committed wire fraud and tax fraud by misappropriating more than $1.3 million from a not-for-profit and not reporting the additional income. The government recommended a 33-to-41-month sentence pursuant to a plea agreement, despite a guideline sentence of 41 to 51 months, and the Court imposed a 24-month sentence. *U.S. v. Cronin*, 17-CR-190 (RJD) ECF No. 16 at 1-2.

- **Hani Kabbara**, an "international cybercriminal" who had a "long history of criminal activity," had a guideline sentence of 51-60 months in prison for his participation in a "grandparent scam" in which he "preyed upon elderly victims and exploited these victims' vulnerable state and devotion to their family members in order to rob them" including by telling them their grandchild had been arrested and the victim needed to send money for bail. *U.S. v. Kabbara*, 16-CR-472 (MKB), ECF No. 33 at 5-6 (Government Sentencing Memorandum). He was sentenced to thirty months incarceration. *See* Press Release, *available at* https://www.justice.gov/usao-edny/pr/international-cybercriminal-sentenced-30-months-imprisonment-grandparent-scams.

- **Anton Bogdanov**, a Russian citizen, faced a Guideline sentence range of 87-108 months imprisonment after he pled guilty to wire fraud conspiracies and computer intrusion. *U.S. v. Bogdanov*, 19-CR-197 (MKB), ECF No. 34 at 1 (Government Sentencing Memorandum). He was charged with attempting to obtain more than $1.5 million fraudulently by hacking private tax preparation firms, stealing various individuals' personal information, filing tax returns in the names of those individuals, and then funneling the returns into his own pocket. *Id.* at 1-2. He was sentenced to sixty months incarceration. *See* Press Release, *available at* https://www.justice.gov/usao-edny/pr/russian-citizen-sentenced-60-months-imprisonment-cyber-tax-fraud-scheme.

In contrast to the victims described above, the primary victim of Mr. Zhukov's crime appears to be Google, a company worth nearly $2 trillion dollars, which something less than $7.6 million. The relative insignificance of this cost to Google is demonstrated by Google's decision to repay advertisers without attempting to receive any money back from Vertamedia, AdKarma, or other similar supply side platforms who sold the traffic to Google (Google had no direct relationship with Zhukov or any of his companies or any entity

alleged to have been under his control). As a result, the companies affected appear to have been made whole by the actions of Google.

In addition to Google, the government claimed that AdKarma was a victim of the scheme, but it is unclear what harm, if any, was done to AdKarma. In fact, AdKarma seems to have benefitted from its relationship with Zhukov. The trial testimony suggested that AdKarma received all payments that were due to them from advertisers, and by withholding money from Mr. Zhukov, earned a windfall of additional money because they received money for bot traffic that they did not pay for. *See e.g.* Tr. 1673:21-1674:10 (testimony of Ann Wilhelm). The government also suggested that publishers such as the New York Times and New York Post may have suffered reputational harm, but that loss remains purely speculative.

The only individual that the government presented as suffering significant *harm* (as opposed to financial losses) as a result of Mr. Zhukov's conduct was Ron Nielsen, the founder of Media122. We respectfully submit that Mr. Nielsen's self-identification as a victim is misleading. Mr. Nielsen's business model was predicated on purchasing cheap traffic like the traffic supplied by Mr. Zhukov and selling it upstream without regard to whether it was real or not.[8] We do not mean to minimize the harm and embarrassment to

---

[8] Mr. Nielsen testified that he was doing particularly well in the summer of 2016. He noted that he recalled working with Vertamedia in early summer of 2016. Tr. 1633:16-21. By late July, he was purchasing large quantities of Mr. Zhukov's traffic via AdKarma. Defense Exhibit R, which was marked only for identification, is a spreadsheet form AdKarma showing that of the $1,475,319.49 worth of traffic purchased by AdKarma customers from Zhukov, $1,289,610.08 was purchased by Media122. This averages out to approximately $20,000 of Mr. Zhukov's traffic purchased by Media122 per day. Mr.

