

U.S. Department of Justice

United States Attorney
Eastern District of New York

SK/JAM/AFM  
F. #2016R02228

271 Cadman Plaza East  
Brooklyn, New York 11201

November 9, 2021

By ECF

The Honorable Eric R. Komitee  
United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

      Re:    United States v. Aleksandr Zhukov  
             Criminal Docket No. 18-633 (S-1) (EK)

Dear Judge Komitee:

      The government writes in further support of its motion for forfeiture, see ECF No. 407 ("Mot."), and in reply to the defendant's opposition thereto, see ECF No. 414 ("Opp.").

      Because forfeiture is "punitive rather than restitutive . . . district courts are not required to conduct an investigative audit to ensure that a defendant 'is not deprived of a single farthing more than his criminal acts produced.'" United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011) (quoting United States v. Lizzas, Indus., Inc., 775 F.2d 494, 498 (2d Cir. 1985)).  The government is merely required to establish the forfeitability of property or money by a preponderance of the evidence, and the Second Circuit further has indicated that sentencing courts "may 'use general points of reference as a starting point' for a forfeiture calculation and 'make reasonable extrapolations'" therefrom.  Roberts, 660 F.3d at 166 (quoting United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011)).

      For the reasons set forth below, the government's proposed forfeiture amount satisfies this standard and the defendant's arguments are without merit.

### 1. Payments from Verta Media to the Defendant are Forfeitable

      The defendant argues that "some, or even all, of the money paid by Verta Media may have been payments by individuals who willingly purchased non-human traffic." Opp. 4.  Here as in other recent submissions, the defendant seeks to revive a theory of the case that is unsupported by the evidence and was soundly rejected by the jury.  The evidence

at trial established that the defendant deployed his bots for a fraudulent purpose—to load ads and make it appear that humans were viewing those ads—and for no other purpose.[1] As the government has previously explained over the course of this litigation, the manner in which, and the purpose for which, the bots were programmed rendered their use fraudulent because they were designed—in all circumstances—to lead advertisers to believe that their ads had been viewed by human internet users when they had not.  For this reason, it is irrelevant whether an intermediary was a co-conspirator or unwitting participant in the defendant's scheme; the scheme defrauded advertisers, and the money that the defendant received in return for the traffic he sold constitutes proceeds of that scheme.

In any event, the evidence at trial also established that the defendant conspired with individuals at Verta Media as part of his scheme.  The government's evidence regarding Verta Media is marshaled extensively in its letter brief submitted at the Court's direction on September 21, 2021, see ECF No. 399.  To take only a few examples:

- Victor Bezer, Verta's general manager of video supply, advised the defendant in September 2015 that his "streaming [was] way too obvious," GX 637TE, directing him to "diffuse" his traffic lest he "look suspicious" and "get busted across the entire industry."  GX 2106.
- Alex Volker, Verta's advertising director, advised the defendant in January 2016 that an advertiser had detected his traffic as being 100% datacenter traffic ("this is sad, of course") and sent the defendant a news release announcing an "advertising industry initiative to fight criminal activity in the digital advertising supply chain . . . [through] a program to block illegitimate and non-human ad traffic originating from data centers."  GX 2200.
- Bezer warned the defendant in February 2016 that they would face "charges" because their "traffic was identified as data center."  GX 1635TE.  Bezer also warned the defendant about the importance of avoiding "a scandal with advertisers, should they start digging deeper."  GX 1683TE.
- Vertamedia typically described its payments to the defendant as "payments for advertising services," GX 1635TE, GX 640T, leaving no doubt that the defendant's bots were being deployed to "watch" advertisements.

---

[1] See Testimony of Lena Loewenstine, Tr. 409 (defendant's code created a browser with no inputs or display function; Tr. 413-14 (fake mouse movements); Tr. 417 (fake social media logins); Tr. 439-42 (bypassing security companies); Tr. 684 (git log referring to pre rolls);  GX 2045 (Methbot code directing the loading of an ad); GX 2048 (Methbot code recording ad impressions); GX 709 (blank webpages with frame for video player recovered from defendant's servers where ads were loaded); Trial Tr. at 2837 (defendant admitting that his traffic did not visit real websites).

The defendant now asks the Court to ignore this evidence and speculate that "some or all" of the money that advertisers paid into this scheme might have been directed at the "willing[] purchase" of nonhuman traffic. Opp. 4. There is no evidence for this proposition, and common sense indicates that the amount advertisers willingly paid in order to show their ads to computers is zero. The Court should reject the defendant's efforts to undo the jury verdict and relitigate his guilt.

### 2. Payments from AdKarma to the Defendant are Forfeitable

In a second argument aimed at relitigating his guilt, the defendant contends that he did not commit fraud by selling ad traffic to Ad Karma. He protests, Opp. 4, that no employee of Ad Karma warned him that advertisers would be deceived by his carefully crafted ad traffic, designed though it was by the defendant's own admission to "cheat," "defeat," "fuck over," "fuck inside-out," and "screw everyone one more time." The Court should reject this self-serving argument as what it is—an attempt to evade the defendant's forfeiture responsibilities by rehashing arguments that failed to persuade the jury.