Mr. Nielsen, but rather note that the harm to him was more emotional and reputational than economic. While the government has at least implied that Mr. Nielsen's business ended due to Mr. Zhukov, Mr. Nielsen testified that he did not close his business until fall 2019. Tr. 1624:6-7. By 2019 there had been radical changes in programmatic advertising that made companies like Media122 and AdKarma less viable as both advertisers and publishers began cutting the number of demand side and supply side platforms with whom they chose to work.[9] In addition, while Mr. Zhukov concededly is responsible for any actual harm to Mr. Nielsen as a result of Methbot, it is worth noting that AdKarma, which had a direct relationship with Mr. Nielsen, failed to inform Mr. Nielsen that he was buying large quantities of traffic that were rife with "red flags." Indeed, Mr. Zhukov credibly testified

---

Nielsen testified that at the peak of his business, during this period of the summer of 2016, he was doing $30,000 to $40,000 per day in revenue. Tr. 1627:21-23. Thus, it appears that most of Mr. Neilsen's income was *attributable* to Mr. Zhukov's bot traffic. There is no indication in the record that there were other sources from whom Mr. Nielsen could have successfully sourced this volume of "remnant traffic" *i.e.* cheap traffic on quality websites. Tr. 1636:1-4. In the end, Mr. Nielsen was paid for most of the traffic he purchased from Mr. Zhukov, with only about $25,000 to $30,000 withheld. Tr. 1621:19-23; 1639:1-6.

[9] *See e.g.* Joseph, Seb "As agencies go directly to SSPs, they are trimming the number they use." *DigiDay* (Dec. 5, 2019) (noting that media companies have started drastically cutting down the number of different supply side platforms they use in part to increase their level of control over traffic quality); Benes, R. "Publishers Are Using Fewer Supply Side Vendors." *eMarketer* (July 17, 2018) *available at* https://www.emarketer.com/content/publishers-purged-one-fourth-of-their-ssps-over-two-years ("Like their advertiser brethren, publishers are culling their programmatic vendors. Ad tracking firm Pathmatics analyzed the biggest 500 US publishers in its system and found that the number of sell-side vendors these publishers use per month-including supply-side platforms (SSPs), ad networks and ad exchanges—declined 26%" between June 2016 and June 2018). The general downturn in this industry is also likely reflected in AdKarma's fate, which went from 50-60 employees in 2016 to a "handful" at present. Tr. 1498:14-18, 1499:4-6.

that he believed Mr. Hulen (and therefore AdKarma) knew that his traffic was non-human. The harm done to Mr. Nielsen should, of course, factor into the court's decision. But Mr. Nielsen was the only person presented by the government as significantly negatively affected by Mr. Zhukov's scheme, and he in fact profited financially from Mr. Zhukov's business.

In sum, the government proved at trial that Mr. Zhukov harmed various entities, but the loss fell primarily on Google, which stepped up and made its customers whole. Corporations, of course, have the right to have those who steal from them held accountable by the criminal justice system. However, proportionate sentencing requires, when making a sentencing determination, considering the relative scope and scale of the *harm* inflicted, not simply the abstract loss amount. *See e.g. Emmenegger*, 329 F.Supp.2d 4 at 427. The focus on loss amount and the resulting drastic escalation of sentences creates an absurd result in this case, with individuals who have inflicted harm (as opposed to economic loss) on others to a far greater extent benefiting from guideline sentences fifteen or more years shorter than the one calculated in the PSR for Mr. Zhukov.

 "Where application of the loss enhancement leads to a patently absurd sentence, it is appropriate for the court to rely more heavily on the § 3553 factors." *U.S. v. Johnson*, 2018 WL 1997975 at *4 (E.D.N.Y April 27, 2018) (NGG), *citing Corsey,* 723 F.3d at 380-82 (Underhill, J., concurring) (sentencing a defendant to 24 months, rather than the guideline sentence of 87-108 months which was "overwhelmingly due to the loss enhancement" and "well out of proportion to [the defendant's] appropriate sentence"). The eighteen-year increase qualifies as "patently absurd" in Mr. Zhukov's case where the

harm caused by his crime was diffuse and largely borne by those in a position to absorb it without substantial pain, and missing many of the factors that can make schemes to defraud particularly pernicious (*e.g.* frauds involving repeated and extended lies by a defendant to innocent victims; developing and exploiting relationships with vulnerable individuals; inflicting substantial losses in relation to victims' overall net worth). As a result, the defense urges the Court to focus on the other § 3553(a) factors, rather than the gargantuan Guideline sentence dictated by the PSR loss amount.