The evidence at trial established the defendant's contractual commitment to AdKarma not to commit ad fraud, his commitment to AdKarma employee Josh Hulen that "we have only US traffic," and AdKarma's extensive efforts to ensure that the defendant's traffic was real, which included testing it through multiple filtering services, all of which the defendant had subverted. See DX T (defendant promising in contract with Adkarma "not to place creatives on blank or invisible web pages with no content or in any way deceptive to the visitor"); GX 1694 (defendant's chat with Hulen); GX 1642 (emails among AdKarma employees circling "bot percentage" column and reporting that "all 3 vendors have scored this positively"). The evidence also included testimony from AdKarma employees that they did not knowingly or willingly purchase bot traffic. Trial Tr. 1395, 1496 (Hulen, account executive for the defendant's account at AdKarma: "I didn't know it was bot traffic"); Trial Tr. 1500, 1651-52 (Wilhelm, founder and Senior Vice President of Operations at AdKarma: bot traffic "would have never been okay with me or anyone at our company"). And the defendant did not contradict this testimony, despite his counsel's urging. Trial Tr. 2706-07.

### 3. Payments to Must Trade and Ksandria are Forfeitable

The payments to Must Trade and Ksandria that the government included in its calculations are forfeitable because they represent proceeds of the defendant's fraud. Every dollar that the government seeks to forfeit is corroborated by evidence in the trial record, and the government was punctilious in its prior submission about excluding transactions that the government felt were insufficiently documented. The defendant's broad-brush portrait of the government's forfeiture calculations is unwarranted.

First, with respect to Ksandria, the defendant argues there is "no basis" to conclude that the two payments of $175,350 and $188,730 from Verta Media to Ksandria inured to his benefit. But the defendant specifically instructed Victor Bezer at Verta to send those payments to him via the Ksandria Group, as detailed in the government's forfeiture

3

motion. GX 640T; see Mot. 6 n.5.[2]  The amounts that the government seeks to forfeit match, to the last cent, the sums laid out in the defendant's email, as corroborated by Verta Media's bank statement.[3]

With respect to Must Trade, the defendant argues strenuously that this entity "was not controlled by him," Opp. 2, relying in large part on his own testimony at trial that he did not control Must Trade. See Tr. 2723:9-11, "I have nothing in common with Must Trade."

But the government introduced chats at trial in which the defendant explicitly claimed ownership of Must Trade. Thus, when Josh Hulen asked the defendant to describe "the relationship between must trade and media methane and . . . mintek," the defendant responded: "All three companies under one concern." GX 1608E. While it is now in the defendant's strategic and financial interest to disown Must Trade, the jury, and now the Court, are entitled to credit the defendant's earlier statement taking responsibility for that company.

The defendant attempts to create distance between himself and Must Trade by arguing that this entity "was . . . part of the Capitalist.net service." Opp. 2. But the evidence introduced at trial runs counter to that theory. In the chat introduced as Government Exhibit 1610TE, Victor Bezer advised the defendant that he had sent "267 and 350 [] to Capitalist." GX 1610TE, p. 5. The defendant responded: "What about the wires? What was sent?" Bezer replied with a series of names and figures, including "$343,064.68 MUST TRADE LTD paid." In other words, Bezer distinguished Capitalist (recipient of a combined $617,000 in funds) from Must Trade (recipient of an approximately $343,000 wire transfer). That discussion is inconsistent with the defense contention that Must Trade and Capitalist are one and the same.

---

[2] As detailed in the government's prior submission, the government in an abundance of caution excluded from its calculations a further payment that the defendant had Verta Media make to another entity, even though the email directing that payment was in the record and the payment itself was reflected in Verta Media's bank statement.

[3] The defendant also seeks to exclude from the forfeiture amount a $2,970 payment from Plexious to Ksandria on the basis that *other* payments between those entities occurred in 2016, after the conclusion of the defendant's business relationship with Sergey Denisoff. Opp. 2. But the record at trial established that payments in the digital advertising industry routinely occur months after the underlying impressions, because of the need for settlement of intermediate transactions between the industry's many middlemen. See, e.g., Tr. 1575 (Ann Wilhelm testifying about "net 90" payment arrangements); 1275 (Denisoff testifying that "net 60" payments occur sixty days after the end of the month in which the impression occurred).

For the reasons discussed above, the Court should enter the proposed order of forfeiture in the amount of $4,858,602.89.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/ Alexander Mindlin
Saritha Komatireddy
Artie McConnell
Alexander Mindlin
Assistant U.S. Attorneys
(718) 254-7000

cc:   Counsel of Record (by ECF)