    B.    **Overlapping § 2B1.1 specific offense characteristics in addition to the money laundering enhancement create an unwarranted increase in the Guideline sentence for substantially similar conduct.**

Courts have recognized that in wire fraud cases some of the Guideline enhancements overlap in such a way as to create undue increase in the Guideline sentence relative to the conduct described in the specific offence characteristics. As the Second Circuit has noted:

> Although the Guidelines contemplate the aggregation of applicable enhancements and provide increasing sentencing range increments as the adjusted offense level increases, we continue to believe that when the addition of substantially overlapping enhancements results in a significant increase in the sentencing range minimum (as it does at the higher end of the sentencing table), a departure may be considered. What is present to a degree not adequately considered by the Commission is the *combined effect of the aggregation of substantially overlapping enhancements* and the large increase in the sentencing range minimum at the higher end of the sentencing table.

*U.S. v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (abrogated on other grounds) (emphasis added); *see also U.S. v. Jackson*, 246 F.3d 22, 26 (2d Cir. 2003).

23

In Mr. Zhukov's case, the following substantially overlapping enhancements apply:

- two levels for ten or more victims

- four levels for being a leader or organizer of an offense involving five or more participants[10]

While we concede these enhancements technically apply, their cumulative effect is disproportionate, especially if the Court finds that Mr. Zhukov's PSR loss amount places him at the end of the Sentencing Guidelines where each additional point increases the minimum Guidelines sentence by years, as opposed to a few months as it does on the lower end of the sentencing table.

As the Second Circuit noted in a similar sophisticated fraud scheme:

> Although the enhancements imposed by the District Court are permissible, they are all little more than different ways of characterizing closely related aspects of [the defendant]'s fraudulent scheme. Thus, his base level of 6 was increased 10 levels because his offense involved a large sum of money, another 2 levels because he carefully planned the activity, another 2 levels because he used sophisticated means, and another 4 levels because the scheme was extensive. Even though these enhancements are sufficiently distinct to escape the vice of double counting, they substantially overlap. Most fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive.

*U.S. v. Jackson*, 346 F.3d 22, 26 (2d Cir. 2003). Similarly, it is hard to imagine a seven million dollar scheme to defraud targeting victims like Pepsi and Geico that did not also

---

[10] Mr. Zhukov also received an enhancement of two levels as the activities took place outside of the United States. However, it is worth noting that he likely would have gotten this two-level increase regardless since it can also apply to a "sophisticated" operation, in which case it would have been an additional two levels for a substantially overlapping conduct.

include many of the enhancements that radically increased Mr. Zhukov's Guidelines sentence. If a scheme of this scale had *fewer* than ten victims, the scale of the victimization of each such individuals would warrant, if anything, a higher sentence. This enhancement for more than ten victims, again, points to the overall size of the scheme, not the relative culpability of the individual.

In total, Mr. Zhukov received six additional points for the above-described enhancements, a cumulative increase of *eight and a half years of imprisonment* (assuming the Court adjudges him a level 37) which are amply captured in the loss amount.

This is further aggravated by a two-level increase due to Mr. Zhukov's conviction for money laundering, which if increasing Mr. Zhukov from level 35 to 37, adds an addition three to four years to his sentence, simply because he reinvested the profits of the Methbot scheme to continue the scheme. The jury acquitted Mr. Zhukov of concealment; thus, his conviction for the money laundering conspiracy is a conviction for activities that are all but impossible to avoid when committing the crime for which he was convicted. Between the cumulative effect of the enhancements, the money laundering conspiracy, and the enormous increase from loss amount, the proposed Guidelines sentence far exceeds a sentence proportionate to the crime committed.

II.   **A sentence of thirty-six months is appropriate in light of the crime committed, Mr. Zhukov's personal history and characteristics, the nature of imprisonment in a foreign country during the COVID-19 pandemic, and other sentences imposed in this district for comparable wire fraud schemes.**

The defense respectfully submits that a term of imprisonment of thirty-six months is appropriate and sufficient but not greater than necessary to achieve the purposes of the

Sentencing Reform Act set forth in 18 U.S.C. § 3353(a). A sentence of three years in prison, 6,000 miles from home, during the pandemic adequately reflects the crime Mr. Zhukov committed, provides both general and specific deterrence, and would account for his history and characteristics. It is also proportionate to sentences imposed on other individuals who have committed similar or worse crimes in the Eastern District of New York.

A.   **Mr. Zhukov's impoverished upbringing and** ███████████████ **should be taken into account when considering the appropriate sentence.**

Mr. Zhukov overcame difficult odds to survive and succeed economically in the embers of the old Soviet Union. Mr. Zhukov's childhood was characterized by ████ ███ poverty, and neglect. He was left to fend for himself at the age of ten. Yet he pushed for education, successfully completing high school and joining the Russian Army ███

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████

During the trial, the government made much of Mr. Zhukov's flamboyant love of money, but it can hardly be surprising that a man who grew up with so little would enjoy his success when it came, or revel in post-Soviet capitalist symbolism. Nor was his spending exclusively selfish: caring for his family members and ensuring they never endured the deprivations he did was of utmost importance to Mr. Zhukov. He ended his own schooling to provide for his daughter when she was born, and he continued to support her and her

26

mother, as well as her mother's family, after they separated. *See* Ex. D. He also, until his arrest, supported his mother and grandmother. His mother explained, "[h]e always tried to make me happy and to help me financially. Thanks to him, I now live in my own apartment which he helped me buy for my 50th birthday." Ex. C. He frequently gave to charity and to help those in need. *See* Ex. D (Mr. Zhukov donated to his church); Ex. E (Mr. Zhukov "helped those in need"). He was also emotionally generous with his friends, many of whom have written to support him. For example, his friend Evgenia Smirnova wrote, "[d]ue to the situation in my family, I was left without the support of my parents at the age of 17. For many years Aleksandr was my backbone and my pillar. He helped me emotionally and professionally in my studies and in sports, and for that I am very grateful to him." Ex. K. Mr. Zhukov's enjoyment of money is not, as the government insinuated at trial, an indication of greed, but rather the response of someone who overcame an impoverished childhood to succeed financially to a degree he could never have imagined.

Mr. Zhukov's background and the support of his friends and family should factor into his sentence. His situation is different from a wire fraud committed by a middle class or wealthy person who wishes to increase her already substantial wealth. Rather, Mr. Zhukov's sentence should reflect that he was seeking financial security after a childhood of poverty, ███████████████████████████████████████ and the financial dependence of his family.

27

B.   **Mr. Zhukov is not, contrary to the Government's depiction, a uniquely prolific creator of bots and programmatic advertising, and a below-Guideline sentence is sufficient to deter others engaging in similar schemes.**

It is certainly true that, for a brief period, Mr. Zhukov headed an operation that created a large quantity of non-human traffic; however, he was hardly unique in this market and making an example of him through harsh sentencing is both unjust and unnecessary from the standpoint of deterrence. Bots in programmatic advertising were, and remain, known problems to those that participate in this form of advertisement. WhiteOps published a report in 2016 after reviewing the programmatic advertising of 49 large-scale corporate advertisers for 60 days in late 2015. *See* Ex. L: WhiteOps, 2015 BOT BASELINE: FRAUD IN DIGITAL ADVERTISING (Jan. 2016) at 6. The study found that traffic purchased by individual advertisers was between 3 and 37% bots during that period. *Id.* at 7. It further estimated that total losses to advertisers in 2016 from bots would be $7 billion. *Id.* at 6. Thus, although Mr. Zhukov certainly trafficked in significant and harmful quantities of non-human traffic, his traffic represented a tiny fraction of the overall bot traffic in the market when his scheme was underway.

Of further importance, Mr. Zhukov stands apart from many who trafficked in bots because he did *not* use malware to infect unsuspecting individual's computers. According to the 2015 White Ops referenced above, "[a]lmost 80 percent of successful bot traffic came from the 2 percent of households with the freshest malware infection." Ex. L at 7. In addition to harming advertisers, this type of malware compromises individual's computers in numerous ways, causing both individual computers and home networks to slow as

resources are fraudulently expended looking at ads without the owner's knowledge or consent.

Mr. Zhukov's sentence should reflect the fact that he was a single end-point creator without a specific contractual duty to advertisers, unlike others in the chain. Vertamedia is still in operation today, despite the government's introduction of communications with various individuals at Vertamedia showing they understood the traffic they purchased from Mr. Zhukov was non-human. Indeed, programmatic advertising involving companies like Vertamedia and AdKarma is particularly prone to bot fraud. The WhiteOps study of 2015 traffic noted that "[s]ourcing traffic (any method by which publishers acquire more visitors through third parties) results in greater fraud. Sourced traffic had more than three times the bot percentage than the study average." *Id.* at 7. Even AdKarma, which had the veneer of respectability as part of a publicly-traded U.S. company, turned a blind eye to the obvious—that Mr. Zhukov was supplying bot traffic, not human traffic—when it helped their profits.[11] So long as AdKarma had plausible deniability, they were happy to purchase what Mr. Zhukov was selling, and they did not stop buying from Mr. Zhukov until they were directed to by their auction platform, SpringServe. *See* Tr. 1525:19-1526:9. Thus, due to the government's own choices in prosecution, Mr. Zhukov stands alone for

---

[11] This is despite the fact that AdKarma had, at the time of its relationship with Mr. Zhukov, recently been purchased by RhythmOne (formerly Blinkx), whose stock had plummeted after their own bot related scandal in early 2014. *See* Cookson, R & Davies, S. "Investors dump Blinkx shares after critical blog." FINANCIAL TIMES (Jan. 30, 2014), *available at* https://www.ft.com/content/f9b301b4-89b0-11e3-abc4-00144feab7de (referencing a blog post by Ben Edelman, *available at* https://www.benedelman.org/news-012814/ which describes, among other issues, bot related fraud).

sentencing, while AdKarma, Vertamedia, and many others who made money from his bots remain undeterred.

The government has, quite successfully, made an example of Mr. Zhukov already. Capitalizing on the work of WhiteOps, which brought Methbot to the attention of American law enforcement, the government has now successfully prosecuted Mr. Zhukov. An extremely harsh sentence is not necessary to promote general deterrence.[12] Mr. Zhukov's arrest, pretrial detention of more than 30 months, and trial, along with a sentence of thirty-six months incarceration would be amply sufficient to achieve just punishment, general deterrence, and specific deterrence, to reflect the seriousness of the crime, and to promote respect for American law around the world. 18 U.S.C. § 3553(a)(2).

C.   **A reduced sentence is warranted given the effect of the COVID-19 pandemic on the conditions at MDC and the added hardship of imprisonment in a distant foreign country.**

As the Court is aware, the abhorrent conditions at MDC during the course of the COVID-19 pandemic have been well documented and have justified downward variances for individuals, such as Mr. Zhukov, who have endured them.[14] The institution was in crisis

---

[12] Evidence overwhelmingly shows that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment" and "[i]ncreasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, National Institute of Justice, FIVE THINGS ABOUT DETERRENCE (May 2016), *available at* https://nij.ojp.gov/topics/articles/five-things-about-deterrence (summarizing a "large body of research related to deterrence").

[14] *See* Ex. M: 12/31/2020 Federal Defenders memorandum describing MDC conditions; *see also* U.S. D.O.J. Office of the Inspector General, *Pandemic Response Report 21-002*: Remote Inspection of Metropolitan Detention Center Brooklyn, *available at* https://oig.justice.gov/sites/default/files/reports/21-002.pdf (documenting lack of medical supplies, protective equipment, and medical personnel at MDC).

before COVID-19. Almost a year after Mr. Zhukov arrived, in December 2019, the MDC

lost heat and power. Since the pandemic began, MDC has been locked down. Things took

a turn for the worse in December 2020. COVID-19 infections exploded in a second wave

that peaked this January. U.S. Reps. Jerrold Nadler and Nydia Velazquez described the

MDC outbreak in an urgent letter to the Bureau of Prisons dated December 4, 2020:

> **As the local federally elected officials, our offices are often the first to receive grievances and complaints concerning the safety and wellbeing of detainees and staff at the Federal facility, and we have a responsibility to the community we represent. We have received reports that large numbers of detainees in unit 73 of MDC were told yesterday that they tested positive. It is our understanding that the number of infected detainees was too large for the facility to isolate cases, and that a number of infected cases are simply being put together in cells on the same unit with others who tested negative. Our offices have also heard that the outbreak started a little over a week ago and by last weekend many were quite sick. Last night we received a disturbing update: some severely ill detainees were not receiving medical attention. The symptoms described to us include coughing up blood and difficulty breathing. It is also our understanding that a number of units at the facility have seen brown water in sinks and toilets, with no potable water being provided. In addition, we have received reports of moldy food, food tray waste piling up, emergency buttons in the cells not working, and staff not consistently wearing masks as they work with inmates, and then going to and from the community each day. We have no information from your office about these alleged conditions. This is simply not acceptable.**

*See* 12/4/2020 Letter from Reps. Valezaquez and Nadler to Warden Heriberto

Tellez, *available at* https://velazquez.house.gov/sites/velazquez.house.gov/files/

MDC%20COVID%20Letter%20Velazquez-Nadler%2012-4-20.pdf.

Sentencing courts have taken notice of the increased hardships people have endured as a result of being imprisoned during the crisis. In May 2020, Judge Oetken, in imposing a time-served sentence in a narcotics case, remarked that conditions in federal prisons are so much more punitive than usual that "it's essentially the equivalent of either time and a half or two times what would ordinarily be served." *See U.S. v. Daniel Gonzalez*, 18 Cr. 669 (JPO), Sentencing Proceeding (S.D.N.Y. April 2, 2020). Former SDNY Chief Judge Colleen McMahon "firmly" agreed with Judge Oetken "that we should be providing some extra time for anybody who spent time in MCC or MDC during this lockdown." *U.S. v. Tiffany Days*, 19 Cr. 619 (CM), Sentencing Proceeding at 11 (S.D.N.Y. April 29, 2021). Judge McMahon noted that conditions at the local federal jails are "inhumane" and "significantly worse than… anyone thought possible in the last 400 years in a federal jail in America." *Id.* in imposing the minimum sentence available, Judge McMahon told the defendant that she "shouldn't have to suffer for the incompetence of the United States Department of Justice and its subsidiary agency, the Bureau of Prisons." Of course, this Court has itself imposed a below-guidelines sentence in part to account for "harsher than usual" conditions of detention and explaining at the oral sentencing that the defendant was held in conditions "tantamount to unearned disciplinary segregation or worse." *U.S. v. Garland Battle*, 20-CR-349 (EK), Sentencing Proceeding and Statement of Reasons (E.D.N.Y. April 22, 2021) (as reported to Federal Defenders of New York). We respectfully request the Court credit Mr. Zhukov at sentencing for the days he spent in nearly constant lockdown, without access to family and friends or rehabilitative programming, and living in fear for his life by granting a downward variance from the calculated Guidelines range.

In addition, a downward variance is appropriate as Mr. Zhukov's sentence going forward will remain harsher than it is for others because his entire family lives abroad. His wife has, thus far, been unsuccessful in her attempts to obtain a visa to come to the United States to visit Mr. Zhukov. It is unclear when in the future she may be able to get a visa, as American embassies in Russia are not currently processing non-emergency visa applications.[15] Mr. Zhukov is separated seemingly indefinitely from his young daughter who wrote, "I miss [my father] terribly and I am very sad that he cannot see me growing up, something I would like him to see very much. I am very tired of having 15-minute calls that are not enough for normal communication by any stretch of the imagination." Ex. A. His grandmothers are both elderly; one was sick with COVID-19 earlier in the year. Mr. Zhukov's mother and wife both miss him terribly.  Exs. B & C. While most people who are jailed can expect to at least see their family members while they are serving a prison sentence or pretrial detention, it appears that Mr. Zhukov will continue to be denied contact with his family indefinitely. Even communication via phone is difficult due to the time zone differences and cost of international calls

Finally, as a foreign citizen, Mr. Zhukov is likely to have access to minimal or no programming in prison that is available to other inmates, some of which can reduce the time a sentence is served. For example, the Residential Drug Abuse Program ("RDAP"), which Mr. Zhukov would benefit from given his long history of substance abuse and would

---

[15] "Message to U.S. Citizens: US Mission Russia – Reduction of Consular Services." U.S. Embassy & Consulates in Russia (April 30, 2021) *available at* https://ru.usembassy.gov/message-to-u-s-citizens-u-s-mission-russia-reduction-of-consular-services/.

substantially reduce his sentence, is not available to him as he is subject to deportation after the completion of his sentence. *See Gallegos-Hernandez v. U.S.*, 688 F.3d 190 (5th Cir. 2012) (explaining regulatory basis for exclusion of non-citizens from RDAP). The Court should consider the inhumane prison conditions during the pandemic, Mr. Zhukov's family's location in a country from which they are unlikely to be able to visit, and his lack of access to programming due to his status as a foreign national when imposing a sentence. 18 U.S.C. § 3553(a)(2)(D) (court must consider the "need for the sentence imposed…to provide the defendant with needed educations or vocational training, medical care, or other correctional treatment in the most effective manner").

D.   **Sentencing Mr. Zhukov to thirty-six months is consistent with other sentences issued in the Eastern District of New York in light of the unique conditions of imprisonment during the COVID-19 pandemic.**

Nationally, the median sentence length for a federal fraud is just eight months. *See* U.S.S.C. 2020 Sourcebook of Federal Sentencing Statistics, Table 15. In this district, courts have routinely issued sentences in wire fraud cases that are far below the advisory Guidelines sentence. According to the Sentencing Commission's Interactive Data Analyzer, for fiscal years 2018, 2019 and 2020, the median sentence length for fraud (counting probation sentences as zero months) in the Eastern District of New York was just six months and the average sentence length was 18 months. *See* Exhibit N (screenshot from Data Analyzer). Sentences in the range of 36 months and above are reserved for the most serious fraud cases in this district. For example:

- **Vitaly Korchevsky** and **Vladislav Khalupsky** were convicted at trial of conspiracy to commit wire fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, computer intrusion and securities fraud, stemming from "their

roles in an international scheme to hack into three business newswires and steal yet-to-be published press releases containing non-public financial information, which was then used to make trades that generated approximately $30 million in illegal profits." https://www.justice.gov/usao-edny/pr/two-defendants-convicted-all-counts-international-computer-hacking-and-securities-fraud. The government recommended a guideline sentence of 135-168 as to Mr. Khalupsky, who was sentenced first. *U.S. v. Khalupsky*, 15-CR-381 (RJD), ECF No. 357 at 1. The Court imposed a sentence of 48 months. As to Mr. Korchevsky, the government recommended a sentence of 96 months, well below the Guideline sentences of 210 to 262 months, in part due to the sentence received by Mr. Khalupsky. Korchevsky made *$15 million in personal profit* on the scheme, while Mr. Khalupsky made less than $700,000. 14-CR-381 ECF No. 385 at 10. Despite this enormous gain to Mr. Korchesvsky, the Court sentenced him to 60 months, far below the sentencing guidelines *and* the government's recommendations.

- **Ercan Findikoglu** was a Turkish citizen who "was one of the masterminds behind three cyberattacks between 2011 and 2013 that inflicted more than $55 million in losses on the global financial system." *U.S. v. Findikoglu*, 13-CR-440 (KAM), ECF No. 35 at 1. His Guideline sentence was 135 to 168 months, and he was instead sentenced to 96 months.

- **Thomas Donovan**, along with two co-conspirators, stole $31 million from Ficus Investments, Inc. and had previously been involved with defrauding investors, though he had only civil rather than criminal judgments for his prior fraud. *U.S. v. Donovan*, 12-CR-196 (JS), ECF No. 104, at 1-2, 4. Pursuant to a plea agreement, his offense level was 29 (absent a plea agreement it would have been 34), and the government recommended he receive a guideline sentence of 87 to 108 months. *Id.* at 1. He was sentenced to 55 months imprisonment.

In light of these sentences and the other factors described above, absent COVID-19, a sixty-month sentence, would seem proportionate and appropriate to avoid unwarranted sentencing disparities consistent with 18 U.S.C. § 3553(a)(6). Mr. Korchevsky, who also went to trial and who made a personal profit of more than $15 million via wire fraud, received 60 months in jail in a scheme whose harm was diffuse in nature, like Mr. Zhukov's. Other individuals described above received sentences less than sixty months for far more harmful conduct, including stealing from elderly victims and non-profit organizations. An additional reduction of fourteen months in light of the COVID-19

35

pandemic, as well as the additional hardship for Mr. Zhukov of being imprisoned an ocean away from his family during the pandemic, is appropriate. Thus, the defense respectfully requests that a sentence of thirty-six months incarceration be imposed on Mr. Zhukov.

### CONCLUSION

For the reasons set forth above, Mr. Zhukov should be sentenced to 36 months imprisonment.

Dated:  September 7, 2021
New York, New York


Respectfully submitted,
ZMO Law PLLC

By:   __S/_____
        Zachary Margulis-Ohnuma
        Tess Cohen
        260 Madison Avenue, 17th Fl.
        New York, NY 10016
        (212) 685-0999

36